# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| N.A., et al., | : |
| Plaintiffs, | : |
| v. | :   **Civ. Action No. 07-1355(RJL)** |
| DISTRICT OF COLUMBIA, et al., | : |
| Defendants. | : |

## ADMINISTRATIVE RECORD

Attached is an index and the record of the administrative proceedings at issue in this action.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District
  of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Edward P. Taptich*
EDWARD P. TAPTICH (012914)
Chief, Equity Section 2

/s/ *Veronica A. Porter*
VERONICA A. PORTER (412273)
Assistant Attorney General
441 4th St., N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6651
(202) 727-3625 (facsimile)
veronica2.porter@dc.gov

**March 31, 2008**

**N.A. v. District of Columbia, Civ. Action No. 07-1355**

**Index of Record**

| | Page |
|---|---|
| 1.  Certification of Record for | 1 |
| 2.  Due Process Complaint Notice, 1/26/07 | 2-9 |
| 3.  Scheduling Memorandum, 1/26/07 | 10-12 |
| 4.  Hearing Notice, 3/1/07 | 13 |
| 5.  Plaintiff's Letter Motion for Continuance, 3/15/07 | 14-15 |
| 6.  Hearing Notice, 3/21/07 | 16 |
| 7.  HOD, 4/30/07 | 17-25 |
| 8.  Plaintiff's Disclosure Letter, 4/9/07 | 26-27 |
| 9.  NA-1 Due Process Complaint Notice, 1/26/07 | 28-33 |
| 10.  NA-2 Letter from Eig to R. Blake, DCPS, 7/21/06 | 34 |
| 11.  NA-3 IEP, Ivymount School, 8/28/06 | 35-57 |
| 12.  NA-4 Baseline Academic Assessment Summary, 9/06 | 58-59 |
| 13.  NA-5 Occupational Therapy Report, 10/19/06 | 60-62 |
| 14.  NA-6 Fax from B. Beers to Eig, 10/25/06 | 63-68 |
| 15.  NA-7 IEP Progress Report, 11/1/06 | 69 |
| 16.  NA-8 Letter from Eig to G. Everett, CARE Center, 11/6/06 | 70 |
| 17.  NA-9 Letter from Eig to G. Everett, CARE Center, 11/9/06 | 71 |
| 18.  NA-10 Letter from P. Cyr to A. Hunter, CARE Center, 12/13/06 | 72 |
| 19.  NA-11 Letter of Invitation, 12/21/06 | 73 |
| 20.  NA-12 Handwritten Notes of P. Cyr, 1/23/07 | 74-76 |

21. NA-13 Ivymount School Exclusion/Seclusion Documentation
     Form, 1/25/07.                                                          77

22. NA-14 Ivymount School Physical Restraint Documentation
     Form, 1/25/07.                                                          78-79

23. NA-15 Scheduling Memorandum, 1/26/07                                     80-81

24. NA-16 Letter from Eig to S. Cogdell, DCPS, 2/9/07                        82

25. NA-17 Due Process complaint Disposition, 2/12/07                         83-85

26. NA-18 Letter Motion for Continuance, 3/15/07                             86

27. NA-19 Letter from eig to S. Newsome, SHO, 3/15/07                        87

28. NA-20 Ivymount School Report to Parents on Student Progress,
     2006-2007SY                                                            88-90

29. DCPS Disclosure Statement, 4/9/07                                        91-92

30. DCPS-01 MDT Meeting Notes, 1/23/07                                       93

31. DCPS-02 Occupational Therapy Evaluation, 7/29/06                         94-100

32. DCPS-03 Individualized Service Plan, 1/23/07                             101-102

33. DCPS-04 Review of Independent Evaluation, 7/7/06                         103-104

34. DCPS-05 Letter of Invitation, 12/21/06                                   105

35. DCPS-06 MDT Student Evaluation Plan, 5/5/06                              106

36. DCPS-07 MDT Meeting Notes, 10/10/06                                      107-114

37. DCPS-08 IEP, 11/13/06                                                    115-117

38. Parents' Motion for Reconsideration, 5/2/07                              118-128
     Exhibit 1- Memorandum Opinion, 4/25/07                                  128-146

39. Transcript of Hearing, 4/17/07

# CERTIFICATION OF RECORD

## INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
### SPECIAL EDUCATION

In the Matter RE:    A▇▇▇▇, N▇▇▇▇ vs. DCPS

Case Information:    Hearing Dates: 04/18/2007
                     Held at: **District of Columbia Public Schools Headquarters**
                              **825 N. Capitol Street, N.E.**
                              **Washington, D.C. 20002**
                     Student Identification Number: 9087019
                     Student's Date of Birth: ▇▇▇/1995
                     Attending School: **Ivymount School**
                     Managing School:
                     Hearing Request Date(s): 01/26/2007

## <u>CERTIFICATION OF RECORD</u>

   **I, Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

   I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Monday, November 05, 2007.

                              **LEGAL ASSISTANT**
                              **STUDENT HEARING OFFICE**

1

**MICHAEL J. EIG AND ASSOCIATES, P.C.**

ATTORNEYS AT LAW
SUITE 300
1776 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C.  20036
(202) 667-7373

JAN 2 6 2007

FACSIMILE (202) 667-9146

January 26, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, N.E., 8th Floor
Washington, D.C. 20002

Re: N██████ A█████████
*via facsimile and first-class mail*

Dear Ms. Newsome:

Enclosed please find a due process hearing request for the above-named student.  Please contact my office if you have further questions.  Thank you.

Sincerely,

Michael J. Eig

cc:    Mr. and Mrs. Alderman

2007 JAN 31  PM ☰ 06
DC PUBLIC
SCHOOL SYSTEM

2

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



JAN 2 6 2007

# *Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. <u>A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).</u>

- The due process complaint must describe an alleged violation that occurred not more that two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- <u>Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice.</u> Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings**.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.  INFORMATION ABOUT THE STUDENT:

Student Name: N̶e̶t̶h̶a̶n̶i̶e̶l̶ A̶l̶d̶e̶r̶m̶a̶n̶                    Birth Date: ▮▮▮▮ 199▮

Address:  3505 34th Street, NW, Washington, D.C. 20008

Home School: Alice Deal Junior High School

Present School of Attendance: Ivymount

Is this a charter school? ____No____    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:  Harold and Claudia Alderman

Address (if different from the student's above): _____ same as above

Phone/Contact Number: _____ see below _____    Fax Number (if applicable): _____ see below

**B. Individual Making the Complaint/Request for Due Process Hearing:**

Name: Harold and Claudia Alderman

Complete Address: _____ same as above _____

_____

Phone: (h) __see below__ (w) __see below__ (Fax) __see below__ (e-mail) _____

Relationship to the Student:

☒ Parent  ☐ Legal Guardian  ☐ Parent Surrogate

☐ Self/Student  ☐ Local Education Agency (LEA)  ☐ Parent Advocate

**C. Legal Representative/Attorney (if applicable):**

Name: Michael Eig

Address: _____ Michael J. Eig and Associates, P.C. _____

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815 _____

Phone: (w) 301-657-1740 (Fax) 301-657-3843 (e-mail) janene.jackson@lawforchildren.com

Will attorney / legal representative attend the resolution session? ☒ Yes  ☐ No

**D. Complaint Made Against (check all that apply):**

☒ DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E. Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☐ I wish to waive the Resolution Session.

**E. Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐ I am requesting mediation as an alternative to the resolution session meeting.
☐ I am requesting mediation services **only**.
☒ I do not wish to use a mediator at this time.

## G.  Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions.  Provide complete details about all the facts supporting your claims.  (You may attach additional pages if needed):

1.           What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

N███████ A███████ is an eleven-year-old child eligible to receive special education services under the IDEA as a student with Multiple Disabilities.  N██████ has Attention-Deficit/Hyperactivity Disorder ("ADHD"), Asperger's Sydnrome, a Receptive Language Disorder, a Disorder of Written Output, a Mood Regulation Disorder, Oppositional Defiant Disorder, and difficulties with sensory processing and modulating sensory input.

N██████completed second and third grade at Kingsbury Day School.  However, despite their experience with students with a range of disabilities, Kingsbury became increasingly unable to manage N███████ behavior, until it was decided he could not return for the 2004-2005 school year.

Because neither the Aldermans nor DCPS could find an appropriate public or private placement for N██████ for the 2004-2005 and 2005-2006 school years, N██████received home-based schooling, paid for by DCPS, implementing a program designed by his mother that incorporated academics and controlled excursions into the community.

In the Fall of 2006, the Aldermans moved N██████ to the new Asperger's Program at The Ivymount School.  They duly notified DCPS on July 21, 2006 of their request for a change in placement.  DCPS did not convene an IEP meeting until October 10, 2006.  At the end of the meeting, the case manager, Gloria Everett, asked the Aldermans to return for a follow-up meeting, and no placement was discussed.

On November 13, 2006, Mrs. Alderman attended another IEP meeting at the C.A.R.E. Center.  The IEP team, which included representatives from Ivymount, finalized an IEP for N██████.  It was determined that N██████ disabilities required placement 100% outside of the general education setting.  The new case manager, Angel Hinton, informed Mrs. Alderman that N██████ package would be sent to a site review committee to determine a placement, and that Mrs. Alderman should hear back within a week or two with this committee's decision.  Mrs. Alderman was not allowed to speak to the committee doing the placement.

On December 13, 2006, Mrs. Alderman still had not heard back from Ms. Hinton, so counsel sent a letter inquiring about a placement for N██████.  The Aldermans renewed their objection to the placement decision being made without parental participation.  DCPS did not respond.

On January 23, 2007, Mrs. Alderman attended another meeting at the C.A.R.E. Center.  Six months had passed since the Aldermans first requested the change of placement for N██████.  Mrs. Alderman was informed by the returning case manager, Gloria Everett, that the site review committee had decided to place N██████ in the Autism classroom at Ludlow-Taylor Elementary School in Northeast DC.  Mrs. Alderman was allowed to speak to Brenda Kinsler, the psychologist at Ludlow-Taylor, and ask questions.  After considering the information she heard,

5

Mrs. Alderman determined that Ludlow-Taylor was not an appropriate placement for N█████ and asked the team gathered to consider Ivymount. Mrs. Alderman was informed that the team present did not make placement decisions and that neither the IEP team members nor Mrs. Alderman could speak with anyone on the site review committee. Mrs. Alderman was informed that, if she disagreed with the placement, she had to file a hearing request, as the IEP team was not authorized to consider private placements, even in the absence of an appropriate public placement. This Due Process Complaint Notice follows.

First, it is a direct violation of the IDEA to make a placement decision without the participation of the parents. 20 U.S.C. 1414 (e) ("Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."); 34 CFR § 300.327 (same). It is a further violation for the decision to be made without the participation or input of any members of the IEP team. 34 CFR § 300.116 ("In determining the educational placement of a child with a disability . . . each public agency must ensure that - (a) the placement decision - (1) is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options").

Second, Ludlow-Taylor is not an appropriate placement for N█████ for at least the following reasons, all of which were explained to the IEP team:

- *Ludlow-Taylor cannot meet N█████ academic needs.* N█████ is not learning disabled. He is capable of a high level of academics as long as he is in a structured environment which allows him to focus on his social-emotional goals and objectives so that he is able to participate academically. His current classroom has six fifth and sixth graders, one teacher and two aides, and N█████ is performing at or above grade level. The proposed classroom at Ludlow-Taylor would offer N█████ no academic peers and an insufficient learning environment. There are between six and nine children in the Autism class, ranging from the third to the fifth grade. The students range from nonverbal to verbal and range from below to on grade level. The teacher focuses on the IEP goals and objectives, and integrates DCPS standards where possible. None of the children in the current class have Asperger's Syndrome.

- *Ludlow-Taylor cannot meet N█████ social-emotional needs.* N█████ consistently has shown an inability to function in large settings or with general education peers; Mrs. Alderman informed the team that he is not even able to eat in a restaurant because of the crowd and noise. He is brought out in public whenever possible, but only in a controlled environment with a high level of support. The students in the Ludlow-Taylor Autism class attend school-wide assemblies, eat lunch and attend recess with the general education population.

- *Ludlow-Taylor cannot handle N█████ behavioral needs.* N█████ is a flight risk and tends to flee from the classroom when given the opportunity. He's also prone to acting out and needing to be restrained for his own and others' safety. Mrs. Alderman explained that at Ivymount, where they are trained for such a situation, N█████ required six adults to restrain him and bring him back to class both physically and emotionally. Ludlow-Taylor does not have the resources to manage N█████ behavior; the psychologist said they did not have a student like that but she was sure the classroom aide and principal could handle it, and that they could call the social workers for extra assistance.

- *DCPS should not, after months of delay, move N███████ mid-semester to a program that will only accommodate him for four months.* The Ludlow-Taylor program ends in the sixth grade, and N███████ currently is a sixth grader. Therefore, after what would absolutely be a long, difficult transition period with no likelihood of success, N███████ would age out of the program in June and be required to transition to a new program in the fall. This clearly is not appropriate for a child with Asperger's who is highly resistant to change. Mrs. Alderman informed the team that even the transition to the Asperger's program at Ivymount, where N███████ is succeeding, was long and difficult.

The consistent delays, failure to include the parents in the placement decision and failure to find an appropriate placement for N█████ A███████ constitute a denial of FAPE. Furthermore, the only appropriate placement for N███████ is the Asperger's program at Ivymount.

2.        To the extent known to you at this time, how can this problem be resolved?

Based on the consistent denial of a FAPE to N█████ A███████ the parents request that he be placed in the Asperger Program at Thy Ivymount School, with funding retroactive to September 2006, when DCPS first denied N███████ a FAPE.

3.        Issues presented:

1 - Did DCPS deny N█████ A███████ a FAPE by consistently delaying the IEP process, refusing to allow the parents to participate in the placement decision and failing to offer him an appropriate placement?

2 - Is the Austism classroom at Ludlow-Taylor Elementary School an appropriate placement for N█████ A███████?

3 - Is the Asperger Program at The Ivymount School a proper placement for N███████ A███████?

**H.    Estimated amount of time needed for the hearing:** ___1 day___

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

**I.    Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

**J.    Waiver of Procedural Safeguards:**

☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.    Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____
Signature of Parent or Guardian                         Date

**L.    Signature of Attorney/Legal Representative:**

_____          1·26·07
Legal Representative / Advocate                          Date

**M.    Signature of LEA Representative (if hearing requested by LEA):**

_____
Representative of LEA                                     Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig        MD, DC
Haylie M. Iseman      MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr           CA, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome<br>Student Hearing Coordinator<br>**DCPS-Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig |
| **Date:** | January 26, 2007 |
| **Time:** | 11:56 am |
| **Total Pages:**<br>(including cover) | 8 |
| **Re:** | N██████ A██████ |

2007 JAN 26 PM 1:05
DC PUBLIC
SCHOOL SYSTEM

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| A███████, N. | | |
| Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| **DCPS** | ) | |
| **Attending Ivymount School** | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

# SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.  The complaint notice was filed on **January 26, 2007**

3.  The deadline for the resolution meeting is **February 10, 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ***Prior Written Notice Not Issued by the Local Educational Agency***. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;

Rev'd. 7/6/05

A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

4.    A description of the factors that is relevant to the agency's proposal or refusal.

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **February 5, 2007.**

C.    *Deficiency Notice*.    A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, within 15 days of receiving the notice of the complaint, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **February 10, 2007.**

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.    A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.    The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.    The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Michael Eig, Esq.**
**Parent: Harold and Claudia Alderman**

Telephone Number: **(301) 657-1740**
Fax Number: **(301) 657-3843**

Pages: **3**
Date: **January 26, 2007**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **N████████ A█████████**
School:  **Attending Ivymount**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**
**Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

12

```
                    TRANSMISSION VERIFICATION REPORT

                                          TIME  : 03/01/2007 17:57
                                          NAME  :
                                          FAX   :
                                          TEL   :
                                          SER.# : BROE6J471573


        DATE,TIME                  03/01  17:56
        FAX NO./NAME               93016573843-
        DURATION                   00:00:18
        PAGE(S)                    01
        RESULT                     OK
        MODE                       STANDARD
                                   ECM
```

OFFICE OF THE
GENERAL COUNSEL

2007 MAR -2  PM 1:42

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): _M. EIG_          Fax No.: _(301) 657-3843_

       LEA Legal Counsel: _OGC_

RE:    _A███████, N███████_  and (LEA)  DOB: _4/20/95_
              Student's Name

FROM:   **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT: _3/1/07_

................................................................

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_1/26/07_ . Please be advised that the hearing has been scheduled for:

DATE: _3/29/07_

TIME: _9:00, 11:00, 1:00, 3:00_

13

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843

MAR 1 5 2007

| Michael J. Eig | MD, DC | | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | | Patricia Cyr | CA, DC |

March 15, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: N████ A████████
*via facsimile and first-class mail*

Dear Ms. Newsome:

Enclosed please find the Letter Motion for Continuance for the above-referenced student. My office contacted the Office of the General Counsel earlier today and spoke with Ann Barns who informed us that opposing counsel had not yet been assigned to the case. If you have any questions, please feel free to contact my office. Thank you.

Sincerely,

Michael Eig

cc:    Mr. and Mrs. Alderman
       The Office of the General Counsel

2007 MAR 20 PM 4: 07
DC PUBLIC
SCHOOL SYSTEM

14

## LETTER MOTION FOR CONTINUANCE



District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

Dear Student Hearing Officer:

This letter is to request a continuance of my Due Process Hearing currently scheduled to take place

on _March 29, 2007_____ for N~~_____~~ A~~_____~~ DOB~~____~~95_____ . I am unable

to appear for the hearing on this date for the following reasons:
_I have a long standing, previously scheduled Due Process Hearing in Montgomery Country, Maryland_____

_____

I am available to appear for the hearing on the following dates:

1. _4-17-07_____  2. _____  3. _____

I attempted to contact opposing counsel to discuss scheduling before proposing these dates: I spoke to

_Ann Barns (The Office of the General Counsel)_ at _9:36_ A.M.on _3-15-07_____ (date).

Opposing Counsel ☐ agreed to the continuance ☐ did not agree to the continuance.

**I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR ANOTHER DATE.**

**I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS COMPLAINT.**

**FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.**

**BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE (FAX CONFIRMATION, COURIER RECEIPT, ETC.)**

Parent/Advocate or Attorney Advisor: _Michael J Eig/pla_    Date: _3/15/07_

Telephone: _(301) 657-1740_    Fax: _(301) 657-3843_

```
                    TRANSMISSION VERIFICATION REPORT

                                        TIME  : 03/21/2007 13:20
                                        NAME  :
                                        FAX   :
                                        TEL   :
                                        SER.# : BROE6J471573


        DATE,TIME               03/21  13:20
        FAX NO./NAME            913016573843
        DURATION               00:00:18
        PAGE(S)                01
        RESULT                 OK
        MODE                   STANDARD
                               ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



X *REVISED COPY*

### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:  Parent (or Representative): _M. EIG_  Fax No.: _(301) 657-3843_

LEA Legal Counsel: _OGC_

RE:  A_____ N_____  and (LEA) DOB: _____
     Student's Name

FROM:  **SHARON NEWSOME**
       Special Education Student Hearing Office Coordinator

DATE SENT: ___3/21/07___

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

DATE: ___4/17/07___

TIME: _9:00, 11:00, 1:00 & 3:00_

Con't f
3/29/07

16

# District of Columbia Public Schools

## *State Enforcement and Investigation Division*
### *confidential*

H. St. Clair, Esq., Due Process Hearing Officer
825 North Capitol Street, NE  8th Floor
Washington, D.C. 20002
Facsimile: (202) 442-5556

| | | |
|---|---|---|
| **In the Matter of** | ) | **IMPARTIAL** |
| | ) | **DUE PROCESS HEARING** |
| N██████, A████████, student | ) | |
| Date of Birth: ███████ 1995 | ) | |
| | ) | |
| | ) | **DECISION & ORDER** |
| Petitioner, | ) | |
| | ) | |
| versus | ) | Request Date:  January 26, 2007 |
| | ) | Hearing Date:  April 17, 2007 |
| **The District of Columbia Public Schools,** | ) | |
| Attending:  Ivymount School, | ) | Held at: 825 North Capitol Street, NE |
| | ) | Eighth Floor, Hearing Room 1 |
| Respondent. | ) | Washington, D.C. 20002 |
| | ) | |

| | |
|---|---|
| **Parents:** | Harold & Claudia Alderman |
| | 3505 **34th** Street, NW |
| | Washington, D.C. 20008 |
| | |
| **Counsel for the Parents/Student:** | Michael J. Eig, Esq. |
| | **Michael J. Eig, Associates, P.C.** |
| | 5454 Wisconsin Avenue |
| | Chevy Chase, Maryland 20815 |
| | |
| **District of Columbia Public Schools:** | Rashida J. Wilson, Esq., Attorney-Advisor |
| | **Office of the General Counsel, DCPS** |
| | 825 North Capitol Street, NE - 9th Floor |
| | Washington, D.C. 20002 |

An <u>INDEX of NAMES</u> is attached hereto for the benefit of the parties.  The index will permit the parties to identify specific witnesses and other relevant witnesses.  The index will be detached before release of this <u>DECISION & ORDER</u> as a public record.

i

**<u>INDEX of NAMES</u> for** N█████ A██████

**Hearing Date:**  April 17, 2007

Appearing on behalf of the parents/student:

1. Claudia Alderman, mother  *
2. Katie C. Alexander, Program Director, Ivymount School Model Asperger Prog., *

Appearing on behalf of DCPS:

1. Gloria T. Everett, Case Manager, Shaw C.A.R.E. Center  **
2. Brenda Kinsler, School Psychologist, Ludlow-Taylor Ele. School  **

\*  Gave testimony.
\*\*  Gave testimony via telephone.

ii

## STATEMENT of the CASE

On January 17, 2007, Counsel for the Parents filed the herein Complaint on behalf of the parents and student complaining the District of Columbia Public Schools (DCPS) denied a Free Appropriate Public Education (FAPE) to the student. Essentially, Counsel for the Parents complained of failure on the part of DCPS to provide an appropriate educational placement.

The Student Hearing Office, DCPS, scheduled a hearing in this matter for 9:00 A.M., Tuesday, April 17, 2007 at DCPS Headquarters, 825 North Capitol Street, NE - 8th Floor, Hearing Room 1, Washington, D.C. 20002. The hearing convened as scheduled.

## JURISDICTION

The hearing convened under Public Law 108-446, The Individuals with Disabilities Education Improvement Act of 2004, Title 34 of the Code of Federal Regulations, Part 300, and Title V of the District of Columbia Municipal Regulations.

**ISSUE(S):**

1. **Was the opportunity of the Parents to participated in the decision-making process concerning the provision of FAPE to the student significantly impeded?**

2. **Was the Autism Program at Ludlow-Taylor Elementary School appropriate for the student?**

3. **Are the Parents entitled to reimbursement for the cost of education at Ivymount School Asperger Model Program from August 28, 2006 to the date hereof?**

4. **Was a prospective placement at the Ivymount School Model Asperger Program appropriate?**

## SUMMARY of the EVIDENCE and FINDINGS of FACT

By facsimile dated April 9, 2007, the parent disclosed 2 witnesses and 20 documents.
By facsimile dated April 9, 2007, DCPS disclosed 10 witnesses and 8 documents.
The Attorney-Advisor objected pointing out that the Parents' disclosure arrived at the Office of the General Counsel, DCPS, after the close of business on April 9, 2007, a holiday for the District of Columbia. The hearing officer determined that no prejudice resulted to DCPS from the one-day late disclosure and OVERRULED the DCPS objection.
The documents were placed into the record and are referenced/footnoted herein where relevant.
Counsel for the Parent stated that after the Multiply Disabled student was expelled from

Kingsbury Day School, DCPS placed the student in home school with his Parents for the 2004-05 and 2005-06 School Years; that by letter dated July 21, 2006, he requested an MDT meeting with DCPS to arrange placement for the student at the Ivymount School in an autism program that the Parent was instrumental in organizing. The student started at the Ivymount School Model Asperger Program on August 28, 2006. Counsel for the Parent went on to represent that DCPS convened MDT meetings for the student on October 10 and November 13, 2006; that not hearing anything from DCPS in response the MDT meetings, the Parent sent a letter to DCPS on December 13, 2006 inquiring of the status of the placement process. On January 23, 2007, the MDT placed the student at the autism program at Ludlow-Taylor Elementary School as the DCPS site review committee had recommended. The Parent rejected the placement at Ludlow-Taylor ES as inappropriate for the student.

The parent was ordered forward.

The Parent testified that the student was diagnosed on the autism spectrum in the first grade and was later diagnosed with Asperger Syndrome and ADHD; that after an unsuccessful year at the Kingsbury Day School, DCPS placed and funded the student with his Parents under home instruction for the 2004-05 and 2005-06 School Years. The Parent described the student as being at or above grade level academically, including math and reading[1]. The Parent testified that she observed the student outgrow the home instruction setting and develop a need for interaction with other children; that after visiting programs for children with Asperger Syndrome in New York, New York and being unable to find an appropriate educational setting for such children in the Washington, D.C. metropolitan area, she and another parent of a student with Asperger Syndrome approached Ivymount School during the 2005-06 School Year with the intention of organized a program for students with Asperger Syndrome. The Parent testified that after consultation with school staff and outside psychiatrist, psychologists and teachers, the Board of Directors of the Ivymount School authorized the Ivymount School Model Asperger Program to enroll students at the beginning of the 2006-07 School Year. The Parent testified that while the student did well academically, he was easily distracted to the point requiring physical restraint and needed one-to-one instruction. The Parent testified that after the July letter to DCPS requesting a new placement for the student at the Ivymount School and the October 13 and November 16, 2006 MDT meetings, DCPS had not proposed an educational placement for the student; that an IEP with a proposed placement at the autism program, Ludlow-Taylor ES was completed on January 23, 2007[2]. The Parent testified that she visited the program at Ludlow-Taylor ES and considered it inappropriate for the student because the program had a 6th grade age-out limitation and contained 3 mentally retarded students and 2 non-verbal very low functioning autistic students; that the spelling lesson she observed concerned words on the order of "I, he and she." The student spelled on a high school level and wrote themes. The Parent testified that her information was that the program went to the 6th grade and that the student would have been eligible to attend Ludlow-Taylor for 4 and half months only, February thru June 2007. The Parent testified that the student had made progress at the Ivymount School Model Asperger Program, both academically and emotionally.

2 of 6 pages

---

[1] Parents Documents No 3, pages 5 & 7 and Document No 20. See also DCPS Document No 7, page 5
[2] DCPS Document No 8. The disclosed January 23, 2007 IEP appeared incomplete.

The Program Director, Model Asperger Program, Ivymount School, testified to her education and experience; that she became the Director in 2005 with the first students enrolling in the program in September 2006. The Director testified that the program was self-contained with an emphasis on daily living, social, communication and academic skills; that the student was in the 6th grade class with 7 other similarly disabled high performing students with Asperger Syndrome, one certified special education teacher and two college degreed teacher assistants. The Director described the student as being academically at or above the 6th grade but easily distracted on occasion requiring physical restraint. The Director described the program – planned to continue beyond the 6th grade to the 7th and then on into high school - curriculum, teaching staff, related services provider staff and students in the Model Asperger Program and testified that the student had received and would continue to receive educational benefit at the Ivymount School Model Asperger Program.

The Parents rested.

DCPS was ordered forward.

The Case Manager, the Shaw C.A.R.E. Center, testified via telephone that she convened and coordinated the MDT meetings for the student; that the student was assigned to her in May 2006[3] when it was determined that the student needed new psycho-educational and speech/language evaluations. The Manager testified that she convened an MDT meeting but could not remember dates; that during the second MDT meeting implementation of the IEP was discussed. The Manager testified that she was unfamiliar with the programs in DCPS that could meet the student's needs and sent the file to the site review committee that recommended the neighborhood school and the autism program at Ludlow-Taylor ES. The Manager testified that the DCPS representative familiar with the autism program at Ludlow-Taylor ES participated in the MDT meeting via telephone when Ludlow-Taylor was discussed as a placement for the student and that the Parent attended the MDT meeting and asked questions; that the Parent agreed to the IEP. On cross-examination, the Manager testified that she could not recall the July 21, 2006 letter to DCPS requesting placement for the student at the Ivymount School Model Asperger Program and that she learned the student was attending the program at the Ivymount School during the first MDT meeting.

The DCPS School Psychologist assigned the Ludlow-Taylor ES testified via telephone that she was familiar the student by records only and that she participated via telephone in an MDT meeting when the appropriateness of the autism program at Ludlow-Taylor ES for the student was discussed. The Psychologist testified that during the MDT meeting when she was asked how many of the students in the autism program had Asperger Syndrome, she could not answer because she did not work with all of the students in the autism program; that there was one student with Asperger Syndrome in the general education setting at Ludlow-Taylor ES. The Psychologist testified that the autism program was designed for 8 students but had 6 with different performance levels, one teacher and two teacher assistants. On cross-examination, the Psychologist testified that a DCPS School Psychologist other than herself reviewed the neuropsychological evaluation scheduled for review in the May 5, 2006 MDT/SEP meeting notes;[4] that while she was not completely knowledgeable about all of the students in the autism

3 of 6 pages

---

[3] DCPS Document No 6
[4] *ibid*

program, all were significantly below grade level in academic performance.

      DCPS rested.

      Argument.

      In consideration of the testimony, documents and arguments herein, the hearing officer found the following facts:

1. On May 5, 2006, DCPS convened an MDT/SEP meeting for the student.

2. By letter dated July 21, 2006, Counsel for the Parents requested DCPS to place the student at the Ivymount School Model Asperger Program for the 2006-07 School Year.

3. MDT meetings for the student convened at the Shaw C.A.R.E. Center on October 10 and November 13, 2006 but did not complete and IEP or issue a Notice of Placement for the student.

4. On January 23, 2007, DCPS completed an IEP for the student that indicated a 100% Out of General Education; the IEP contained occupational therapy goals only.

5. Also at the January 23, 2007 MDT meeting, DCPS announced that the site review committee had recommended the autism program at Ludlow-Taylor ES as the educational placement for the student. The autism program was made up of mentally retarded and autistic children who functioned very much below grade level. The student was at or above grade level in all academic areas.

6. The autism program at Ludlow-Taylor ES was not 100% Out of General Education in that students had contact with the non-disabled population during part of the school day.

7. The decision to place the student at the autism program at Ludlow-Taylor ES was made at the site review committee without any participation on the part of the Parent(s).

8. The Parent(s) did not inform DCPS of their expectation for reimbursement for the cost of education prior to removal from home instruction or enrollment at the new placement at as required 34 CFR 300.148

4 of 6 pages

# DISCUSSION and CONCLUSIONS of LAW

## I

### DCPS did not afford the Parent(s) an opportunity to participate in the decision as to where the student would be placed.

From the testimony, it was clear that the decision to place the student was made at the site review committee without any participation by the Parent(s). The Case Manager testified that she was unfamiliar with DCPS programs for autistic student. **The decision making-process for the student was a Denial of FAPE.**

## II

### The autism program at Ludlow-Taylor ES was not appropriate for the student.

The 5-6 students in the class at the autism program at Ludlow-Taylor ES were very low functioning academically, three mentally retarded and the remainder either non-verbal or verbal very little. The student was diagnosed with Asperger Syndrome, a condition on the autism spectrum, but was on or at grade level academically. Placing the student in the program at Ludlow-Taylor would have portended academic stagnation or regression for the student. Neither the special education coordinator nor autism classroom teacher at Ludlow-Taylor ES testified.

The students in the autism program at Ludlow-Taylor ES had contact with the non-disabled student population. The January 23, 2007 IEP indicated 100% Out of General Education as the Least Restrictive Environment (LRE) for the student and, as such, intended that the student not have any contact with non-disabled students. **The autism program at Ludlow-Taylor ES was not appropriate for the student and constituted a Denial of FAPE.**

Lastly under this discussion, a transfer of the student this late in the school year would be ill advised. DCPS knew of the request of the Parent(s) for a change in placement in July 2006 and took until January 23, 2007 to propose an educational placement for the student.

## II

### DCPS is not responsible for reimbursement.

The record did not show where the Parent(s) informed DCPS they expected the latter to reimburse the cost of education because the student was in an inappropriate educational placement or otherwise was denied a FAPE. **The request for reimbursement is DENIED.**

5 of 6 pages

**IV**

**The Ivymount School Model Asperger Program could provide
educational benefit to the student.**

The evidence established that the student could receive educational benefit at the
Ivymount School Model Asperger Program.  A prospective placement was indicated.

In consideration of the foregoing, the hearing officer made the following

**ORDER**

With transportation, DCPS will place and fund the
student at the Ivymount School Model Asperger for
the remainder of the 2006-07 School Year.

**This is THE FINAL ADMINISTRATIVE DECISION. Appeal can be made to a court of
competent jurisdiction within ninety (90) days of the issue date of this decision.**

_____  Date: _4-30-2007_____
H. St. Clair, Esq., Hearing Officer

Issued: _____
        Student Hearing Office, DCPS

6 of 6 pages

24

**ATTENDANCE SHEET**

**STUDENT'S NAME:** ▆▆▆▆ A▆▆▆▆

**SCHOOL OF ATTENDANCE:** Ivymount School

**D.O.B:** ▆▆-95

**HEARING DATE:** 4-17-07    **ROOM:** 1    **TIME:** 9 (A.M.)/P.M.

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | TITLE: |
|---|---|---|
| Michael J. Eig | Student | Counsel for Student |
| Katie S. Alexander | Student | Program Director |
| Claudia Alderman | student | Parent of N▆▆▆ |
| Rashida Wilson | DCPS | Atty-Advisor |
| Gloria T. Everett | | |
| Brenda Kinsler | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
**Impartial Hearing Officer**

Revised 10/17/2006

25

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC
Haylie M. Iseman     MD, DC, NY

Of Counsel:
Matthew B. Bogin     MD, DC

Paula A. Rosenstock   VA, DC
Patricia Cyr                 CA, DC

April 9, 2007

District of Columbia Public Schools
Office of the General Counsel
825 North Capitol Street, NE, 9th Floor
Washington D.C. 20002

Re: N███████ A██████,
*via overnight Fed-Ex*

To Whom It May Concern:

For the upcoming due process hearing schedule for April 17, 2007, regarding the above-referenced student we will be relying on the following documents:

NA- 1.   Due Process Complaint Notice, 1-26-07;
NA- 2.   Letter to Ms. Ruth Blake from Michael J. Eig, Esq., 7-21-06;
NA- 3.   The Ivymount School IEP, 8-28-06 (?);
NA- 4.   Ivymount Asperger Program Baseline Academic Assessment Summary, 9-06;
NA- 5.   The Ivymount School Occupational Therapy Report, 10-19-06;
NA- 6.   Facsimile from Ms. Bonnie Beers to Michael J. Eig, Esq., 10-25-06;
NA- 7.   Ivymount Asperger Program IEP Progress Report, 11-1-06;
NA- 8.   Letter to Ms. Gloria Everett from Michael J. Eig, Esq., 11-6-06;
NA- 9.   Letter to Ms. Gloria Everett from Michael J. Eig, Esq., 11-9-06;
NA- 10.  Letter to Ms. Angel Hunter from Patricia Cyr, Esq., 12-13-07;
NA- 11.  DCPS Letter of Invitation, 12-21-06;
NA- 12.  Notes of Patricia Cyr, Esq., 1-23-07;
NA- 13.  The Ivymount School Asperger Program Exclusion/Seclusion Documentation Form, 1-25-07;
NA- 14.  The Ivymount School Asperger Program Physical Restraint Documentation Form, 1-25-07;
NA- 15.  DCPS Scheduling Memorandum, 1-29-07;
NA- 16.  Letter to Ms. Shalonda Cogdell from Michael J. Eig, Esq., 2-9-07;
NA- 17.  Due Process Complaint Disposition, 2-12-07;
NA- 18.  Letter Motion for Continuance, 3-15-07;

**MICHAEL J. EIG AND ASSOCIATES, P.C.**

The Office of the General Counsel
April 9, 2007
Page Two

     NA- 19.  Letter to Ms. Sharon Newsome from Michael J. Eig, Esq., 3-15-07;

     NA- 20.  The Ivymount School Asperger Program Report to Parents on Student Progress;
             First through Third Semesters for the 2006-2007 school year.

     We will be relying on the following witnesses or their designees either in person or via teleconference:

     1.      Harold and Claudia Alderman, Parents;

     2.      Katie Alexander, Director, The Ivymount School Aspergers Program.

               Sincerely,

               Michael J. Eig

*Enclosure*

cc:     Mr. and Mrs. Alderman
         The Student Hearing Office

State Education Agency for the District of Columbia
State Enforcement and Investigation Division
Special Education Programs



JAN 2 6 2007

# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more that two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name: N████ A██████      Birth Date: █████1995

Address: 3505 34th Street, NW, Washington, D.C. 20008

Home School: Alice Deal Junior High School

Present School of Attendance: Ivymount

Is this a charter school?   No    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: Harold and Claudia Alderman

Address (if different from the student's above):   same as above

Phone/Contact Number:   see below    Fax Number (if applicable):   see below

**EXHIBIT**

04-128

**B.** **Individual Making the Complaint/Request for Due Process Hearing:**

Name: Harold and Claudia Alderman

Complete Address: _____ same as above _____

_____

Phone: (h) _see below_ (w) _see below_ (Fax) _see below_ (e-mail) _____

Relationship to the Student:

☒ Parent ☐ Legal Guardian ☐ Parent Surrogate

☐ Self/Student ☐ Local Education Agency (LEA) ☐ Parent Advocate

**C.** **Legal Representative/Attorney (if applicable):**

Name: _Michael Eig_____

Address: _____ Michael J. Eig and Associates, P.C._____

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815

Phone: (w)_301-657-1740____ (Fax)_301-657-3843____ (e-mail) janene.jackson@lawforchildren.com

Will attorney / legal representative attend the resolution session? ☒ Yes ☐ No

**D.** **Complaint Made Against (check all that apply):**

☒ DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.** **Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☐ I wish to waive the Resolution Session.

**E.** **Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐ I am requesting mediation as an alternative to the resolution session meeting.
☐ I am requesting mediation services **only**.
☒ I do not wish to use a mediator at this time.

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.        What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

N███████ A████████ is an eleven-year-old child eligible to receive special education services under the IDEA as a student with Multiple Disabilities. N██████ has Attention-Deficit/Hyperactivity Disorder ("ADHD"), Asperger's Sydnrome, a Receptive Language Disorder, a Disorder of Written Output, a Mood Regulation Disorder, Oppositional Defiant Disorder, and difficulties with sensory processing and modulating sensory input.

N██████ completed second and third grade at Kingsbury Day School. However, despite their experience with students with a range of disabilities, Kingsbury became increasingly unable to manage N██████ behavior, until it was decided he could not return for the 2004-2005 school year.

Because neither the Aldermans nor DCPS could find an appropriate public or private placement for N██████ for the 2004-2005 and 2005-2006 school years, N██████ received home-based schooling, paid for by DCPS, implementing a program designed by his mother that incorporated academics and controlled excursions into the community.

In the Fall of 2006, the Aldermans moved N██████ to the new Asperger's Program at The Ivymount School. They duly notified DCPS on July 21, 2006 of their request for a change in placement. DCPS did not convene an IEP meeting until October 10, 2006. At the end of the meeting, the case manager, Gloria Everett, asked the Aldermans to return for a follow-up meeting, and no placement was discussed.

On November 13, 2006, Mrs. Alderman attended another IEP meeting at the C.A.R.E. Center. The IEP team, which included representatives from Ivymount, finalized an IEP for N██████. It was determined that N██████ disabilities required placement 100% outside of the general education setting. The new case manager, Angel Hinton, informed Mrs. Alderman that N██████ package would be sent to a site review committee to determine a placement, and that Mrs. Alderman should hear back within a week or two with this committee's decision. Mrs. Alderman was not allowed to speak to the committee doing the placement.

On December 13, 2006, Mrs. Alderman still had not heard back from Ms. Hinton, so counsel sent a letter inquiring about a placement for N██████. The Aldermans renewed their objection to the placement decision being made without parental participation. DCPS did not respond.

On January 23, 2007, Mrs. Alderman attended another meeting at the C.A.R.E. Center. Six months had passed since the Aldermans first requested the change of placement for N██████. Mrs. Alderman was informed by the returning case manager, Gloria Everett, that the site review committee had decided to place N██████ in the Autism classroom at Ludlow-Taylor Elementary School in Northeast DC. Mrs. Alderman was allowed to speak to Brenda Kinsler, the psychologist at Ludlow-Taylor, and ask questions. After considering the information she heard,

Mrs. Alderman determined that Ludlow-Taylor was not an appropriate placement for N████████ and asked the team gathered to consider Ivymount. Mrs. Alderman was informed that the team present did not make placement decisions and that neither the IEP team members nor Mrs. Alderman could speak with anyone on the site review committee. Mrs. Alderman was informed that, if she disagreed with the placement, she had to file a hearing request, as the IEP team was not authorized to consider private placements, even in the absence of an appropriate public placement. This Due Process Complaint Notice follows.

First, it is a direct violation of the IDEA to make a placement decision without the participation of the parents. 20 U.S.C. 1414 (e) ("Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."); 34 CFR § 300.327 (same). It is a further violation for the decision to be made without the participation or input of any members of the IEP team. 34 CFR § 300.116 ("In determining the educational placement of a child with a disability . . . each public agency must ensure that - (a) the placement decision - (1) is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options").

Second, Ludlow-Taylor is not an appropriate placement for N██████ for at least the following reasons, all of which were explained to the IEP team:

- *Ludlow-Taylor cannot meet N████████ academic needs.* N██████is not learning disabled. He is capable of a high level of academics as long as he is in a structured environment which allows him to focus on his social-emotional goals and objectives so that he is able to participate academically. His current classroom has six fifth and sixth graders, one teacher and two aides, and N████████ is performing at or above grade level. The proposed classroom at Ludlow-Taylor would offer N██████ no academic peers and an insufficient learning environment. There are between six and nine children in the Autism class, ranging from the third to the fifth grade. The students range from nonverbal to verbal and range from below to on grade level. The teacher focuses on the IEP goals and objectives, and integrates DCPS standards where possible. None of the children in the current class have Asperger's Syndrome.

- *Ludlow-Taylor cannot meet N████████ social-emotional needs.* N██████ consistently has shown an inability to function in large settings or with general education peers; Mrs. Alderman informed the team that he is not even able to eat in a restaurant because of the crowd and noise. He is brought out in public whenever possible, but only in a controlled environment with a high level of support. The students in the Ludlow-Taylor Autism class attend school-wide assemblies, eat lunch and attend recess with the general education population.

- *Ludlow-Taylor cannot handle N████████ behavioral needs.* N██████is a flight risk and tends to flee from the classroom when given the opportunity. He's also prone to acting out and needing to be restrained for his own and others' safety. Mrs. Alderman explained that at Ivymount, where they are trained for such a situation, N████████ required six adults to restrain him and bring him back to class both physically and emotionally. Ludlow-Taylor does not have the resources to manage N████████ behavior; the psychologist said they did not have a student like that but she was sure the classroom aide and principal could handle it, and that they could call the social workers for extra assistance.

- *DCPS should not, after months of delay, move N‗‗‗‗‗ mid-semester to a program that will only accommodate him for four months.* The Ludlow-Taylor program ends in the sixth grade, and N‗‗‗‗currently is a sixth grader. Therefore, after what would absolutely be a long, difficult transition period with no likelihood of success, N‗‗‗‗‗ would age out of the program in June and be required to transition to a new program in the fall. This clearly is not appropriate for a child with Asperger's who is highly resistant to change. Mrs. Alderman informed the team that even the transition to the Asperger's program at Ivymount, where N‗‗‗‗ is succeeding, was long and difficult.

The consistent delays, failure to include the parents in the placement decision and failure to find an appropriate placement for N‗‗‗‗‗ A‗‗‗‗‗ constitute a denial of FAPE. Furthermore, the only appropriate placement for N‗‗‗‗is the Asperger's program at Ivymount.

2.       To the extent known to you at this time, how can this problem be resolved?

Based on the consistent denial of a FAPE to N‗‗‗‗‗ A‗‗‗‗, the parents request that he be placed in the Asperger Program at Thy Ivymount School, with funding retroactive to September 2006, when DCPS first denied N‗‗‗‗‗a FAPE.

3.       Issues presented:

1 - Did DCPS deny N‗‗‗‗‗ A‗‗‗‗‗a FAPE by consistently delaying the IEP process, refusing to allow the parents to participate in the placement decision and failing to offer him an appropriate placement?

2 - Is the Austism classroom at Ludlow-Taylor Elementary School an appropriate placement for N‗‗‗‗‗ A‗‗‗‗?

3 - Is the Asperger Program at The Ivymount School a proper placement for N‗‗‗‗ A‗‗‗‗‗?

**H.**   **Estimated amount of time needed for the hearing:**    1 day

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

**I.**   **Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

32

**J.**   <u>**Waiver of Procedural Safeguards**</u>:

☐   I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.**   <u>**Parent Signature and Affirmation**</u>:

I affirm that the information provided on this form is true and correct.

_____

Signature of Parent or Guardian                             Date

**L.**   <u>**Signature of Attorney/Legal Representative**</u>:

_____   1·26·07

Legal Representative / Advocate                             Date

**M.**   <u>**Signature of LEA Representative (if hearing requested by LEA)**</u>:

_____

Representative of LEA                                       Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843



July 21, 2006

Ruth Blake
Director, Nonpublic Day Placement Unit
District of Columbia Public Schools
Special Education Department
825 North Capitol Street, NE, 6th Floor
Washington, D.C. 20002

Re: N██████ A██████
*BY FACSIMILE AND 1st CLASS MAIL*

Dear Ms. Blake:

As you may recall, our office represents the above-named student and his parent, Harold and Claudia Alderman. Pursuant to *Patsel v. District of Columbia*, this letter constitutes notice to DCPS of my clients' plan to change N██████ educational placement from his home-schooling program to The Ivymount School's Aspergers program.

I would ask that the school system now support N██████ placement at Ivymount, commencing with his enrollment there at the start of the 2006-07 school year. We would be pleased to provide any information necessary to facilitate your understanding of this program, and placement. If you have any questions, please do not hesitate to call.

I appreciate your time and assistance in this matter.

Sincerely,

Michael J. Eig

cc:    Harold and Claudia Alderman

EXHIBIT
NA-2

# The Ivymount School
#### An Exceptional School for Exceptional Children

## Individualized Education Program

| Student Name: N██████ A██████ | Student Data / Cover Sheet | Student ID: 42095 |
|---|---|---|

### Student Data / Cover Sheet

**Student Name:** N██████ C█████ A█████         **Date of Birth:** ████1995

**Current Age:** 11:7                                                      **Grade:** 6

**Address:** 3505 34th Street, NW                              **Disability:**

**City, St Zip:** Washington, DC 20008

**Funding Source:** Parent

**Date of Entry:** 8/28/2006

**Parent/Guardian:** Dr. Harold Alderman              Mrs. Claudia Alderman

**Relationship:** Father                                                Mother

**Home Phone:** 202-362-6979

**Work Phone:** 202-473-0372

**IEP Meeting:**

**Period of Plan:** to                                          **Reevaluation Due Date:**

### Recommended Related Services                 ### Frequency

Language/Speech Therapy                    60 minutes per week
Occupational Therapy                           60 minutes per week
Counseling                                             60 minutes per week

**% of Time in Regular Education Instructional Program:** 0%

**Hours/Week in Adapted Physical Education:**

**School Health Services:**          **Health Plan:**          **Medication:** School: No    Home

**Other**

Was a Functional Behavior Assessment (FBA) conducted?          ~~No~~ In Process

Nathaniel requires transportation because of severity of disability.

**ATTENDANCE**

| QUARTERS | First | Second | Third |
|---|---|---|---|
| | | | |

**EXHIBIT**
NA-3  35

| | | | |
|---|---|---|---|
| Days Present | 42 | 4 | 0 |
| Days Absent | 0 | 0 | 0 |
| Late Arrival | 1 | 0 | 0 |
| Early Departure | 0 | 0 | 0 |

(Late Arrival = After 9:15 am)   Early Departure = Before 2:30 pm (M,T,Th,F)   Early Departure = Bef

## Extended School Year Services

**Recommending ESY Services:**

**Participants' Signatures**

Parent/Guardian: _____     Student: _____

LEA Representative: _____     Administrator: _____

Special Education
Teacher: _____     Social Worker: _____

Assistant Teacher: _____     Assistant Teacher: _____

Occupational
Therapist: _____     Physical Therapist: _____

Speech/Language
Therapist: _____  _____  _____

_____          _____  _____

**The Ivymount School**
An Exceptional School for Exceptional Children

**Individualized Education Program**

---

Student Name: N_____ A_____

Supplementary Aids and Instructional
Modifications

Student ID: 42095

---

## Supplemental Aids and Instructional Modifications

The following Identified Instructional Modifications and Supports have been identified by the IEP Team:

**Instruction/Assignment Modification:**

Alternating seatwork with other kinds of work
Extended time for work completion
1-1 support as needed
Opportunity to express his own idea of how to approach / complete assignment

**Behavior Management Strategies:**

"Work time minutes to earn break time" contract
Classroom behavior management / reinforcement program
Opportunity for sensory breaks
Menu of calming strategies

**Environmental/Physical Adaption:**

Opportunity to work in small, quiet area outside classroom as needed (individually or with peer)

**The Ivymount School**
An Exceptional School for Exceptional Children

**Individualized Education Program**

| Student Name: N_____ A_____ | Validity Statement for Standardized Educational Testing | Student ID: 42095 |

### Validity Statement for Standardized Educational Testing

The following test(s):

is (are) judged to be an appropriate measure for use with for *diagnostic/programming purposes only*. The characteristics (cultural/linguistic) of this student are **not** represented in the normative sample and therefore, the results should be interpreted with caution.

# The Ivymount School
### An Exceptional School for Exceptional Children

## Individualized Education Program

---

| Student Name: N█████ A████████ | Current Levels of Performance | Student ID: 42095 |
| --- | --- | --- |

---

### Current Levels of Performance

**Date of Birth:** █/██/1995          **Age:** 11

**\*\*** Informal assessment in some areas has been used to better represent the student's progress because:

\_\_\_\_\_ the standardized tests could not be administered without accommodations.

\_\_\_\_\_ the standardized test requirements did not allow the student to demonstrate skills achieved.

**CLOP Area:** Math

#### Impact Statement:

N█████ is near or above grade level in all areas of math. His use of skills in specific applications (problem solving, estimation, interpreting data) are relative weak areas.

| Data Source | Date | Educator/Evaluator Position |
| --- | --- | --- |
| Key Math Rev. Form A B(Mean=100, SD=15) | 10/6/2006 | Stephanie Fulford    Teacher |

#### Scores/Levels of Performance

| Standard Score | Percentile | Grade Equiv. | |
| --- | --- | --- | --- |
| Basic Concepts | 121 | 92 | 9.7 |
| Operations | 103 | 54 | 6.0 |
| Applications | 96 | 39 | 5.9 |
| Total Test | 103 | 54 | 5.9 |

Student Name: N████████ A███████          Current Levels of Performance                    Student ID: 42095

**CLOP Area:** Occupational Therapy

**Impact Statement:**

N██████ difficulty regulating his sensory processing and emotional reactions impacts his ability to maintain himself in a group of peers.

| **Data Source** | **Date** | **Educator/Evaluator** | **Position** |
|---|---|---|---|
| Other (OT) | 11/1/2006 | Julie Martin | Occupational Therapy |

**Scores/Levels of Performance**

Senory Profile: Definite difference from typical peers in most areas of sensory processing; tactile processing, taste and smell sensitivities, seeks sensation, auditory filtering problems and visual sensitivities.
School Function Assessment:  Difficulty with listening and attending, recovering after failure, acceptin unexpected changes in routines, refraining from provoking others, waiting his turn in a group, and working in groups with others without disruption. He also demonstrated difficulties in the area of organization and cleanup.

Student Name: N████████ A████████     Current Levels of Performance

**CLOP Area:** Reading

Student ID: 42095

### Impact Statement:

N████████ reads at or above grade level material. His comprehension is affected by his prior knowledge and interest in the topic and by degree of inferred meaning in text.

## Data Source

Informal Reading Inventory

**Date**     **Educator/Evaluator Position**

Bonnie Beers          Curriculum
                      Coordinator

## Scores/Levels of Performance

Qualitative Reading Inventory--3
Comprehension:

Instructional:  Expository:  familiar topic    6th grade level

Frustration:     Narrative:   unfamiliar topic   6th grade level

Student Name: ███████ ██████    Current Levels of Performance    Student ID: 42095

## CLOP Area: Speech/Language

### Impact Statement:

N████ social/pragmatic language deficits impact his ability to communicate appropriately with his peers and teachers.

| Data Source | Date | Educator/Evaluator Position |
|---|---|---|
| Clinical Observations (Speech/Language) | 11/6/2006 | Lorin Youngdahl — Speech and Language Pathologist |

### Scores/Levels of Performance

Thus far this school year, N████ has been seen for language services during various times throughout the school day, including during Drama, and lunch. At these times consultative and direct services have been provided and some observational data has been collected as well. In addition, he has received direct large group instruction during Social Skills class in collaboration with the program's Clinical Psychologist. During these class times, N████ has worked on the skills of introductions, cooperation, group participation, turn taking, paying it forward, flexibility and problem solving through Goal/Plan/Do/Check.

The Pragmatic Profile (PP) from the Clinical Evaluation of Language Fundamentals (CELF-4) was completed by N████ teacher. The PP completed by N████ teachers revealed his criterion Score to be 92.5 (93), which did not meet the criteria of greater than or equal to 136 when compared to his age matched peers. This indicates that N████ presents with inadequate social communication skills. On the PP, various pragmatic skills are divided into the areas of: Rituals and conversational skills, Asking for and giving information, and Nonverbal communication. Each skill within these areas are given a rating of 1= Never 2= Sometimes 3= Often and 4= Always. The following pragmatic language skills are ones in which N████ teachers rated a 1:
- Avoids use of repetitive/redundant information
- Adjusts/modifies language based on the communication situation
- Uses appropriate strategies for responding to interruptions and interrupting others
- Offers to help others appropriately
- Agrees and disagrees using appropriate language
- Starts and/or responds to nonverbal or verbal negotiations appropriately
- Asks others to change their actions appropriately
- Apologizes or accepts apologies appropriately
- Responds to teasing, anger, failure appropriately
- Responds appropriately when asked to change his actions
- Uses facial cues, body language, voice intonation and other nonverbals appropriately
- Reads body language appropriately

The following skill areas were rated the highest (3) by N████ teachers:
- Tells/understands jokes
- Shows appropriate sense of humor
- Understands posted and implied school/group rules
- Responds to expressions of affection, appreciation appropriately
- Gives/asks for the time of events
- Gives and/or asks for reasons and causes for actions/conditions/choices
- Uses media (email) appropriately
- Responds to greetings from others

The Pragmatic Profile completed by N████ teachers as well as observational data/information were used to formulate N████ speech and language goals.

Lorin Youngdahl, MA, CCC-SLP

## The Ivymount School
An Exceptional School for Exceptional Children

## Individualized Education Program

| Student Name: N█████ A█████ | Student Goals and Objectives / Progress Report | Student ID: 42095 |
|---|---|---|

| Progress Key:   M= Student has mastered this goal/objective.<br>SP= Student is making progress towards mastering this goal/objective.<br>EP= Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within the duration of this IEP.<br>NP= Student has not yet made progress toward mastering this goal/objective.<br>NI= This goal/objective has not been introduced. | Q1 Q2 Q3 Q4 ESY |
|---|---|

**AREA :    Daily Living**          ** See Current Levels of Performance form.

**Annual Goal(1):** Nathaniel will demonstrate appropriate classroom behavior by demonstrating mastery on the following objectives at the stated criteria.

In a small group                                                                              Q1 Q2 Q3 Q4 ESY

N█████ will reduce his frequency of provoking/teasing other students

to no more than 2 instances of provoking/teasing per day on 4 out of 5 days during 2 consecutive data collection weeks.

During a difficult moment                                                                  Q1 Q2 Q3 Q4 ESY

N█████ will ask for permission before leaving his classroom work area

4 out of 5 times over 4 consecutive data collection weeks.

Following a difficult moment                                                            Q1 Q2 Q3 Q4 ESY

N█████ will appropriately return to the classroom activity within 10 minutes

4 out of 5 times over 2 consecutive data collection weeks.

**Annual Goal(2):** N█████ will demonstrate appropriate classroom work habits by demonstrating mastery on the following objectives at the stated criteria.

During small group instruction with adult support as needed                Q1 Q2 Q3 Q4 ESY

N█████ will remain engaged in group instruction for at least 30 minutes with no more than 1 two-minute break

3 out of 4 observed opportunities over 2 consecutive data collection weeks.

During small group instruction with adult support as needed                Q1 Q2 Q3 Q4 ESY

N███████ will sustain attention to a non-preferred academic task for 15 minutes with no more than 2 prompts

3 out of 4 observed opportunities over 2 consecutive data collection weeks.

In a classroom or general school setting, with 1 verbal or written warning     Q1 Q2 Q3 Q4 ESY
(e.g. ____minutes before cleanup)

N███████ will terminate a task without arguing within 30 seconds of a request

3 out of 4 observed opportunities over 2 consecutive data collection weeks.

**Service Provider(s):**
    Special Education Team
    Occupational Therapy Consult
    Mental Health/Behavior Counselor Consult

| Student Name: N█████ A█████ | Student Goals and Objectives / Progress Report | Student ID: 42095 |
|---|---|---|

| Progress Key: M= Student has mastered this goal/objective. | Q1 Q2 Q3 Q4 ESY |
|---|---|
| SP= Student is making progress towards mastering this goal/objective. EP= Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within the duration of this IEP. NP= Student has not yet made progress toward mastering this goal/objective. NI= This goal/objective has not been introduced. | |

**AREA :    Occupational Therapy**           ** See Current Levels of Performance form.

**Annual Goal(1):** N████████ will improve work behaviors for greater task performance in the classroom or vocational environment by demonstrating mastery on the following objectives at the stated criteria.

With visual and adult support                                    Q1 Q2 Q3 Q4 ESY

N███████ will replace materials in the classroom in containers or on appropriate shelves in order to maintain an organized and neat work/desk area.

with reduction of adult support by 50% from baseline with data collected over 2 consecutive weeks.

**Annual Goal(2):** N████████ will improve ability to use sensory information to understand and effectively interact with people and objects in school and community environments by demonstrating mastery on the following objecives at the stated criteria.

With a sensory diet and adult support                           Q1 Q2 Q3 Q4 ESY

N███████ will use sensory awareness and strategies in order to function in groups by demonstrating an increase in the following attending to listener, accepting changes, waiting his turn, and refraining from disrupting others.

with an increase from baseline by 50% as measured by a therapist/teacher checklist with data taken over 2 consecutive weeks.

**Service Provider(s):**
    Speech Language Therapy Consult
    Special Education Team
    Occupational Therapist

| Student Name: N██████ A██████, | Student Goals and Objectives / Progress Report | Student ID: 42095 |

| Progress Key: | | Q1 Q2 Q3 Q4 ESY |
| M= | Student has mastered this goal/objective. | |
| SP= | Student is making progress towards mastering this goal/objective. | |
| EP= | Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within the duration of this IEP. | |
| NP= | Student has not yet made progress toward mastering this goal/objective. | |
| NI= | This goal/objective has not been introduced. | |

***AREA :***   **Reading**                           **\*\* See Current Levels of Performance form.**

**Annual Goal(1):** N██████will demonstrate a variety of comprehension skills by demonstrating mastery of the following objectives at the stated criteria.

In one to one instruction, using a grade level text                           Q1 Q2 Q3 Q4 ESY

N██████ will demonstrate knowledge of cause and effect

with 80 percent accuracy 4 out of 5 observed opportunities over 2 consecutive data collection weeks.

In one to one instruction, using a passage at his instructional level          Q1 Q2 Q3 Q4 ESY

N██████will answer inferencial questions about the passage

with 80% percent accuracy 4 out of 5 observed opportunities over 2 consecutive data collection weeks.

In one to one instruction,with a narrative text at his instructional level     Q1 Q2 Q3 Q4 ESY

N██████will use the passage and his background knowledge to draw appropriate conclusions about the passage

with 80 percent accuracy 4 out of 5 observed opportunities over 2 consecutive data collection weeks.

**Service Provider(s):**
   Speech Language Therapy Consult
   Special Education Team

| Student Name: N̶̶̶̶̶ A̶̶̶̶̶̶̶ | Student Goals and Objectives / Progress Report | Student ID: 42095 |

| Progress Key:<br>**M=** Student has mastered this goal/objective.<br>**SP=** Student is making progress towards mastering this goal/objective.<br>**EP=** Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within the duration of this IEP.<br>**NP=** Student has not yet made progress toward mastering this goal/objective.<br>**NI=** This goal/objective has not been introduced. | Q1 Q2 Q3 Q4 ESY |

*AREA :* **Social Emotional**          ** See Current Levels of Performance form.

**Annual Goal(1):** N̶̶̶̶̶ will demonstrate improved interactions with others by mastering the listed objectives at the stated criteria.

In a 1:1 or dyad setting with support of a teacher or therapist          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will identify that his verbalizations and actions affect others in 4 out of 5 observed opportunities for 4 consecutive weeks.

After having engaged in an action or verbalization that negatively impacted others,          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will apologize and/or attempt to modify his behavior 20% above baseline.

**Annual Goal(2):** N̶̶̶̶̶ will demonstrate improved emotional regulation by mastering the listed objectives at the stated criteria.

In individual or group settings,          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will demonstrate the ability to identify self-regulating strategies in 4 out of 5 opportunities for 4 consecutive weeks.

In a suppported school setting, using a menu of practiced strategies          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will select and utilize at least 3 different strategies to decrease frustration, anxiety or anger in 4 out of 5 opportunities for 4 consecutive weeks.

In a supported school setting, with adult guidance          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will utilize pro-active problem solving strategies such as Goal-Plan-Do-Check to help resolve dilemmas in 4 out of 5 opportunities for 4 consecutive weeks.

In an individual or small group setting, with adult support          Q1 Q2 Q3 Q4 ESY

N̶̶̶̶̶ will utilize positive self-talk strategies when recovering from a

difficult moment in 4 out of 5 observed opportunities for 4 consecutive weeks.

With adult support                                                                                          Q1 Q2 Q3 Q4 ESY

Na█████ will develop and implement a self-rating system for identifying his
level of frustration, anxiety or anger in 4 out of 5 observed opportunities for 4
consecutive weeks.


**Service Provider(s):**
   Mental Health/Behavior Counselor
   Speech Language Therapist
   Occupational Therapy Consult
   Special Education Team

Student Name: N██████ A███████      Student Goals and Objectives / Progress Report      Student ID: 42095

| Progress Key: | | Q1 Q2 Q3 Q4 ESY |
|---|---|---|
| **M=** | **Student has mastered this goal/objective.** | |
| **SP=** | **Student is making progress towards mastering this goal/objective.** | |
| **EP=** | **Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within the duration of this IEP.** | |
| **NP=** | **Student has not yet made progress toward mastering this goal/objective.** | |
| **NI=** | **This goal/objective has not been introduced.** | |

*AREA :*    **Speech/Language**           ** See Current Levels of Performance form.

**Annual Goal(1):** N██████ will demonstrate improved skills in the areas of pragmatic and social language by demonstrating mastery on the following objectives at the stated criteria.

In a small group of peers, structured and supervised by an adult          Q1 Q2 Q3 Q4 ESY

N██████ will initiate topics of conversation of interest to others

3 out of 4 observed opportunities during a 2 week data collection period.

In a small structured group of peers with adult support          Q1 Q2 Q3 Q4 ESY

N██████ will maintain conversations for at least 2 exchanges on topics of interest to others by asking questions or making comments that relate to the given topic

3 out of 4 observed opportunities during a 2 week data collection period.

In a variety of comomunication exchange settings, with adult support          Q1 Q2 Q3 Q4 ESY

N██████ will wait his turn to speak in a variety of communication exchanges

3 out of 4 observed opportunities during a 2 week data collection period.

In a classroom small or whole group setting with adult support          Q1 Q2 Q3 Q4 ESY

N██████ will express his disagreement, disapproval, or disappointment using an adequate volume, an appropriate tone of voice, and body language

3 out of 4 observed opportunities during a 2 week data collection period.

**Service Provider(s):**
   Special Education Team
   Speech Language Therapist

Student Name: N_____ A_____

# The Ivymount School
An Exceptional School for Exceptional Children

## Individualized Education Program

### Student Data / Cover Sheet

Student Data / Cover Sheet

Student ID: 42095

**Student Name:** N_____ C_____ A_____

**Current Age:** 11:11

**Address:** 3505 34th Street, NW

**City, St Zip:** Washington, DC 20008

**Funding Source:** Parent

**Date of Entry:** 8/28/2006

**Date of Birth:** _____ 1995

**Grade:** 6

**Disability:**

**Parent/Guardian:** Dr. Harold Alderman          Mrs. Claudia Alderman

**Relationship:** Father                                    Mother

**Home Phone:** 202-362-6979

**Work Phone:** 202-473-0372

### IEP Meeting:

**Period of Plan:**        to                                    **Reevaluation Due Date:**

### Recommended Related Services

| | **Frequency** | **Number/Length** |
|---|---|---|
| Language/Speech Therapy | 60 minutes per week | |
| Occupational Therapy | 60 minutes per week | |
| Counseling | 60 minutes per week | |

**% of Time in Regular Education Instructional Program:** 0%

Hours/Week in Adapted Physical Education:

School Health Services:    Health Plan:    Medication: School: No  Home: Yes

Other

Was a Functional Behavior Assessment (FBA) conducted?    No

Nathaniel requires transportation because of severity of disability.

ATTENDANCE

| QUARTERS | First | Second | Third | Fourth |
|---|---|---|---|---|
| Days Present | 42 | 41 | 37 | 7 |
| Days Absent | 0 | 4 | 1 | 0 |
| Late Arrival | 1 | 0 | 0 | 0 |
| Early Departure | 0 | 0 | 0 | 0 |

(Late Arrival = After 9:15 am)    Early Departure = Before 2:30 pm (M,T,Th,F)    Early Departure = Before 12:15 pm (W)

Recommending ESY Services:

Extended School Year Services

Participants' Signatures

Parent/Guardian: _____    Date: _____

Student: _____    Date: _____

LEA Representative: _____    Date: _____

Administrator: _____    Date: _____

Ivymount Model Asperger Program
IEP Progress Report  2006-2007

March 26, 2007

**Psychologist Support within the Classroom**
**Room 165**

This quarter, students continue to utilize their individualized self-rating scales and are encouraged to expand their list of calming strategies. These scales were designed to increase self-awareness and coping skills. Students were asked to label emotions that correspond to different zones on the scale. They also chose different colors for various parts of the zones. Students personalized the scale in other ways through their design. They also selected specific coping strategies that they could utilize when they are having a difficult moment and added these strategies to their feelings charts. The students have been using these scales to rate their emotional state and to remind them of their coping strategies.

To encourage flexibility and "getting along" within the classroom, students have been earning "gumby" and "pokey" points. Students earn "gumby" points for displaying flexibility. If the class earns their targeted number of gumbies, they get special flextime at the end of the week. Students earn "pokey" points for using strategies that help them "get along" with others, such as being kind, sharing, compromising, using polite words, taking turns and using an appropriate voice tone. These points go toward a group goal of their choosing (e.g., pizza party, going to a museum, watching a movie, etc.). In social skills groups, students have been playing various board games and earning gumby and pokey points for displaying the targeted pro-social behaviors.

Students are also encouraged to practice using the strategies we have practiced in our social skills groups during their group project time. Group projects have included performing a play and creating a virtual museum tour.

At the end of the week, students participate in Friday Choice. Earlier in the week, they vote on the desired group activity. Activities have included creating a group paper dragon for Chinese New Year, decorating the classroom door for St. Patrick's Day, and making pizzas.

Karyn Ewart, Ph.D.
Licensed Psychologist
The Ivymount Model Asperger Program

52

**Student Name:** N███████ A██

## Student Goals and Objectives / Progress Report

**Student ID:** 42095

|  | | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | ESY |

**Progress Key:**   Student has mastered this goal/objective.
M=
   SP= Student is making progress towards mastering this goal/objective.
   EP= Student exhibits emerging ability to demonstrate the skill but may not master this goal/objective within
       the duration of this IEP.
   NP= Student has not yet made progress toward mastering this goal/objective.
   NI= This goal/objective has not been introduced.

**AREA :   Occupational Therapy**

** See Current Levels of Performance form.

**Annual Goal(1):** N██████ will improve work behaviors for greater task performance in the classroom or
vocational environment by demonstrating mastery on the following objectives at the stated criteria.

|  | Q1 | Q2 | Q3 | Q4 | ESY |
|---|---|---|---|---|---|
| With visual and adult support | | SP | | | |

N██████ will replace materials in the classroom in containers or on appropriate shelves in order to
maintain an organized and neat work/desk area.

with reduction of adult support by 50% from baseline with data collected over 2 consecutive weeks.

**Annual Goal(2):** N██████ will improve ability to use sensory information to understand and effectively
interact with people and objects in school and community environments by demonstrating mastery on the
following objectives at the stated criteria.

|  | Q1 | Q2 | Q3 | Q4 | ESY |
|---|---|---|---|---|---|
| With a sensory diet and adult support | | SP | SP | | |

N██████ will use sensory awareness and strategies in order to function in groups by demonstrating an
increase in the following attending to listener, accepting changes, waiting his turn, and refraining from
disrupting others.

with an increase from baseline by 50% as measured by a therapist/teacher checklist with data taken over
2 consecutive weeks.

**Service Provider(s):**

3/30/2007

53

Speech Language Therapy Consult
Special Education Team
Occupational Therapist

**Exclusion/Seclusion Documentation Form**
The Ivymount School Asperger Program

Student Name: D[___]

DATE/TIME OF DAY: 1/25/07   Type of Procedure:   At[___]

| Interventions used prior to 7:15 | | Exclusion / Seclusion | Duration of procedure: 4 min. 11 sec. |
|---|---|---|---|
| Procedure | ☐ Prevention | | |
| ☐ De-escalation- please list: | | | |
| - limited choice | | | |

Type of Procedure:
☑ Redirection
☐ Block
☐ Current BIP procedures
☐ Other:

| | |
|---|---|
| Setting Event(s): had been physically restrained after appearing aggressive. Staff was attempting to explain. | Staff present when behavior occurred and/or implemented procedure. |

| Staff who observed, implemented and monitored procedure |
|---|

Name: Keira Furst    Name: Shanna McComack
Signature: [signature]    Signature: [signature]

Name: [signature]    Name:
Signature: [signature]    Signature:

Name: Alexa Arezalo    Name:
Signature: [signature]    Signature:

Name: [signature]    Name:
Signature: [signature]    Signature:

Name: Rina Parle    Name:
Signature: [signature]    Signature:

Antecedent: took his clothes off and said that we could not touch him now.

Behavior: was still escalated. He put his clothes on and sat calmly for 2 minutes when the door opened, he eloped. He had no clothes on and was attempting to elope.

Describe student behavior and reaction during procedure

Was parent/guardian notified?   NO   YES   (verbal communication / written communication)   (please circle

Administrator Name and Signature
Name: [signature]
Signature: [signature]

Updated on 08/31/06

55

Exclusion/Seclusion Documentation Form
The Ivymount School Asperger Program

Student Name: _Dan___ Ami___

DATE/TIME OF DAY: 1:25

| Type of Procedure: | Exclusion | Seclusion | Duration of procedure: 12 min |
|---|---|---|---|

Interventions used prior to procedure
- Prevention
- De-escalation- please list: _mental sheets_
- ☑ Redirection
- ☑ Block
- ☐ Current BIP procedures
- ☐ Other:

Setting Event(s):

_Dan__ was physically restrained.

Antecedent:

He was in the T.O. room -

| Staff present when behavior occurred and/or implemented procedure. | Staff who observed, implemented and monitored procedure |
|---|---|
| Name _Stacy Bost_ | Name _Rina Plak_ |
| Signature _LCB_ | Signature _Rina Plak_ |
| Name _Sharon McCormick_ | Name _Kevan Arenado_ |
| Signature _Sharon McCormick_ | Signature _KAAF_ |
| Name | Name |
| Signature | Signature |
| Name | Name |
| Signature | Signature |

Behavior: He tried from the time at
Describe student behavior and reaction during procedure
He swore, tried to negotiate and threw his shoes against me
wall. He went to the bathroom in the T.O. room and took
off all of his clothes

Was parent/guardian notified?     YES     NO     verbal communication     written communication     (please circle)

Administrator Name and Signature
Name _Kelli C. Alexander_
Signature _[signature]_

Updated on 08/31/06

56

**Exclusion/Seclusion Documentation Form**
*The Ivymount School Asperger Program*

Student Name: _____

DATE/TIME OF DAY: 1:45   Type of Procedure: 1/25/07

Interventions used prior to procedure:

Prevention
De-escalation-please list: _Limited Choices_

☑ Redirection
☐ Block
☐ Current BIP procedures
☐ Other: _____

Setting Event(s):
Was Physically redirected and put in Seclusion in the T.O. room.

Antecedent:
Was transported from the hall to the F.A. room after he attempted to elope from the T.O. room.

Behavior:
Spit tried to bite and hit staff. Tried to elope.

Describe student behavior and reaction during procedure:
Attempted to elope. Pulled at door handle, repeatedly hit large glass Pane. Tried to negotiate.

| Exclusion | Seclusion | |
|---|---|---|
| Staff present when behavior occurred and/or implemented procedure. | | Duration of procedure: 7 minutes |
| | | Staff who observed, implemented and monitored procedure |
| Name: Karen Burt | Name: Rita Penland | Name: |
| Signature: | Signature: | Signature: |
| Name: Karen Arevalo | Name: | Name: |
| Signature: | Signature: | Signature: |
| Name: Brad Brown | Name: | Name: |
| Signature: | Signature: | Signature: |

Was parent/guardian notified?   NO   (YES)

verbal communication   written communication   (please circle)

Administrator Name and Signature: Nina C. Alexander

Updated on 08/31/06

57

Ivymount Asperger Program
Baseline Academic Assessment Summary

Student: N_____ A_____          DOB: _____95

Date of Assessment: 9/06

Reading:

Previous assessment results:
Reading:    WJ. 11/05: wd id: 109 6.3 GE, wd attk 113, 10.2 GE, pass comp 99, 5.1 GE

| Assessment tool / Assessor | Results | Strengths | Needs |
|---|---|---|---|
| Qualitative Reading Inventory B Beers 9/06 | **Word Reading:  no errors at 6 grade level** <br> **Comprehension:** <br><br> **Narrative: unfamiliar topic  6 grade** <br> *No Look-backs:* <br> Explicit:  2 <br> Implicit   1 <br> 3/8                        frustration level <br> *With Look-backs:* <br> Explicit  2 <br> Implicit  2 <br> 4/8                        frustration level <br><br> **Expository: familiar topic  6 grade** <br> Explicit  3 <br> Implicit  3 <br> 6/8              **Instructional level** | Word reading <br><br> Fluency <br><br> Background information in topics of interest <br><br> Comprehension, literal and implicit, for topics of interest | Comprehension and organization of unfamiliar or non-preferred information <br><br> Systems for processing information (vs. impulsive) |

**EXHIBIT**

ΠA-158

## Written Language:

Previous assessment results:
Wten Lang:  WJ 11/05: 115, 9.9 GE
Spelling:   WJ 11/05: 118 9.9 GE

| Assessment tool / Assessor | Results | Strengths | Needs |
|---|---|---|---|
| Words Their Way Spelling Assessment
Stephanie Fulford | Derivational Relations | | |

## Math:

Previous assessment results:
Math:    WJ 11/05: Calc 100 4.9 GE, Applied Pblms 110 6.4 GE, Fluency 94  4.5 GE

| Assessment tool / Assessor | Results | | | | Strengths | Needs |
|---|---|---|---|---|---|---|
| | | SS | %ile | GE | | |
| Key Math-R
Stephanie Fulford | Basic Concepts | 121 | 92 | 9.7 | Number concepts
Geometric shapes, lines
Operations with whole numbers
Money skills / equivalents
Time skills / equivalents | Problem solving
Estimation
Interpreting data
Angles
Solid geometry
Operations with decimals / fractions |
| | Operations | 103 | 54 | 6.0 | | |
| | Applications | 96 | 39 | 5.2 | | |
| | Total Test | 103 | 54 | 5.9 | | |

59

# Occupational Therapy Report

**Name:**  N███████ A███████

**Date of Report:** 10-19-2006

**Date of Birth:** ████-1995

**Therapist:**  Julie Martin OTR/L

N█████ is an 11.5-year-old student attending The Ivymount School Asperger program.   A thorough assessment was completed by occupational therapy in order to determine his special education and related service needs as well as to ascertain his current levels of performance.

## Assessments and Results:

### School Function Assessment: A criterion referenced tool examining functional performance in the areas of physical tasks and Cognitive/Behavioral tasks required for school.

| Activity Performance- Physical/Cognitive/Behavior Tasks | Nathaniel's Criterion Score | Criterion Cutoff score 4-6 |
|---|---|---|
| **Relative Strength** | | |
| Eating and Drinking | 100 | 100 |
| Hygiene | 100 | 100 |
| Clothing Management | 100 | 100 |
| Up/down stairs | 100 | 100 |
| Computer Usage | 100 | 100 |
| Written Work | 78 | 94 |
| Personal Care Awareness | 70 | 100 |
| | | |
| **Relative Weakness** | | |
| Set up and Clean up | 69 | 100 |
| Task Behavior | 39 | 81 |
| Positive Interaction | 48 | 83 |
| Behavior Regulation | 31 | 78 |
| Safety | 48 | 100 |
| | | |
| | | |

EXHIBIT

NA-5 60

An item analysis was conducted in order to determine tasks of which N███████is capable of improving.

| Does not perform to partial performance | Partial performance to inconsistent performance | Inconsistent performance to consistent performance |
|---|---|---|
| Listening and attending to an entire class | Wipes up spills on a flat surface | Put materials into small containers |
| Recovers after failure- does not lose temper or give up. | Responds appropriately to social interaction with peers | Cover mouth when cough or sneeze |
| Accepts unexpected changes in routines | Waits for turn in group activities | |
| Refrains from provoking others | Work in a group without disrupting work of others. | |
| Wariness of unknown people | Keep unsafe objects out of mouth | |

## Short Sensory Profile:

N███████ demonstrated a definite difference from typical peers in most areas of sensory processing.  These include the following; tactile, taste, and smell sensitivities, seeks sensation, auditory filtering and visual sensitivities.  In the area of taste and smell sensitivities, N███████avoids certain tastes or smells of food, will only eat certain tastes, limits himself to particular food textures and is in general a picky eater.  He has difficulty maintain himself when near others such as in a line.  He seeks all kinds of movement and becomes excited with movement.  He has difficulty paying attention, and becomes distracted by noise around him.  He is bothered by bright lights, and will cover his eyes or squint to protect eyes from light.

## Developmental Test of visual Motor Integration:

N███████s right hand dominant and uses his left hand as an adequate assist.  He gripped his pencil using his thumb and first three fingers.  The pencil was held vertically.  N███████ worked left to right on the paper.  His drawings lacked attention to details.  As the drawings became more detailed he had more difficulty with organization, placement, and pencil control.  Impulsivity during the task also negatively impacted his score (making squiggly lines,



hurrying through the task to get done, not giving himself time to adjust posture). His motor coordination score was below average with his combined visual motor score in the borderline range.

|  | Standard score | Percentile | Age equiv. |
|---|---|---|---|
| Visual Motor Int. | 84 | 14 | 8.4 |
| Visual Perc. | 125 | 95 | 17.6 |
| Motor Coord. | 79 | 8 | 7.6 |

## Summary and Recommendations:

N███████is an 11.5 year old student exhibiting an underlying difficulty in the area of sensory processing. He is highly sensitive to many forms of environmental input including; touch, taste, smell, auditory and visual. He has difficulty maintaining control when moving, becoming excited and interfering with function. He has difficulty paying attention, managing frustration, and accepting changes in routines. It is recommended that N███ receive occupational therapy as a related service to his special education program 60 minutes per week.

---

Julie Martin OTR/L

62



# FAX TRANSMITTAL COVER SHEET

## THE IVYMOUNT SCHOOL

*The Ivymount School*

An Exceptional Sch☐
for Exceptional Chil☐

TO: _Michael Eig_

FROM: _Bonnie Beers_

COMPANY: _____

DEPARTMENT: _____

FAX #: _301/657-3843_

IVYMOUNT PHONE: _(301) 469-0223_

DATE: _10/25/06_

TRANSMITTING FAX NUMBER: (301) 469-07☐

# PAGES _6_ (INCLUDING THIS PAGE)

## Privileged and Confidential:

The information supplied in this facsimile message may be confidential information intended only for use of the individual or entity named above and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the address reference☐ below via the United States Postal Service. Thank you.

Comments:

documentation of contact w/ DCPS
re N███████ A███████

(I realized that memo Tzis AmNOT dated –
but attached fax pp w/ date/time)

---

Ivymount School
11614 Seven Locks Road
Rockville, Maryland  20854

Note:
If you do not receive the numbe☐
or if the pages are illegible, plea☐
sender at the number above as ☐

**EXHIBIT**

NA-☐63

Contact Log:   DCPS  re N████████ A█████████

| 10/10 | Phone conference iep meeting:<br>Notice or meeting rec'd at 1:30 for meeting already in progress.<br>Participants:  Bonnie Beers, Stephanie Fulford<br>Follow-up meeting scheduled for 10/25 at 1:30 |
|---|---|
| 10/11 | BBeers:  call to Vecia Banner stating that follow-up meeting date not possible due to a due-process hearing for another student.<br>Voice message left. |
| 10/16 | BBeers:  fax to Vecia Banner stating unfeasibility of the 10/25 follow-up meeting date, giving alternate dates possible for Ivymount |
| 10/16 | Call from Vecia Banner to B Beers:<br>Acknowledged receipt of fax memo.<br>Stated that she would email which dates given by Ivymount were possible for DCPS.<br>B Beers agreed to pass these dates on to family so that they could coordinate with their attorney. |
| 10/25 | B Beers:  left voice message for Vecia Banner stating that no info rec'd from DCPS re follow-up meeting dates<br><br>B Beers:  faxed memo to Vecia Banner stating above and giving revised list of possible dates for Ivymount and family. |



# FAX TRANSMITTAL COVER SHEET

## THE IVYMOUNT SCHOOL

*The Ivymount School*

*An Exceptional School for Exceptional Children*

---

TO: __Vecia Banner__          FROM: __Bonnie Boos__

COMPANY: _____     DEPARTMENT: _____

FAX #: __202/673-6557__      IVYMOUNT PHONE: __(301) 469-0223__

DATE: __10/16/06__

# PAGES __2__ (INCLUDING THIS PAGE)    TRANSMITTING FAX NUMBER: (301) 469-0778

                                        __469-0778__

---

**Privileged and Confidential:**    10/30,31    11/89

The information supplied in this facsimile message may be confidential information intended only for use of the individual or entity named above and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the address referenced below via the United States Postal Service. Thank you.

Comments:

Please see attached - read for
new date for N~~~~~~ A~~~~~~

call 10/11   left voice mail w/ VB that 10/25 not possible

call 10/16   V. Banner agreed to send dates when DCPS
             wld be available. IVM notify parents/attny

10/25        no email - call/left vm
             fax

---

Ivymount School
11614 Seven Locks Road
Rockville, Maryland  20854

Note:
If you do not receive the number of pages stated,
or if the pages are illegible, please call the
sender at the number above as soon as possible.

## TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 10/25/2006 08:27
                                    NAME : IVYMOUNT SCHOOL
                                    FAX  : 3014690778
                                    TEL  : 3014690223
```

```
DATE,TIME              10/25 08:26
FAX NO./NAME           2026736557
DURATION               00:00:36
PAGE(S)                02
RESULT                 OK
MODE                   STANDARD
                       ECM
```



*The Ivymount School*

# FAX TRANSMITTAL COVER SHEET

## THE IVYMOUNT SCHOOL

An Exceptional School
for Exceptional Children

TO: _Vecia Bonner_

COMPANY: _DCPS_

FAX #: _202/ 673- 6557_

DATE: _10/25/06_

# PAGES __2__ (INCLUDING THIS PAGE)

FROM: _Bonnie Boers_

DEPARTMENT: _____

IVYMOUNT PHONE: _(301) 469-0223_

TRANSMITTING FAX NUMBER: (301) 469-077

## Privileged and Confidential:

The information supplied in this facsimile message may be confidential information intended only for use of the individual or entity named above and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the address referenced below via the United States Postal Service. Thank you.

Comments:

Ivymount School
11614 Seven Locks Road
Rockville, Maryland 20854

Note:
If you do not receive the number of pages stated,
or if the pages are illegible, please call the
sender at the number above as soon as possible. 67

To: Vecia Banner

From:     Bonnie Beers
          Acting Director, Asperger Program
          Ivymount School

I am following up on our conversation on October 16.
My understanding at that time was that you would email me the dates
that DCPS is available to continue the IEP meeting for N███████
A█████████. I notified N████ mother about this plan and that I would
forward the available dates to her so that she could schedule a time with
their attorney.

At this time, I have not received any notice of DCPS's availability.  We did
receive a fax of the IEP draft goals and objectives.  We will forward our
response to them soon.

We are available at this point on:
October 31, November 8, 9.  N█████ parents are not able to come on
Nov. 3.

Thank you.

Bonnie Beers
301-469-0223
fax: 301-469-0778
email: bbeers@ivymount.org

68

Ivymount Asperger Program
IEP Progress Report 2006-2007

Student: ~~Ma____ M____~~

Area: _Occupational Therapy_

Key: M=mastered

SP=student making progress
NP=not making progress

EP=emerging progress, may not master 06-07
NI= not introduced

| Goal / Objective | 1st quarter Nov 1, 06 | 2nd quarter | 3rd quarter | 4th quarter |
|---|---|---|---|---|
| IEP development: Completed SPA and Sensory Profile and VMI | Developing current level of performance and goals in areas of sensory integration and classroom organization | | | |
| Attends Sensory Skills group on Thursday to a Sensori-motor format | Get regular physical regular prompt to initiate, then physical/verbal prompt to sustain, all tasks in group w/ sensory prompt | | | |
| | | | | |
| | | | | |
| | | | | |

Juli Martini OTR/L

EXHIBIT
tabbies
NA-7 69

# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843



| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

November 6, 2006

Ms. Gloria Everett
Case Maneger
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001

Re: N_____ A._____
*via facsimile and first-class mail*

Dear Ms. Everett:

This letter will confirm that through telephonic communication today, the IEP meeting scheduled for November 8, 2006, regarding the above-referenced student has been canceled due to Ivymount's unavailability. We are all available on November 13, 2006, in the afternoon. Please contact my office to confirm this date and time. Thank you.

Sincerely,

Michael J Eig/mlg

Michael J. Eig

cc: Mr. and Mrs. Alderman

EXHIBIT
70
NA-8

# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

November 9, 2006

Ms. Gloria Everett
Case Maneger
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001

Re: N█████ A█████████
*via facsimile and first-class mail*

Dear Ms. Everett:

Enclosed, as requested at the IEP Meeting on October 10, 1006, please find Ivymount's IEP for the above-referenced student. Thank you.

Sincerely,

Michael J. Eig

Enclosure

EXHIBIT

nA-9

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

DEC 1 3 2006

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

December 13, 2006

Angel Hunter
Case Manager
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington D.C. 20001

Re: N███████ A████████
*via facsimile and first-class mail*

Dear Ms. Hunter:

I am writing as a follow up to our November 13, 2006 IEP meeting. At the conclusion of the meeting, you stated that you were going to send N███ IEP to a central committee for a placement recommendation and that we would be hearing from you shortly.

As a first matter, it is a violation of the IDEA to make such a placement decision in the absence of the parents, and I still am not clear why no placement was discussed at the November 13 meeting. Furthermore, in the past month, we have not received any communication regarding the placement recommendations for N███

We look forward to hearing without further delay that N███ has been placed at Ivymount in the Asberger's program, as this is the only appropriate program to meet his educational needs.

Sincerely,

Patricia Cyr /mly

Patricia Cyr

cc:    Mr. and Mrs. Alderman

EXHIBIT
NA-18²

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM
**(MDT)**
**Meeting Notice**

MDT Referral Date: _____

FAXED
DEC 2 1 2006
Date 12/20/06

Re: _____

**Letter of Invitation**

Dear Mr. & Mrs. Alderman _____

A multidisciplinary team (MDT) meeting is scheduled to discuss the status of your child's educational needs. Your participation is essential, and we look forward to your valuable input. The purpose and details of the meeting are printed below. You and the school may have additional individuals attend the meeting who have knowledge or special expertise regarding your child. Other invited participants are listed under MDT members.

| Place/Location: | Please check one date for confirmation: |
|---|---|
| CARE Center<br>925 Rhode Island, NE<br>Washington, DC 20001 | [X] Date: 01/23/06 (07)   Time: 9:30 AM ; or<br>[ ] Date: 01/24/06   Time: 1:00 PM ; or<br>[ ] Date: _____   Time: _____ |

If a suggested meeting time is inconvenient, please call the counselor and/or special education coordinator for a mutual time to address the concerns. Participation by teleconference may be requested if other arrangements prove to be unsuccessful.

**\*The purpose of this meeting is to:**

[X] \*\*develop/review IEP (including consideration of extended school year (ESY) services    [ ] \*\*discuss CompEd

[ ] \*\*review evaluation or reevaluation information    [X] discuss placement    [ ] \*consider transition services needs

[X] develop the student evaluation plan (SEP)    [ ] determine manifestation    [ ] discuss quarterly review

[ ] discuss documented levels of service    [X] discuss eligibility    [ ] behavior plan review

[ ] \*\*review records to support the completion of services as follows:

[ ] Graduated    [ ] Completed Services    [ ] Aged Out    [ ] Transferred Out of District    [ ] Dropped Out

[ ] Other: _____

**\*\*Placement will be discussed.**

MDT Members:    [ ] Principal or Designee    [X] General Education Teacher    [X] Psychologist

[X] Parent    [X] Special Education Teacher    [ ] Other: _____

[X] LEA Representative    [ ] Speech and Language

[ ] Student    [ ] Social Worker

Any questions you may have concerning your child's program will be discussed at the above meeting. A copy of the Procedural Safeguards for parents is enclosed for your information. If the school can be of assistance to you, please contact

Gloria T. Everett _____ at 671-0882 _____ (school telephone number).

If the purpose of the meeting includes consideration of a transition plan, your child is invited to attend and a representative of the following agency(ies) may be invited, if appropriate

_____     _____

See attachments, when appropriate, for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

**\*After the third attempt to contact the parent, the meeting will be held without further notice.**

Please sign below and return this page to the school.

Parent/Guardian/Surrogate Signature _____    Date 12/21/06

I acknowledge receipt of the Procedural Safeguards for parents (due process procedures).    [ ] Yes    [ ] No

EXHIBIT
NA-17³

Gloria Everett            Social worker
Lesly Charles             speech
Vecia O'Banner            spec ed , IEP developer
Jermaine Perkins          psychologist
Mary Brackenberry         gen ed

Ludlow
Taylor     — autism program
     659 G St.
     698 - 3244

Brenda Kinsler - psych at Ludlow Taylor

· 6-9 kids /classroom              up to 6th grade
       Some have dedicated aides
· Integrate DCPS Standards where appropriate
· Special Olympics , schoolwide assembly
· Mix of 3rd - 5th grade this year

? - kids in classroom - level ?
       A: doesn't know
             Some non verbal and some verbal
I student had inclusion opportunities
weekly progress reports
I asberger's student last year

? - when kid runs out ?
       A: aide, social worker, psych, principal

lunch & recess w/ regular ed

EXHIBIT
NA-13

? - Can't handle large groups
   - behavioral intervention

Ivymount
   - no opportunity to interact w/ regular ed peers

? - academic functioning
  A: range
     below or on grade level    3rd - 5th grade
? - no academic-level peers

PC: Ivymount can explain why no public school
   "I would expect them to"

? where do they go after?
   - team decision
     - Elliott
     - neighborhood school

? - transition this late in the year?
A: with proper preparation

PC: 2 month delay, no communication
transition mid-semester
4 month placement

GE: sent packet to site review committee
   team gives choices   (no one from IEP team there)

75

offered s/c at John Eaton
OT consultation at Ivymount

**Exclusion/Seclusion Documentation Form**
**The Ivymount School Asperger Program**

**Student Name** [redacted]

| DATE/TIME OF DAY: 1/25/07 | Type of Procedure: |
|---|---|

Interventions used prior to procedure
- ☐ Prevention
- ☑ De-escalation - please list: Prompted to take a break
- ☑ Redirection
- ☐ Block
- ☐ Current BIP procedures
- ☐ Other:

**Duration of procedure:** 3 min.

**Exclusion    (Seclusion)**
Staff present when behavior occurred and/or implemented procedure.

Staff who observed, implemented and monitored procedure.

**Setting Event(s):**
N____ was upset that the IT men were going to install something on his computer.

Name  Stephanie Fulford
Signature  _Stephanie Fulford_

Name  Kevin Arevalo
Signature  _[signature]_

Name  Brad Brown
Signature  _Brad Brown_

Name
Signature

**Antecedent:**
N____ ran around the room and screamed. He tried to hit a staff member.

**Behavior:**
He was in the FA room+ was banging his feet against the wall.

Describe student behavior and reaction during procedure
He laid on the floor at the wall. He began to spit - 3 of 4 times

Was parent/guardian notified?    NO    (YES)
verbal communication    written communication    (please circle)

Because he was being unsafe in the F.A. room, he was transported to the T.O. room.

Administrator Name and Signature
Name  _[signature]_ Linda C. [illegible]
Signature  _[signature]_

Updated on 08/31/06

**EXHIBIT**

tabbies

IN-713

**Physical Restraint Documentation Form-PCM**
*The Ivymount School Asperger Program*

Student Name: N___ A___

DATE/TIME OF DAY: 12.5.07  1255

Interventions used prior to procedure
- ☑ Prevention
- ☑ De-escalation- please list:
- ☑ Redirection
- ☐ Block
- ☐ Current BIP procedures
- ☐ Other:

Setting Event(s):
N___ had been in the time out room. He started spitting and doing something near the wall.

Antecedant:
The door was opened and he fought to get out.

Behavior:
Kicking and attempting to get away from staff.

Type of restraint implemented (check):
- ☐ One Arm Wraparound
- ☐ 2 Person Vertical Immobilization -Adult (double Sunday stroll)
- ☐ 2 Person Vertical Immobilization -Child (double wrist tricep)
- ☐ 3 Person Vertical Immobilization- Adult
- ☐ 3 Person Vertical Immobilization- Child
- ☐ 2 Person BARR
- ☑ 3 Person BARR

Duration of procedure: 15 min.

Staff present when behavior occurred and/or implemented and monitored procedure.

Stephanie Fulford
Name
_Stephanie Fulford_
Signature

Kevan Arevalo
Name
_(signature)_
Signature

Brad Brown
Name
_Brad Brown_
Signature

_____
Name
_____
Signature

Staff who observed, implemented and monitored procedure

Aaron Frost
Name
_K. F.___
Signature

Megan Hoffman
Name
_M. Hoffman_
Signature

_____
Name
_____
Signature

_____
Name
_____
Signature

Describe student behavior and reaction during procedure:
N___ kicked his legs continuously. He fought with his arms and attempted to bite. He screamed and repeatedly asked to be released.

Was parent/guardian notified?
(verbal communication)    NO
written communication    YES (please circle)

Ivymount School Nurse **MUST** examine student following any immobilization procedure.

Attach School Nurse Body Check Form

Administrator Name and Signature
_Kate Alexandra_

Updated on 09/08/06

**EXHIBIT**
NA794

Any injury caused by the use of physical restraint should be reported immediately to the Behavior Resource Team Coordinator, Division Director, and School Director.

## Ivymount School
## School Nurse Body Check Form/Physical Restraint

- To be filled out after each Physical Restraint Intervention
- To be attached to the Physical Restraint Intervention Form

Student Name: ███████ ██ A█████    Date: 1/25/07

Staff Member requesting
Body Check: _____

School Nurse: _Lynn Malven_

Time of restraint: _____
Time of call: _____
Time of Body Check: 2:20 Pm

School Nurse Report:
☑ No sign of body trauma/body marks      ☐ No pain complaints
☑ Sign(s) of body trauma/body marks      ☑ Pain complaints: _R heel_

☐ Redness of body parts: – _Petechiae on both arm pits from holch – armo_
☐ Scratches:                                                                    _fur (R)_
☐ Other: "_I stomped on my feet (right) + hurt it - because_
_they make me MAD?_"

Action Taken: ☑ Ice Pack    ☐ Bandage    ☐ Other: _____

**FRONT**                                                        **BACK**

Please circle all
body areas
where there is
visible trauma.

←——————→

School Nurse Signature: _Lynn Malven, RN_

© Magdalena Stoica

Revised 5/11/04 79

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| A‗‗‗‗‗ N. | | |
| Petitioner | ) | |
| | ) | |
| Vs. | ) | HEARING OFFICER |
| | ) | |
| DCPS | ) | |
| Attending Ivymount School | ) | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. <u>The Student Hearing Office does not schedule or participate in resolution meetings</u>.

2.  The complaint notice was filed on **January 26, 2007** ✓ jmy

3.  The deadline for the resolution meeting is **February 10, 2007** unless the parent and ✓ jmy Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  *Prior Written Notice Not Issued by the Local Educational Agency*. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

    1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;

    2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;

Rev'd. 7/6/05

EXHIBIT
80
ΠΑ-15

3.    A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

4.    A description of the factors that is relevant to the agency's proposal or refusal.

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **February 5, 2007.**

C.    **_Deficiency Notice_.**    A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **February 10, 2007.**

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

81

FEB - 9 2007

# MICHAEL J. EIG AND ASSOCIATES, P.C.
### ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843

Michael J. Eig    MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr    CA, DC

February 9, 2007

Shalonda Cogdell
Resolution Scheduler
Office of Special Education
District of Columbia Public Schools
825 North Capitol Street, NE, 6th Floor
Washington, D.C. 20002

Re: N███████ A███████
*via facsimile and first-class mail*

Dear Ms. Cogdell:

As you may know, DCPS has scheduled a resolution session in the above-named student's case for February 12, 2007 at 10:30 A.M. The law requires that certain individuals be present at a resolution session including, "relevant member or members of the IEP team who have specific knowledge of the facts identified in the complaint"and "a representative of the agency who has decisionmaking authority on behalf of such agency." *See* 20 U.S.C. § 1415(f)(1)(B).

We are willing to attend a resolution session, but ask that DCPS provide us with confirmation that the required personnel will attend. We make this request because DCPS has not been following the law concerning the required attendees. Please provide us with the names, and titles of the individuals who will fill the required roles.

Thank you.

Sincerely,

Michael Eig /jmj

Michael Eig

cc:    Mr. and Mrs. Alderman

EXHIBIT
NA-1082

**State Education Agency for the District of Columbia**
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# Due Process Complaint Disposition

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

## A.   STUDENT AND CASE INFORMATION:

Student Name: N█████     A█████     Birth Date: ████/95

First     MI     Last

SHO Case Number: [                    ]   (if applicable)

## B.   PARENT / GUARDIAN:

Name: Harold     Alderman

First                                           Last

Complete Address:   3505 34th Street NW
Washington, DC 20008

Phone:  202.362.6979

Home          Work or alternative phone no.          Fax No. if applicable

## C.   LOCAL EDUCATION AGENCY REPRESENTATIVE:

Full Name: Anitra Allen-King          Title: LEA, CRS

Address:

825 North Capitol St. NE
Washington, DC 20002

Phone:   (202) 442-4800          (202) 442-5517

Office          Fax

1

SEID DRN  Rev'd. 6/14/05

EXHIBIT

tabbies

NA-17   83

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

___ PUBLIC  ____ DCPS CHARTER  __ LEA CHARTER  _X_ NONPUBLIC  ____ PRIVATE/RELIGIOUS

### RESOLUTION MEETING NOTES

Meeting Confirmation Date: [_____]     Meeting Held: 2/12/07

Student: N_____ A_____     DOB: ____/95     School: [_____]

| (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Anitra Allen-King. | *Anitra All-* | LEA/CRC |
| Patricia Cyr Esq. | *Patricia Cyr* | Attorney |
| Harold Alderman | *H. a* | Parent |
| Gloria Everrett | *Gloria J. Everett* | *LEA Social Worker* |
| | | |
| | | |
| | | |
| | | |
| | | |

[ ] Resolved        [X] Unresolved

The resolution session began with introductions.  The parent's complaint is that DCPS has failed to (1) place the student in an appropriate placement and (2) convene a meeting in which the parent participated in the determination of placement.  It is DCPS' position that the student has difficulty with social skills and the student will not be able to develop the necessary social skills in the Ivymount placement. Additionally, it is DCPS' position that Ludlow-Taylor can meet the needs of this student. (note* parent did participate in the placement meeting—placement was not agreed upon) *Parent does not agree that the parents participated AA in the placement meeting. PC AK*

For the record attorney/parent indicated that mother attempted to schedule a visit at Ludlow-Taylor –Ludlow-Taylor did not have an appointment available until the last week of February— reason not provided (possible testing in progress).

DCPS agrees to convene a placement meeting in which other placements options will be discussed within 21 days. *AA AK*

*It is Parents' position that the Ivymount Aspergers' Program is the only appropriate placement PC*

The parent is rejecting DCPS offer and will proceed to due process. The parent/counsel will attend all meeting scheduled by DCPS.

RESOLUTION MEETING NOTES        Page __2____        Sept. 12, 2005        84

The complaint is/was resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

____X____    The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____    The resolution session was unsuccessful. The parties have agreed to try mediation.

_____    The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____    The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____    The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

## J.   **Signature and Affirmation**:

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

_____      __2/12/07__
Signature of Parent/Guardian                          Date

_____      _____
Local Educational Agency Representative              Date

Mail, fax or deliver this form to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

2

# LETTER MOTION FOR CONTINUANCE



District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

Dear Student Hearing Officer:

This letter is to request a continuance of my Due Process Hearing currently scheduled to take place

on _March 29, 2007_ for N̶e̶█████ A̶█████ DOB█████95 . I am unable

to appear for the hearing on this date for the following reasons:
_I have a long standing, previously scheduled Due Process Hearing in Montgomery Country, Maryland_

I am available to appear for the hearing on the following dates:

1. _4-17-07_ 2. _____ 3. _____

I attempted to contact opposing counsel to discuss scheduling before proposing these dates: I spoke to

_Ann Barns (The Office of the General Counsel)_ at _9:36_ A.M. on _3-15-07_ (date).

Opposing Counsel ☐ agreed to the continuance ☐ did not agree to the continuance.

**I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR ANOTHER DATE.**

**I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS COMPLAINT.**

**FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.**

**BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE (FAX CONFIRMATION, COURIER RECEIPT, ETC.)**

Parent/Advocate or Attorney Advisor: _Michael J Eig /p/c_      Date: _3/15/07_

Telephone: _(301) 657-1740_      Fax: (301)

EXHIBIT
ΛΑ-98

# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843

| | | | | |
|---|---|---|---|---|
| Michael J. Eig | MD, DC | | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | | Patricia Cyr | CA, DC |

March 15, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: N███████ A███████
*via facsimile and first-class mail*

Dear Ms. Newsome:

Enclosed please find the Letter Motion for Continuance for the above-referenced student. My office contacted the Office of the General Counsel earlier today and spoke with Ann Barns who informed us that opposing counsel had not yet been assigned to the case. If you have any questions, please feel free to contact my office. Thank you.

Sincerely,

Michael Eig

cc:     Mr. and Mrs. Alderman
        The Office of the General Counsel

**EXHIBIT**
NA 819

# Ivymount School Asperger Program

11614 Seven Locks Road
Rockville, MD 20854

## Report to Parents on Student Progress

Asperger Program 5-6 Grade Class

Grade  6    2006-2007
Teacher: Stephanie Fulford

Name: A▄▄▄
3505 34th St. NW
Washington, DC 20008

| Subjects | 1st | Report period 2nd | 3rd | 4th |
|---|---|---|---|---|
| Reading Comprehension | A | | | |
| Spelling | B | | | |
| Writing Process/Organization | A | | | |
| Writing Content | A | | | |
| Written Mechanics | A | | | |
| Math | A | | | |
| Science | IN | | | |
| Social Studies | B | | | |

| Effort and Behavior | 1st | Report Period 2nd | 3rd | 4th |
|---|---|---|---|---|
| Returns completed homework | S | | | |
| Completes classwork | S | | | |
| Participates in class | S | | | |
| Uses feedback to improve learning/performance | G | | | |
| Cooperates with others toward a common goal | S | | | |
| Follows oral / written instructions | G | | | |
| Follows classroom rules | N | | | |

O = Outstanding         S = Satisfactory
G = Good                N = Needs Improvement

**Comments:**
11/06: N▄▄▄ the teachers truly enjoy reading your writing and we encourage you to keep up the good academic work. Great job integrating your technology skills into our classroom and homework assignments!

EXHIBIT
ΠA880

# Ivymount School Asperger Program
## 11614 Seven Locks Road
## Rockville, MD 20854

## Report to Parents on Student Progress

---

**Asperger Program 5-6 Grade Class**

Grade 6    2006-2007
Teacher: Stephanie Fulford

Na▓▓▓▓
3505 34th St. NW
Washington, DC 20008

| Subjects | Report period | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| Reading Comprehension | A | A | | |
| Spelling | B | B | | |
| Writing Process/Organization | A | A | | |
| Writing Content | A | A | | |
| Written Mechanics | A | A | | |
| Math | A | B | | |
| Science | A | A | | |
| Social Studies | B | B | | |

| Effort and Behavior | Report Period | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| Returns completed homework | S | O | | |
| Completes classwork | S | S | | |
| Participates in class | S | G | | |
| Uses feedback to improve learning/ performance | G | G | | |
| Cooperates with others toward a common goal | S | N | | |
| Follows oral / written instructions | G | S | | |
| Follows classroom rules | N | N | | |

O = Outstanding          S = Satisfactory
G = Good                    N = Needs Improvement

**Comments:**
11/06: N▓▓ the teachers truly enjoy reading your writing and we encourage you to keep up the good academic work. Great job integrating your technology skills into our classroom and homework assignments!
1/07: N▓▓ you have become a great leader in our classroom. The teachers appreciate how you encourage your classmates to make good choices throughout the day.

89

# Ivymount School Asperger Program

11614 Seven Locks Road
Rockville, MD 20854

## Report to Parents on Student Progress

Asperger Program 5-6 Grade Class
Grade 6    2006-2007
Teacher: Stephanie Fulford

Name: A███
3505 34th St. NW
Washington, DC 20008

| Subjects | Report period | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| Reading Comprehension | A | A | A | |
| Spelling | B | B | A | |
| Writing Process/Organization | A | A | A | |
| Writing Content | A | A | A | |
| Written Mechanics | A | A | A | |
| Math | A | B | B | |
| Science | A | A | C | |
| Social Studies | B | B | A | |

| Effort and Behavior | Report Period | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| Returns completed homework | S | O | O | |
| Completes classwork | S | S | N | |
| Participates in class | S | G | G | |
| Uses feedback to improve learning/ performance | G | G | G | |
| Cooperates with others toward a common goal | S | N | N | |
| Follows oral / written instructions | G | S | S | |
| Follows classroom rules | N | N | N | |

O = Outstanding          S = Satisfactory
G = Good                      N = Needs Improvement

**Comments:** █████, the teachers truly enjoy reading your writing and we encourage you to keep up the good academic work. Great job
11/06: N█████ integrating your technology skills into our classroom and homework assignments! The teachers appreciate how you encourage your classmates to you have become a great leader in our classroom.
1/07: N█████ make good choices throughout the day, by simply improving your participation during math time. Please try your best on
3/07: N█████ you can easily earn an "A" in math by a teacher to provide another example before you begin your work.
all assignments and remember you can always ask a teacher to provide another example before you begin your work.

90



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000 Fax: 202-442-5098
www.k12.dc.us

April 9, 2007

Michael J. Eig, Esq.
5454 Wisconsin Ave.
Suite 760
Chevy Chase, Maryland 20815

## DISCLOSURE STATEMENT

## VIA FACSIMILE 301-657-3843

**Subject: Due Process Hearing for N██████ A████████**
**DOB:     █████/95**
**Attending School: Ivymount**

Dear Mr. Eig:

At the upcoming due process hearing in the above-referenced matter, scheduled for Tuesday, April 17, 2007, at 9:00 a.m., and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

**Witnesses**

Dr. Marla Oakes, or her designee(s), Executive Director of Special Education Reform, DCPS **825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 –** *same for all Central Office staff*
Kym Grafton, or her designee(s), Dispute Resolution Coordinator, DCPS
Victoria Williams, or designee(s), OSE, DCPS
Gloria Everett, or her designee(s), Case Worker, CARE Center OSE **925 Rhode Island Ave.N.W., Washington, DC 20001; (202) 671-0882-same for all CARE Center staff**

---

[1] Witnesses may testify by telephone.

91

Jermain Perkins, or designee(s), Psychologist, CARE Center
Tawana Hinton, or designee(s), Speech Pathologist, CARE Center
Wanda Banks, or designee(s), Occupational Therapist, CARE Center
Dr. Brenda Kinsler, or designee(s), Pscyhologist, DCPS
Donald Presswood, or designee(s), Principal, Ludlow Taylor ES **659 G St., N.E., Washington, DC 20002; (202)698-3244- same for all Ludlow staff**
Brenda Gayles, or designee(s), Special Education Coordinator, Ludlow Taylor, DCPS

### Documents

| | |
|---|---|
| **DCPS 01:** | MDT Meeting Notes, dated 1/23/07 |
| **DCPS 02:** | Occupational Therapy Evaluation, dated 7/17/06 |
| **DCPS 03:** | Service Plan |
| **DCPS 04:** | Review of Neuropsychologial Evaluation, dated 7/07/06 |
| **DCPS 05:** | Ltr of Invt., dated 12/20/06 |
| **DCPS 06:** | SEP, dated 5/5/06 |
| **DCPS 07:** | MDT Meeting Notes, dated 10/10/06 |
| **DCPS 08:** | IEP, dated 11/13/06 |

DCPS reserves the right to amend this disclosure as documents become available

DCPS reserves the right to object to expert testimony by any person whose curriculum vita has not been disclosed to DCPS at least five (5) business days prior to the hearing for this student.

DCPS reserves the right to examine any witnesses called or identified as a potential witness by the representative of the student as though the witness was called by DCPS.

DCPS reserves the right to rely upon and /or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Also, DCPS reserves the right to call rebuttal witnesses in its case.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5000.

Sincerely,

Rashida J. Wilson
Attorney Advisor

cc: Student Hearing Office

92

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES**

MDT

MDT REFERRAL DATE: _____

STUDENT: ~~Nathan Alderman~~        SCHOOL: Ivy Mount        DATE: 1/23/07

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Claudia Alderman | Claudia Alderman | Mother |
| Patricia Cyr | Patricia Cyr | Attorney |
| GLORIA T. EVERETT | Gloria T. Everett | LEA |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Vega O. Banner | Vega O. Banner | IEP developer Spec. ed. |
| Harry Brackenberry | Harry Brackenberry | General Ed. Teacher |
| LESLIE J. CHARLES | Leslie J. Charles | Speech Language Pathologist |
| Brenda Kessler | via Telephone | Psychologist |

The purpose of the meeting was to discuss
placement. DCPS determined that Ludlow Taylor
Autism program can be his academic, speech
language & psychological needs.

Ludlow Taylor participated via telephone

Based on today's meeting, the mother rejected
the placement at Ludlow Taylor. She will visit
the program to obtain a better understanding of
the school's program. The mother was
offered to have speech language and OT services
but at this time, she expressed that she was
not prepared to accept the services.



## Central Assessment Referral and Evaluations (C.A.R.E.) CENTER

Office of Special Education
(Located at Shaw Junior High School)
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0882



## OCCUPATIONAL THERAPY EVALUATION REPORT

### STUDENT IDENTIFYING INFORMATION:

| | |
|---|---|
| Student Name: | N██████ A████ |
| D.O.B.: | ████95 |
| Parent(s): | Claudia Alderman |
| Therapist: | Wanda R. Banks, M.A., OTR/L |
| Date of Evaluation: | 7/17/06 |
| Date of Report: | 7/29/06 |

### Background Information:

N██████ is an 11 year 2 month old male who was referred for an occupational therapy evaluation to determine whether school based occupational therapy services are warranted.

### BEHAVIORAL OBSERVATIONS

N██████ came to a testing area that was free from distractions willingly with this therapist after some encouragement from his mother. N██████ responded to questions by this therapist concerning his likes in which he stated computer programming and games. He was cooperative during most of the evaluation; however, near the end of the evaluation session he did require a good deal of coaxing to complete the activities.

### ASSESSMENTS ADMINISTERED

1. Bruininks-Oseretsky Test of Motor Proficiency (Fine Motor Composite)
2. Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI) 5th edition
3. Clinical Observations
4. Sensory Profile (Informal) completed by Claudia Alderman

### ASSESSMENT RESULTS

** It should be noted that the numerical scores for these tests are based on children without developmental delays. The Age Equivalents, although easily understood, are often not the best measure of a child's growth from year to year. The standardized score, which is not dependent on age, but the number of correct responses given out of all the possible answers. may be more accurately used for comparison purposes.

94

**Bruininks-Oseretsky Test of Motor Proficiency**

The Bruininks-Oseretsky Test of Motor Proficiency is an individually administered test that assesses the motor functioning of children from 4.5 to 14.5 years of age.  The fine motor subtests were administered.  These subtests measure a child's ability to respond quickly to a moving visual stimulus, to coordinate precise hand and visual movements, and hand and finger dexterity, hand speed and arm speed.  Nathaniel's scores are recorded below:

### BOT of Motor Proficiency

| Fine Motor Subtest | Raw Score | Standard Score | Age Equivalence | Description of Performance |
|---|---|---|---|---|
| Response Speed | 10 | 15 | 11 yrs 8 months | Average |
| Visual Motor Control | 20 | 14 | 10 yrs 2 months | Average |
| Upper Limb Speed & Dexterity | 39 | 8 | 9 yrs 2 months | Below Average |
| Fine Motor Composite | Sum Of Standard Score | 37 | Percentile Rank | 50 |
| Description of Performance for Fine Motor Composite | Average | | | |

On the Response Speed subtest N████ was able to coordinate his eye and hand movements to stop the response speed stick.  His movements appeared quick and coordinated.  N████ understood the directions and he stopped the speed stick 7 out of 7 trials.  This task was performed with his preferred hand, which is his right hand.  His raw score of 10 for this subtest was in the average range.  N████ exhibited good attention during this task.

The items on the Visual-Motor Control subtest were done with his preferred hand, which is his left hand.  On the Visual-Motor Control subtest N████ was able to cut out a circle with his preferred hand with no errors.  He held the scissors in his right hand and manipulated the paper with his left hand.  He used smooth and coordinated cuts.  He demonstrated the ability to draw a line through various paths (crooked, straight and curved) with minimal errors.  N████ completed the crooked path with no errors; however, he had 1 error on the straight path and 3 errors on the curved path.  When drawing the lines through the different paths N████ moves very quickly.  And when drawing on the straight and curved paths he turns his paper.  With the crooked path his movements were fluid but with the straight and curved paths his movements were less fluid and had more of a stop and go pattern.    The copying tasks were scored on a point system of 0, 1, or 2. When copying a circle, triangle and a horizontal diamond N████ scored a 2 for each shape, which is described as a good reproduction, and he scored a 1 on the overlapping pencils, which is described as an adequate reproduction.  The items in the Upper-Limb Speed and Dexterity subtest were performed with either both hands or his preferred hand. When placing pennies in a box he was able to coordinate his finger movements to move

quickly through this task. He was able to place 18 pennies in the box in 15 seconds, which gave him a point score of 5 out of 8.   When placing pennies in two boxes with both hands he demonstrated the ability to move both hands at the same rate of speed to place the pennies at the same time. N█████ was able to complete the task in 14 seconds, which gave him a point score of 7 out of a possible 10.   When sorting cards he held the deck of cards in his left hand and sorted them with his right hand.  His movements demonstrated a consistent speed and he was able to sort 17 cards in 15 seconds, which gave him a point score of 4 out of a possible 10.  On the stringing beads task N█████ was able to string 6 beads in 15 seconds, which gave him a point score of 3 out of 7.  He was able to coordinate his hand movements to complete the task. He held the string and picked up the beads with a pincer grasp.  N█████ was able to displace 12 pegs using his right hand in 15 seconds. He used a pincer grasp to pick up each peg and move it to the row above.  His finger movements were coordinated.  When he performed the drawing vertical lines task N█████ moved quickly through this task and at times his movements appeared unorganized.  On the making dots in circles with his preferred hand N█████ was able to make 23 dots in 15 seconds.  And on the making dots with his preferred hand he was able to make 48 dots in 15 seconds. With these tasks N█████ started to get frustrated because he could not see the dots he was making with the red pencil for the tasks.  I assured him that I could see them and it was fine and he continued on with the task; however, I could see that N█████ was still frustrated with the task.  I think that his frustration affected his performance on these tasks.

N█████ score are in the average range for respond speed and in the average range for visual- motor control.  For the upper limb speed and dexterity subtest his scores were in the below average range; however, overall N█████ fine motor composite score was in the average range.

**Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI) 5th edition**
The VMI is a test that measures a child's visual motor and perceptual and motor coordination skills by having them copy a series of increasingly complex lines, shapes, and designs, where they receive a score of 0 or 1 depending on how accurate the drawing is.  Visual-motor integration is the degree to which visual perception and finger-hand movements are well coordinated.  N█████ performance scores are recorded below:

### Beery VMI

|  | VMI | Visual Perception | Visual Motor |
|---|---|---|---|
| Raw Scores | 21 | 28 | 20 |
| Standard Scores | 85 | 113 | 76 |
| Scaled Scores | 7 | 13 | 5 |
| Percentiles | 16 | 81 | 5 |
| Age Equivalents | 8 yrs 4 months | 14 yrs 3 months | 6 yrs 11 months |
| Standard Score Interpretation | Below Average | Above Average | Low |

96

3

N███████ achieved a standard of 85 on VMI section, which is in the below average range. On the visual perception test he achieved a standard score of 113, which is in the above average range. And on the visual motor test N███████ achieved a standard score of 76, which is in the low range. N███████ held his pencil with his right hand with four fingers and thumb directed toward the paper. He moved quickly through VMI test booklet quickly drawing each stimulus. He was attentive to each page and maintained eye contact. N███████ made noises throughout the visual perception portion of the test as he indicated the correct answers. He visually scanned all of the answer choices and moved quickly through this portion of the test. During the motor coordination section he drew some of the shapes segmentally as opposed to one continuous stroke. N███████ area of difficulty appeared to be with motor coordination. N███████ was able to visually perceive the various stimuli but he had difficulty with motor coordination in relation to the reproduction.

## CLINICAL OBSERVATIONS

N███████ appeared to have low muscle tone throughout his trunk and extremities as noted by his difficulty with assuming and maintaining anti-gravity postures. He assumed the prone extension posture segmentally, his face was raised less than 45 degrees, his back was minimally arched and his thighs and knees remained on the floor. He appeared to exert considerable amount of effort to maintain the position. With the supine flexor posture N███████ was able to assume and maintain the position for approximately 11 seconds but he was unable to hold the position against resistance. N███████ was able to assume and maintain his balance during the reflex inhibiting posture right and left. N███████ was able to do jumping jacks with fair rhythm and coordination. His range of motion (degree of movement in his joints) was normal. His equilibrium reactions appear to be present. He demonstrated fair posture while sitting at the table; he tends to lean his trunk toward the table. Visual skills focus on the student's ability to organize and interpret sensory input needed for an appropriate adaptive response and interaction with the environment. N███ is able to track an object as it moves in horizontal, vertical, and diagonal planes using smooth and coordinated eye movements with small jerks and hesitations noted. Clinical Observations were made of N███████ hand dominance; grasp pattern, writing pressure, spacing/alignment, directionality/reversals, and stabilization of written work. N███████ is right-handed to use a pencil and to cut. N███████ held his pencil with his right hand with four fingers and thumb directed toward the paper. N███████ was asked to write his name first and last. He used a combination of upper and lowercase letters appropriately. Some of his lack complete and accurate formation but you can tell what letter he was trying to make. Some of his letters are not completely closed. This was also observed when he wrote the alphabet in upper case letters. He stabilized the paper with his left hand. His writing was very heavy and dark and this was also observed on the VMI. He drawings were so heavy that an impression was seen on back of the page.

## SENSORY PROFILE (INFORMAL)

The Sensory Profile is a measure of children's responses to sensory events in daily life. The caregiver completes the Sensory Profile by assessing the frequency of the child's responses to certain sensory processing, modulation, and behavioral/emotional events as described in the 125 items. We know from research that the Sensory Profile can help

identify the child's sensory processing patterns; then we can consider how these patterns might be contributing to or creating barriers to performance in daily life. The sensory Profile is for children ages 3 to 10 years and because N██████ is 11 years 2 months of age this will be used informally.

N██████ mother, Claudia Alderman, completed the Sensory profile caregiver questionnaire. Mrs. Alderman's main concern is his sensory regulation.

## Sensory Processing

In the area of Auditory processing (measures the child's responses to things heard) N██████ responds negatively to unexpected or loud noises, holds his hands over ears to protect ears from sound, is distracted or has trouble functioning if there is a lot of noise around, appears to not hear what you say, does not respond when name is called but his hearing is OK and seeks to make noise for noise's sake. N██████ demonstrated making noises for noises sake during the visual perception section of the VMI. He would make a noise when he indicated the answer.

In the area of Visual Processing (measures the child's responses to things seen) Mrs. Alderman reports that N██████ occasionally prefers to in the dark, expresses discomfort with or avoids bright lights, looks carefully or intensely at objects/people or has a hard time finding objects in competing backgrounds.

With Vestibular Processing (measures child's responses to movement) N██████ always seeks all kinds of movement activities and it interferes with daily routines and he frequently rocks in desk/chair or on the floor.

In the area of Touch Processing (measures the child's responses to stimuli that touch the skin) N██████ expresses distress during grooming, avoids wearing shoes; loves to be barefoot, and does not seem to notice when face or hands are messy. He frequently is sensitive to certain fabrics (ex. Is particular about certain clothes or bed sheets), becomes irritated by shoes or socks, and has difficulty standing in line or close to other people.

With Multisensory Processing (measures the child's responses to activities that contain a combined sensory experience) N██████ always has difficulty paying attention, looks away from tasks to notice all actions in the room and he frequently leaves clothing twisted on body.

In the area of Oral Sensory Processing (measures the child's responses to touch and taste stimuli to the mouth) Mrs. Alderman reports that N██████ always avoids certain tastes or food smells that are typically part of children's diets, will only eat certain tastes (bland and sour), limits self to particular food textures, picky eater, especially regarding food textures, avoids smells, shows strong preferences for bland tasting foods, craves certain foods such as pasta and sweets, chews or licks nonfood objects, and mouths objects.

## Modulation

In the area of Sensory Processing Related to Endurance/Tone (measures the child's ability to sustain performance) N██████ always props to support self even during an activity and he frequently tires easily, especially when standing, and he seems to have weak muscles.

In the area of Modulation Related to Body Position and Movement (measures the child's ability to move effectively) N██████ occasionally seems accident prone, takes excessive risks during play, takes movement or climbing risks during play that compromise

personal safety, and turns whole body to look at you.

In the area of Modulation of Movement Affecting Activity Level (measures the child's demonstration of activeness) N██████ frequently spends most of the day in sedentary play, prefers quiet sedentary play, seeks sedentary play options, and prefers sedentary activities.

In the area of Modulation of Sensory Input Affecting-Emotional Responses (measure the child's ability to use body senses to generate emotional responses) he always does not perceive body language or facial expressions and he frequently needs more protection from life that other children.

With Modulation of Visual Input Affecting Emotional Responses and Activity Level (measures the child's ability to use visual cues to establish contact with others) N██████ always avoids eye contact and watches everyone when they move around the room.

### Behavioral and Emotional Responses

In the area of Emotional/Social Responses (indicates the child's psychosocial coping strategies) N██████ always reacts immaturely to situations displays excessive emotional outburst when unsuccessful at a task, and has a poor frustration tolerance. He frequently seems anxious and cries easily.

With the area of Behavioral Outcomes of Sensory Processing (indicates the child's ability to meet performance demands) Mrs. Alderman reports that he always has an inefficient ways of doing things, has difficulty tolerating changes in plans and expectations and has difficulty tolerating changes in routines.

In the area of Items Indicating Thresholds for Response (indicates the child's level of modulation) N██████ always jumps from one activity to another so that it interferes with play.

N██████ appears to be a child who has difficulty processing and modulating sensory input as noted by his varying reactions to sensory input as reported by his mother. Also N██████ appears to have behavioral and emotional responses in relation to sensory input.

### SUMMARY and RECOMMENDATIONS

N██████ is an 11 year 2 month old male who is in need of school based occupational therapy services. He achieved scores in the average range on the Bruininks-Oseretsky Test of Motor Proficiency (Fine Motor Composite) for response speed and visual motor control and in the below average range for upper-limb speed and dexterity. On the VMI N██████ scores were in the below average range for visual motor integration, in the above average range for perception and in the low range for motor coordination. He required some redirection during testing and near the end of testing he required a good deal of coaxing to complete the tasks. N██████ exhibits low muscle tone throughout his body. With handwriting some of his letters lack closure and his writing is very heavy and dark which is related to his low muscle tone. He tends to hold his pencil somewhat tight, which gives him information about his fingers, and what they are doing; however, holding his pencil tight can cause his fingers to tire. He exhibits difficulties with sensory processing and modulating sensory input. N██████ should receive direct Occupational Therapy services for 60 minutes a week and consultation to classroom staff at least twice a month to

address his needs in the classroom setting. A sensory diet should be developed by the treating Occupational Therapist and used by N███████ in the classroom setting to meet his sensory needs throughout the school day. A slant board should be used in the classroom during writing activities to help facilitate appropriate sitting posture and wrist extension.

The teachers and family working with are more than welcome to contact the C.A.R.E. Center for further information, as needed. The number for the C.A.R.E. Center is 202-671-0882. Thank You.

Wanda R. Banks, M.A., OTR/L

100



District of Columbia Public Schools
Office of Special Education



## INDIVIDUALIZED SERVICES(S) PLAN FOR
## PARENTALLY PLACED PRIVATE/RELIGIOUS SCHOOL STUDENTS

Student Name: ~~N⸻~~  DOB: _Ivy Mount_  School: _DOB ⸻ 95_

The district and the parent/guardian of the student agree that the district has offered the student a Free Appropriate Public Education (F.A.P.E.) pursuant to the IEP date _11-13-06_ (see attached). Parents have declined this IEP and instead have placed the student in the _Ivy Mount_ private/religious school at their own expense. The parents agree that the district has no responsibility for the costs of the private/religious school placement.

Pursuant to 20 USC 1412(a)(10) (IDEA 97), the Local Education Agency (LEA) will provide special education service (s) per the agreement as outlined below for the student while enrolled in private-religious school.

| Special Education Service | Frequency of Service | Duration | Location | Start Date | End Date |
|---|---|---|---|---|---|
| Speech Therapy | Weekly | 1 hour | TBD | | |
| | | | | | |

Area of need: _Communication_

Present Level: _ROWPVT-SS-134; CASL-101 (pragmatic language subtest score = 80 - below average)._

Annual Goal: _N⸻ will demonstrate improvement in pragmatic language as evidenced by mastery of short-term objectives_

Benchmarks: _With 80% accuracy._

Personnel Responsible: _Speech-Language Pathologist_

_The parents understand in accordance with IDEA 97, their rights to due process do not apply in the Private Religious setting_

Parent Signature: ⸻  Date: _1/23/07_

IEP Chair Signature: _Vena Q. Banner_  Date: _1/23/07_

Student's Case Manager: _Gloria T. Everett_  Date: _1/23/07_

Other: _Leslie Charles, SLP, DCPS_  Date: _1-23-07_

Next Annual Review Date: _11-29-07_   Next Triennial Review Date: _11-29-09_

101

# INDIVIDUALIZED SERVICES PLAN
## (ISP)
## MEETING NOTES

STUDENT ~~Nathaniel Abrams~~  SCHOOL _Ivy Mount_  DATE _11/3/07_

**PARTICIPANTS:**     **PARTICIPANTS (Sign Name)**     **DISCIPLINE**

Gloria T. Everett     Gloria T. Everett     LEA

Vena O. Banner     Vena O. Banner     ISP developer

Jermaine Perkins     Jermaine R...     School Psychologist

Harry Brockenberry     Harry Brockenberry     General Ed.

~~Nathaniel~~ presents as a student who is academically competent and proficient in the use and understanding of language, however he continues to present with pragmatic language difficulties. Current assessments reveal average to high average performance on the CASL Core language subtests with exception of pragmatic language which fell in the below average range. ~~Nathaniel~~ often experiences more difficulty with pragmatic language than the testing actually reveals. This deficit in pragmatic language may be impacting upon his adjustment to a new school situation and making new friends as well as the appropriate use of social language. ~~Nathaniel~~ will benefit from one hour of therapy (speech-language) ~~as~~ weekly to continue to address his language needs as related to his academic performance.



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557
www.k12.dc.us

## REVIEW OF INDEPENDENT EVAUATION
### (Confidential-for professional use only)

NAME: N████ A█████                 REPORT DATE: 7/07/06
AGE: 11 years, 2 months             REVIEWER: Jermaine Perkins
DATE OF BIRTH: ███/95
GENDER: Male
ID: 9087019
GRADE: 5th
SCHOOL: Homeschooled

**Assessment Techniques Utilized:**

Record Review (7/07/06)
- Neuropsychological Re-Evaluation—Summary Report

**Independent Evaluation Review**

    N████ was referred for assessment by his parents in order to provide a measure of his progress since an initial evaluation as well as determine school placement (i.e. re-entry into formal school) for the upcoming school year. During the evaluation, the examiner noted more significant difficulties with expressive and receptive language than had previously been suspected.

    In order to assess N████ cognitive functioning; he was given the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV). His general intellectual ability was estimated to be in the Superior range (FSIQ=122; 93rd percentile). N████ verbal (VCI=124; 95th percentile) and nonverbal (PRI=123; 94th percentile) reasoning abilities were respectively considered to be well above most children his age. His abilities to abstract underlying concepts (verbal and pictorial), verbally conceptualize word meanings, and organize information in space were all considered to be personal strengths. Supplementary subtests of verbal fluid reasoning generally supported his performances on the WISC-IV. Within the language domain, there were noted difficulties with the delayed retrieval of information and verbal fluency (moderate).

103
DCPS 04

N███████ performances across attention and executive functioning related subtests suggested Average to Above Average abilities.  The examiner did note that his test behavior along with parent and teacher reports were still consistent with problems with "hyperactivity, impulsivity, inattention, and disorganization."  It was further suggested that he demonstrated features of an "overfocused" attention disorder because of described difficulties with shifting attention and "hyperfocus."

       N███████ was educationally evaluated using the WJ-III Tests of Achievement and TOWRE.  His overall reading skills were in the Superior range.  Sight word reading, word attack, reading fluency, and comprehension skills ranged from Average to Very Superior.  N███████ overall math skills were considered to be in the Average range.  Strengths were noted with tasks that required the integration of math reasoning and problem-solving skills while he had moderate struggles on a timed task of math fact recall.  His written language skills were designated as being in the Superior range.  All areas of written expression were considered as above his same-age peers.  On a test of visual motor integration, he performed below his age-mates.  Based on this evaluation and past information, N███████ was given the following diagnoses: Aspergers Disorder; Mood Regulation Disorder; ADHD; Disorder of Written Output; and Written Language Disorder.

### Summary and Impressions

       Based on the reviewed independent evaluation, N███████ does not appear to meet the DCPS criteria for a child with a Learning Disability.   Although the examiner denoted a Disorder of Written Output, which would fall under the DSM-IV-TR category of Learning Disorder (NOS), evaluation information does not indicate deficits that would exclusively substantiate this diagnosis.  Moreover, the noted and moderate linguistic and attention and organization issues, as related to written expression, are common of children with Aspergers Disorder and ADHD.  It is believed that these diagnoses better reflect N███████ social and educational functioning.  Given test results also suggest concern that fine-motor difficulties may be contributing to his disdain for writing.  A final determination regarding eligibility for Special Education and/or related services will be made at the Multi-Disciplinary Team (MDT) meeting.

**This report is valid only if signed by a qualified professional:**

Jermaine Perkins
School Psychologist

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**Meeting Notice**

MDT Referral Date: _____

FAXED

DEC 2 1 2006

Date 12/20/06

Re: _____

**Letter of Invitation**

Dear Mr. & Mrs. Alderman _____

A multidisciplinary team (MDT) meeting is scheduled to discuss the status of your child's educational needs. Your participation is essential, and we look forward to your valuable input. The purpose and details of the meeting are printed below. You and the school may have additional individuals attend the meeting who have knowledge or special expertise regarding your child. Other invited participants are listed under MDT members.

Place/Location:

CARE Center
925 Rhode Island, NE
Washington, DC 20001

**Please check one date for confirmation:**

☒ Date: 01/23/06 (07)    Time: 9:30 AM  ; or

☐ Date: 01/24/06    Time: 1:00 PM  ; or

☐ Date: _____    Time: _____

If a suggested meeting time is inconvenient, please call the counselor and/or special education coordinator for a mutual time to address the concerns. Participation by teleconference may be requested if other arrangements prove to be unsuccessful.

**\*The purpose of this meeting is to:**

☒ \*\*develop/review IEP (including consideration of extended school year (ESY) services)    ☐ \*\*discuss CompEd

☐ \*\*review evaluation or reevaluation information    ☒ discuss placement    ☐ \*consider transition services needs

☒ develop the student evaluation plan (SEP)    ☐ determine manifestation    ☐ discuss quarterly review

☐ discuss documented levels of service    ☒ discuss eligibility    ☐ behavior plan review

☐ \*\*review records to support the completion of services as follows:

☐ Graduated    ☐ Completed Services    ☐ Aged Out    ☐ Transferred Out of District    ☐ Dropped Out

☐ Other: _____

**\*\*Placement will be discussed.**

MDT Members:    ☐ Principal or Designee    ☒ General Education Teacher    ☒ Psychologist

☒ Parent    ☒ Special Education Teacher    ☐ Other: _____

☒ LEA Representative    ☐ Speech and Language    _____

☐ Student    ☐ Social Worker    _____

Any questions you may have concerning your child's program will be discussed at the above meeting. A copy of the Procedural Safeguards for parents is enclosed for your information. If the school can be of assistance to you, please contact

Gloria T. Everett _____ at 671-0882 _____ (school telephone number).

If the purpose of the meeting includes consideration of a transition plan, your child is invited to attend and a representative of the following agency(ies) may be invited, if appropriate

_____    •    _____

**See attachments, when appropriate, for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

**\*After the third attempt to contact the parent, the meeting will be held without further notice.**

Please sign below and return this page to the school.

Parent/Guardian/Surrogate Signature _____    Date 12/21/06

I acknowledge receipt of the Procedural Safeguards for parents (due process procedures).    ☐ Yes    ☐ No

105

NCPS 05

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**STUDENT EVALUATION PLAN**
**(SEP)**

MDT REFERRAL DATE: _____

MEETING DATE: 5/5/06

STUDENT: N█████ A█████_____ DOB: ██/95 AGE: 10 GRADE: 5 SCHOOL: Home

STUDENT IDENTIFICATION NUMBER: _____ TEACHER / HOMEROOM: _____

ADDRESS: 3505 34th St. NW> WDC 20008

PARENT(S)/GUARDIAN: Harold & Claudia Alderman    TELEPHONE (H): 2/362-6979    (W): 2/473-0372

**Summarize Area(s) of Concern:**

Areas of Concern: Academics greatly affected by his behavioral concerns
See MDT notes

**Team Recommendations:**

The following Student Evaluation Plan is recommended for your child Nathaniel :

- Review Neuropsychological Eval.
- Review Speech
- Review OT
- Updated educational eval if warranted

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☒ Speech/Language | Review | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other  X Observation | Other: Neuropsych Review  Other: | | | |
| X | OT Review | | | |

| TEAM MEMBERS: NAME | POSITION | TEAM MEMBERS: NAME | POSITION |
|---|---|---|---|
| ____ Hall | | Maria T. Everett | Case Manager |
| Natalie Ansah | Assessment Coordinator | | |
| Lisa A. Flynn | School Psychologist | | |
| Claudia Alderman | | | |
| X | | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

Place completed form in MDT folder.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

106

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES**

MDT REFERRAL DATE: _Alderman_   MEETING DATE: _10/10/06_

STUDENT: ~~N_____ C_____~~   SCHOOL: __CARE Center__

PARTICIPANTS: (Print Name)   PARTICIPANTS: (Sign Name)   POSITION

_Bonnie Beers_   _via telephone_   _Acting Director_
_Stephanie Fulford_   _via telephone_   _Classroom teacher_

**Introduction:**
The meeting convened and all team members introduced themselves. The purpose of the meeting was stated, which is to review the current assessments and determine the student's eligibility for special education and related services. If the student is found eligible, the team will develop the I.E.P and discuss placement.

**The Parent Reports and/or Social History:** _According to mother student is on & above grade level. He has been home-schooled for the two school years. Student's current diagnoses are ADHD, Aspergers Disorder, written-language disorder, Mood Regulation Disorder and Written Output. The mother helped to establish his current school. He had attended several schools prior to enrolling in Guyot. Currently student appears to enjoy school. He attends daily. She agreed with schools accommodations as student is able to available for learning._

**The General Educators Report** _1st time at current school. 6-8 boys in classroom of 5th/6th graders. Two teachers, 2 teacher aides & other professional work in the classroom. According to teacher transition into the school presented problems. He leaves the classroom to go to certain locations in the school. He is attempting to establish peer relationships. In social skills class creates_

THE PARENT [X] IS PRESENT ☐ IS NOT PRESENT AT THE MEETING.

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT ~~N_____ C_____~~

[X] IS ELIGIBLE FOR SPECIAL EDUCATION   ☐ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS NOT ELIGIBLE FOR SPECIAL EDUCATION   ☐ IS TO BE EXITED FROM SPECIAL EDUCATION

107

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

2  | MDT |

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

STUDENT: N███████ A███████          SCHOOL: _Ivy Mount_    DATE: _10/10/06_

PARTICIPANTS: (Print Name)

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Claudia Alderman | Claudia Alderman | mother |
| Monica H. Titus | Monica H. | Occupational Therapist |
| Gloria T. Everett | Gloria T. Everett | LEA |
| Tawana Hinton, MSECC-SLP | Tawana Hinton | Speech Pathologist |
| Haylie Isman | Haylie M. | attorney for family |
| Jermaine Perkins | | School Psychologist |
| Carlos W. Phillip | Carl Phillip | School Psychologist |
| Vecia O. Banner | Vecia O. Banner | IEP developer/Spec Ed |

**OT Notes**

N█████ is an 11 year 2 month old male who is in need of school based occupational therapy services. He achieved scores in the average range on the Bruininks-Oseretsky Test of Motor Proficiency (Fine Motor Composite) for response speed and visual motor control and in the below average range for upper-limb speed and dexterity. On the VMI N█████ scores were in the below average range for visual motor integration, in the above average range for perception and in the low range for motor coordination. He required some redirection during testing and near the end of testing he required a good deal of coaxing to complete the tasks. N█████ exhibits low muscle tone throughout his body. With handwriting some of his letters lack closure and his writing is very heavy and dark which is related to his low muscle tone. He tends to hold his pencil somewhat tight, which gives him information about his fingers, and what they are doing; however, holding his pencil tight can cause his fingers to tire. He exhibits difficulties with sensory processing and modulating sensory input. N█████ should receive direct Occupational Therapy services for 60 minutes a week and consultation to classroom staff at least twice a month to address his needs in the classroom setting. A sensory diet should be developed by the treating Occupational Therapist and used by N█████ in the classroom setting to meet his sensory needs throughout the school day. A slant board should be used in the classroom during writing activities to help facilitate appropriate sitting posture and wrist extension

District of Columbia Public Schools
Washington, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

STUDENT: N‌̅̅̅̅̅̅̅ A‌̅̅̅̅̅̅̅    SCHOOL: Ivymount    DATE: 10/10/06

## Speech Therapist

N‌̅̅̅̅̅ was evaluated by Tawana Hinton on 9/8 & 9/18/06 at Ivymount School. The student was observed in the classroom prior to the first testing session. The following tests were administered: The Comprehensive Assessment of Spoken Language (CASL) and the Receptive One Word Picture Vocabulary Test (ROWPVT)

CASL:
Antonyms - ss 109
Grammatical Morphemes - ss 107
Sentence Comprehension - ss 114
Nonliteral Language - ss 97
Pragmatic Judgment - ss 80 (Below Average)
CORE COMPOSITE - ss 101

ROWPVT
Standard score 134 (Superior)

Articulation, voice, fluency, hearing and oral-motor functioning are within normal parameters for the purpose of the evaluation.

N‌̅̅̅̅̅ has been home-schooled for the past two years and has received speech-language therapy through Communication Enrichment Services.

Speech-language-therapy is recommended for one hour weekly to address pragmatic language areas.

District of Columbia Public Schools
Washington, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

STUDENT: ██████████  SCHOOL: Ivymount  DATE: 10/10/06

Based on reviewed Independent Evaluations, the Students difficulties in the classroom appear to be related to the diagnoses of Asperger Disorder; Mood Regulation Disorder; and ADHD. This examiner disagreed with the Disorder of Written Output; of which was thought to be related to OT issues.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS      DIVISION OF SPECIAL EDUCATION      MDT MEETING NOTES

110

District of Columbia Public Schools
Washington, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

STUDENT: _N_____ A_____    SCHOOL: _IvyMount_    DATE: _10/10/06_

## Psychologist

An Independent Neuropsychological Re-Evaluation was performed, which was undertaken in order to determine progress and school placement. The student obtained the following scores.

WISC-IV
VCI = 124
PRI = 123
WMI = 104
PSI = 112
FSIQ = 122

WJ-III Understand Direction = 79th percentile
OWLS Listening Comprehension = 58th %
WRAML Sentence Memory = 50th %
     "    Story Memory = 25th %
     Delayed Recall = 9th %
     Recognition Memory = 50th %
Boston Naming Test = 92nd %
TLC-E Oral Expression = 50th %
CTOPP Rapid Naming = 91; 27th %
     Rapid Digit Naming = 9th percentile
     Rapid Letter Naming = 8th; 25th %

WJ-III Concept Formation = 83rd percentile
WJ-R Verbal Analogies = 57th percentile
Rey-Osterrieth Complex Figure = <20th percentile
WJ-III Visual Matching = 71st percentile
D-KEFS Verbal Fluency
     Letter " = 48th percentile
     Category = 25th percentile
     Category Switching = 50th – 75th percentile

Consolidation of Target Items
Subtest 1 = Average
          2 = Average
          3 = Average

WJ-III Tests of Achievement
Broad Reading = 124
Broad Math = 104
Broad Written Lang = 124

Letter-Word Id = 109
Reading Fluency = 140
Passage Comprehension = 94
Word Attack = 113

Calculation = 100
Applied Prob. = 110
Math Fluency = 99

TOWRE – Sight Word Efficiency = 111
     Phonetic Decoding " = 117
     Total = 117

Spelling = 118
Writing Sample = 115
Writing Fluency = 125 _(Continued)_

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, DC**

**CONTINUATION MEETING NOTES**

MEETING TYPE: _____ ~~___~~        Page: 6 of 6

Student: ~~___~~    School: Ivymount    Date: 10/10/06

difficulties. When allowed to work on the computer, student becomes overly focused and can work on this computer for hours. Behavior interventions are used in the classroom to monitor his behavior. His behavior interventions goals were modified to address this issues.

The classroom teacher listed accommodations given to student.

N_____ meets the criteria for eligibility as a student with Multiple Disability in the areas of Autism and Other Health Impairment - MD (Autism/OHI).

Due to time constraints, the MDT agreed to reconvene on 10/25/06 at 1:30 PM at the C.A.R.E. Center. Ivymount agreed to participate by phone on that day.

## Autism
### Eligibility Determination Form
(Attach MDT Meeting Notes)

| Student's Full Name: N̶u̶t̶h̶a̶n̶ A̶l̶—̶ | Student ID: 9087019 |
| Date of Birth: —95 | Date of MDT: 10 10 06 |
| Attending School: Ivy Mount | Neighborhood School: John Eaton |

In order to determine if a student to have the disability of Autism and is eligible for specialized instruction and/or related services the MDT must compare evaluation data and document that:

| | | |
|---|---|---|
| ●Y  o N<br><br>o Insufficient<br>(There is NOT enough documentation available to make a determination) | 1a. | The student has a developmental disability, generally evident prior to age 3, significantly effecting verbal and nonverbal communication (must be present for eligibility),<br>☐ delay in, or lack of spoken language development (with no compensation through alternative modes of communication)<br>☑ in verbal persons, marked impairment in conversational skills<br>☑ stereotyped and repetitive use of language<br>☑ lack of spontaneous age-appropriate make-believe or social imitative play, and |
| ●Y  o N<br><br>o Insufficient | 1b. | The student has a developmental disability effecting social interaction (must be present for eligibility,<br>☑ marked impairment in the use of multiple nonverbal behaviors<br>☑ failure to develop age appropriate peer relationships<br>☑ lack of spontaneous seeking to share interests and achievement with others<br>☑ lack of social or emotional reciprocity, and |
| ●Y  o N<br><br>o Insufficient | 1c. | The student has a developmental disability effecting behavior (must be present for eligibility).<br>☑ preoccupation with at least one stereotyped and restricted pattern of interest to an abnor—: degree<br>☑ inflexible adherence to nonfunctional routines or rituals<br>☐ stereotyped and repetitive motor mannerisms<br>☐ preoccupation with parts of objects. |
| ●Y  o N<br><br>o Insufficient | 2. | Evaluation information confirms there is an adverse effect on educational performance (must be present for eligibility). ✗ |

Supporting Evidence [Type(s) of documentation used to make the determination, i.e., psycho-educational evaluation, speech language evaluation, classroom work, teacher observation, etc.]: Neuropsychological Evaluation; Parents reports ; teacher reports.

| ●Y  o N | Evaluation information confirms that lack of instruction in reading and/or math was not a determinant factor in the eligibility decision. |
| ●Y  o N | Evaluation confirms that limited English proficiency was not a determinant factor in the eligibility decision. |
| ●Y  o N | The student's deficits are not **primarily** the result of an emotional disturbance, speech or language impairment or mental retardation. |

The MDT used the above interpretation of the evaluation data to determine:

☑ The student has Autism and is eligible for specially designed instruction and/or related services (Criteria 1and 2 MUST all be checked to be eligible), or

☐ The student does not have Autism, or

☐ Evaluation data is insufficient to determine eligibility. Additional assessments and/or data will be obtained in the area(s) as indicated on the STUDENT EVALUATION PLAN (SEP). The MDT will reconvene by _____ to review and determine eligibility.

*All medical documentation must be reviewed by the DCPS medical doctor.

# Other Health Impairment (OHI)
## Eligibility Determination Form
### (Attach MDT Meeting Notes)

| Student's Full Name: N_____ A_____ | Student ID: 908 7019 |
|---|---|
| Date of Birth: _____ 95 | Date of MDT: 10 | 10 | 06 |
| Attending School: Ivy Mount | Neighborhood School: John Eaton |

In order to determine if a student to have the disability of Other Health Impairment and is eligible for specialized instruction and/or related services, the MDT must compare evaluation data and document that:

| | | |
|---|---|---|
| ●Y ○N ○ Insufficient (There is NOT enough documentation available to make a determination) | 1a. | A health impairment caused by chronic or acute health problems such as heart condition, tuberculosis, sickle cell anemia, hemophilia, epilepsy, rheumatic fever, nephritis, asthma, lead poisoning, leukemia, diabetes, acquired immune deficiency syndrome, attention deficit disorder, or attention deficit hyperactive disorder. The diagnosis of Other Health Impairment is (specify): |
| ●Y ○N ○ Insufficient | 1b. | The impairment effects the following (check all that apply): |
| | | Strength, or |
| | | Vitality, or |
| | | ☒ Alertness (including heightened alertness to environmental stimuli that results in limited alertness with respect to the educational decision. |
| ●Y ○N ○ Insufficient | 2. | Evaluation information confirms there is an adverse effect on educational performance. |
| ●Y ○N ○ Insufficient | 3. | Diagnosed by a physician as having an other health impairment. *Psychologist determined* |
| Supporting Evidence [Type(s) of documentation used to make the determination, i.e., psycho-educational evaluation, speech, language evaluation, classroom work, teacher observation, etc.]: *Neuropsychological Evaluation, parent reports, and teacher reports.* | | |
| ●Y ○N | | Evaluation information confirms that lack of instruction in reading and/or math was not a determinant factor in the eligibility decision. |
| ●Y ○N | | Evaluation information confirms that limited English proficiency was not a determinant factor in the eligibility decision. |

The MDT used the above interpretation of the evaluation data to determine:

☒ The student has Other Health Impairment and is eligible for specially designed instruction and/or related services (Criteria 1, 2, and 3 MUST all be checked to be eligible), or

☐ The student does not have Other Health Impairment, or

☐ Evaluation data is insufficient to determine eligibility. Additional assessments and/or data will be obtained in the area(s) as indicated on the STUDENT EVALUATION PLAN (SEP). The MDT will reconvene by _____ to review and determine eligibility.

\* All medical documentation must be reviewed by a DCPS medical doctor.

September 20, 2002

114

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page 1 of 4
Additional Comments: ☐

### I. IDENTIFICATION INFORMATION

### II. CURRENT INFORMATION

Student Name: Last A█████████   First N██████   MI

Date of IEP Meeting: 11-13-06
Date of Last IEP Meeting:

Student ID 9087019   Soc. Sec. No.   Age: 11   Grade 5/6

Date of Most Recent Eligibility Decision:

Gender ☒ M ☐ F   Date of Birth ████95   Ethnic Group

Purpose of IEP Conference:
☐ Initial IEP   ☐ Review of IEP
☒ Requested Eval.   ☐ 3yr ReEval.

Address 3505   34th St. NW
House No.   Street Name

☐ Non-attending   Washington   DC   20008
City   State   Zip Code
Quadrant   Apartment #

Indicate Level of Standardized Assessment: III

Attending School Ivy Mount   Home School John Eaton

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS/J

Parent Dr Harold and Claudia Alderman

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

Address of (if different from student):   ☒ Parent ☐ Guardian ☐ Surrogate

| BEHAVIOR | TRANSPORTATION |
|---|---|
| ESY | TRANSITION |

House No.   Street Name   Quad   Apt. No.   City   State   Zip Code
Telephone: Home 202- 362-6979   Work 202-473-0372

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | N/A | Native Lang. | Oral |
| Parent | English | N/A | English | Native Lang. | Rdg./ Written |
| Home | English | N/A | English | Native Lang. | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | FREQUENCY Hr/ Min   D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos |
|---|---|---|---|---|---|
| Specialized Instruction | 24.5 | hr   W | Special Education Teacher | 11-14-06 | 10 mos |
| Speech/Language | 1.0 | hr   W | Speech Pathologist | 11-14-06 | 10 mos |
| Psychological Services | 1.0 | hr   W | Social Worker (Psychology) | 11-14-06 | 10 mos |
| OT | 1.0 | hr   W | Occupational Therapist | 11-14-06 | 10 mos |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL | 27.5 | Hours Per Week | | | |

### V. Disability(ies)   MD (Autism/OHI)

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%   ☐ 21-60%   ☒ 61-100%

Percent of time NOT in a Regular Education Setting 100%

### VI. IEP TEAM (Participants in the development of the IEP)

Claudia Alderman   parent
Angel D. Hunter   Angel D. Hunter via phone, Ivymount
Karen Ewart   via phone, Ivymount Counseling dept.
Jermaine Perkins
Tawana Hinton   Tawana Hinton

Print and sign your name below.
Wanda R. Banks   Wanda R. Banks, MA/SLC
Bonnie Beers   via phone Ivymount
Acting Director
Stephanie Fulford   via phone, Ivymount
Harry Brockenberry Gen Ed   Harry Brockenberry
Patricia Cyr   Patricia Cyr Counsel

☑ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature   Claudia Alderman   Date 1/23/07

District of Columbia Public Schools   07-02-2001   Division of Special Education   Appendix - A   IEP Page 1 of 4

115

| Student Name N▮▮▮▮▮ A▮▮▮▮▮ | | Managing School C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9087019 | DOB ▮▮▮/95 | Attending School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ☐

Area addressed by goal:  Motor/Health

ANNUAL GOAL: (including mastery criteria.)

To improve postural control and upper extremity strengthening to provide a stable base of support needed to facilitate better hand use for manipulation of classroom materials, posture while working or playing and mobility in school environments by the achievement of the below stated objectives

Provider(s): Occupational Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| N▮▮▮▮ will maintain a lifted and extended posture of the head, upper body, and legs while propelling a scooterboard in prone (on stomach) for a distance of 20 feet | | Monthly |
| N▮▮▮▮ will hold onto a bolster with arms and legs wrapped around it and with back toward the floor while bolster is tilted at an angle of 45 degrees from the floor for 25 seconds | | Monthly |
| N▮▮▮▮ will push off from a wall using hands while prone (on stomach) on a scooterboard, ending with hands at least 4 feet from walls 4 out of 5 opportunities | | Monthly |
| N▮▮▮▮ will wheelbarrow walk for a distance of 15 feet with support provided at his ankles | | Monthly |
| N▮▮▮▮ will maintain a functional sitting posture with upright head and trunk, hips at 90 degrees, and feet flat on the floor, without support from arms during classroom fine motor activities 80% of the time | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   ☐ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☐ Report   ☒ Other  Progress Report

| Student Name | N██████ A██████ | | Managing School | C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9087019 | DOB ██/95 | Attending School | | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |
|---|---|---|

Area addressed by goal: **Motor/Health**

**ANNUAL GOAL:** (including mastery criteria.)

To improve sensory processing skills by the achievement of the below stated objectives

**Provider(s):** Occupational Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| N█████ will particpate in sensory activities to include tactile, vestibular, proprioception, visual and auditory input without behavioral overreactions 90% of the time | | Monthly |
| N█████ will use components of sensory diet to include tactile, vestibular, proprioceptive, auditory, and visual activities to regulate senses independently 90% of the time | | Monthly |
| | | |
| | | |
| | | |
| | | |
| | | |

### EVALUATION PROCEDURE(S)

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☒ Other Progress Report

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

117

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

MAY - 2 2007

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

Of Counsel:
Matthew B. Bogin    MD, DC

May 2, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: N██████ A█████/DCPS
*via facsimile and regular mail*

Dear Ms. Newsome:

Enclosed please find the Parents' Motion for Reconsideration in the above-referenced matter. Please forward it immediately to Hearing Officer Herbert St. Clair for consideration.

If you have any questions regarding this matter, please contact my office. Thank you.

Sincerely,

Michael Eig

Enclosure

cc:    Rashida J. Wilson, Esq.
Mr. and Mrs. Alderman

118

MAY - 2 2007

|  |  |  |
|---|---|---|
| IN THE MATTER OF | * | BEFORE AN IMPARTIAL HEARING |
|  | * | OFFICER OF THE |
|  | * | DISTRICT OF COLUMBIA OFFICE OF |
| N██████ A█████ | * | STUDENT HEARINGS |
|  | * |  |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PARENTS' MOTION FOR RECONSIDERATION

N████ A█████, by and through his parents, Harold and Claudia Alderman, respectfully moves this administrative body to reconsider the Hearing Officer's April 30, 2007 Decision. Specifically, the Aldermans request reconsideration of Finding of Fact 8 and Conclusion of Law III as contrary to the IDEA and the relevant sections of the Code of Federal Regulations ("CFR").

Finding of Fact 8 states that, "The Parent(s) did not inform DCPS of their expectation for reimbursement for the cost of education prior to removal from home instruction or enrollment at the new placement at [sic] as required 34 CFR 300.148[.]" Conclusion of Law III [mistakenly listed as the second Conclusion of Law II], which results from Finding of Fact 8, states that, "DCPS is not responsible for reimbursement. The record did not show where the Parent(s) informed DCPS they expected the latter to reimburse the cost of education because the student was in an inappropriate educational placement or otherwise was denied a FAPE." Because this Finding of Fact and Conclusion of Law are contrary to the Individuals with Disabilities Education Improvement Act ("IDEA") and the CFR, as well as directly contradicted by the remaining Findings and Conclusions, we request they be reconsidered, and that the Hearing Officer order that N██████ A████████ placement at Ivymount be retroactive to August 28, 2006.

119

A.    THE RECORD IS CLEAR THAT THE PARENTS WERE NOT SUBJECT TO, BUT STILL COMPLIED WITH THE REQUIREMENTS OF 20 USC § 1412(A)(10)(C) AND 34 CFR § 300.148.

1.    *There is no such thing as a Notice of Expectation for Reimbursement.*

The notice requirements relied upon by the Hearing Officer plainly do not apply to N███████. If they did, the parents did everything humanly possible to comply with them.

First of all, there is nothing in the IDEA or the CFR that requires separate notice from the parents that their timely request for a change in placement has to be supplemented with additional notice once DCPS fails to timely respond.  Here, despite the parents' full cooperation, DCPS engaged in unlawful and unconscionable delay and did not place a very disabled child for six months and this was a child the system was supposed to be monitoring.  Then the school system placed N███████, with no parental participation, in a wholly inappropriate setting where he would have received no educational benefit.  Under these facts, the suggestion that such additional notice is or would be required is nonsensical, and DCPS never even argued such an absence of notice.

The Aldermans sent a letter in July of 2006 notifying DCPS that N███████ required a new placement and requesting that DCPS place him at Ivymount for the 2006-2007 school year.  *See* NA-2.[1]  Did they really have to clarify their "expectation" that this placement would start at the beginning of the 2006-2007 school year?  Of course not; it was only the DCPS delays and continued violations of the IDEA (Conclusions of Law I, II), that turned the Alderman's timely

---

[1]    These citations are to the numbered exhibits contained in the parents' disclosure sent on April 9, 2007.  Copies of all documents are in the Student Hearing Office file.  The exhibits are referred to throughout the motion as NA-__.   Citations to exhibits contained in DCPS disclosure are referred to as DCPS-__.

and lawful request for placement (Finding of Fact 2; NA-2), into a Due Process Hearing Request

for reimbursement. NA-1. In other words, the school clearly understood what these parents were

seeking. They just failed to respond in a timely or appropriate manner.

> **2.    Though not required to do so, the Parents complied with all provisions of 34 CFR §300.148 and the IDEA.**

To the best of their abilities, the Aldermans complied with 34 CFR §300.148 and 20

USC §1412(a)(10)(C),[2] and are entitled to reimbursement for the tuition paid to Ivymount. It is

clear that DCPS denied N█████ a free appropriate public education ("FAPE"). However, 34

CFR §300.148(a) would relieve DCPS of its obligation to pay for a parentally-chosen private

placement only if it, "made FAPE available to the child and the parents elected to place the child

in a private school or facility." In this case, the Hearing Officer found that DCPS denied FAPE

to N█████ A█████ (Conclusions of Law I, II), so subsection (a) does not apply.

Similarly, Subsection (b) does not apply, as the parents did turn to the Due Process

procedures as directed as soon as they learned there was a disagreement about FAPE. It was the

DCPS six-month delay that led to this issue, and not any failure of the parents to follow the

proper procedures.

Subsection (c) allows the Hearing Officer to order DCPS to reimburse the parents for

tuition at Ivymount prior to the April 30, 2007 decision if the "hearing officer finds that the

agency had not made FAPE available to the child in a timely manner prior to that enrollment and

that the private placement is appropriate." 34 CFR §300.148(c). This is exactly what the

Hearing Officer found: DCPS did not make FAPE available to N█████ (Conclusions of Law I,

---

[2]    Because the Hearing Officer relied on the CFR, the CFR cites will be used in this argument. However, the relevant provisions in the IDEA and the CFR are identical.

II), in a timely manner prior to his enrollment at Ivymount (Conclusion of Law II), and Ivymount

is the appropriate educational setting (Conclusion of Law IV).

The exceptions for reimbursement found in Subsection (d) simply do not apply in this

case.  Pursuant to Subsection (d)(1), a Hearing Officer may reduce or deny reimbursement if,

*after DCPS proposes a placement*:

> (i) [a]t the most recent IEP team meeting that the parents attended
> prior to the removal of the child from the public school, the parents
> did not inform the IEP Team that they were rejecting the placement
> proposed by the public agency to provide FAPE to their child,
> including stating their concerns and their intent to enroll the child in
> a private school at public expense;  or

> (ii) [a]t least ten business days . . . prior to the removal of the child
> from the public school, the parents did not give written notice to the
> public agency of the information described in paragraph (d)(1)(i) of
> this section.

In other words, in order for full funding for a placement that is different from a DCPS-proposed

placement to be unquestionably retroactive, the parents – either at the placement meeting or, if no

such meeting was held, ten business days before the child was removed from a public school to a

private placement – must have timely informed DCPS that they were rejecting the proposed

placement and instead were seeking public funding for a private placement.  The intent of this

notice requirement is clear – to ensure that the local school system has an informed opportunity

to address parental concerns before a child is removed from a public school to a private

placement.

There are a number of obvious reasons why this section does not apply to N███████

A███████.  First, despite the July of 2006 request by the parents, DCPS did not propose a

placement for N███████ until after the beginning of the second semester of the 2006-2007 school

4

year.  Therefore, in August 2006, when it was time to decide whether to continue a now-
inappropriate private placement or send N██████ to the appropriate school, the parents had no
"placement proposed by the public agency" to reject via Subsection (d)(1).

Moreover, N██████ was not attending a public school in 2005-2006.  Because of the
lack of appropriate placement prior to the inception of the Ivymount program, DCPS was
voluntarily funding his privately-administered home-based program.  Therefore, the Aldermans
were seeking to move N██████ from one private option to another, and not to "remov[e] the
child from the public school."  As a result, no written notice was required and Subsection (d)(1)
does not apply.

Regardless of the inapplicability of 34 CFR §300.148(d)(1), the Aldermans did give
written notice to DCPS of their request for a change in placement and intent to enroll N██████
at Ivymount in July of 2006, thereby satisfying the underlying purpose of the regulation despite
its inapplicability.  (Finding of Fact 2; NA-2).  Not only did they give written notice but they did
it early enough in the summer to leave DCPS plenty of time – and much more than ten business
days – to hold an Individualized Education Program ("IEP") meeting and consider placement.
Therefore, there is no basis on which to find that the parents violated 34 CFR §300.148(d)(1).  In
addition, once the belated IEP process began, and then stalled, the Aldermans provided notice
again of their request for Ivymount funding.  On December 13, 2006, the parents wrote, "We
look forward to hearing without further delay that N██ has been placed at Ivymount in the
Asperger's program, as it is the only appropriate program to meet his educational needs."  NA-
10.

5

123

DCPS never has suggested any lack of notice as to the request for funding at Ivymount. The school system plainly understood what is equally plain in the parents' written request. There is no allegation that DCPS was requesting further evaluations and no finding of unreasonableness with respect to the actions taken by the Aldermans, so Subsections (d)(2) and (3) are equally inapplicable. As a result, there is absolutely no support for the Hearing Officer's statement that the parents did not comply with 34 CFR §300.148.

It is important to consider the fact that DCPS failed to offer a placement to the Aldermans until after the beginning of the second semester of the 2006-2007 school year. Without a DCPS-proposed program, the parents had nothing to formally reject and therefore no notice was required. A long line of cases have held that the IDEA is violated if special education and/or related services are offered too late. For example, in *Gerstmyer v. Howard County Public Schools*, 850 F. Supp 361 (D.Md. 1994), the failure of the school system to have an IEP in place at the beginning of the school year supported a finding for private tuition reimbursement. Even more on point, in *Kitchelt v. Weast*, 341 F.Supp.2d 553 (D.Md. 2004), the fact that the IEP team did not propose its placement until late September similarly supported tuition reimbursement. In *Kitchelt*, the Court emphasized that, had the student there started school on his draft or interim IEP, it was clear he would not have received what everybody agreed he needed. Here, even if N█████ had been able to start in the proposed program, it is beyond argument that he would not have had what he needed and what the Hearing Officer concluded he needed – placement at the Ivymount Asperger's program. *See, also,  Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576 (D. Md. 2001), *Alfonso v. District of Columbia*, 45 IDELR 118 (D.D.C. 2006), *MM v. School Dist.*

6

*of Greenville County*, 303 F.3d 523 (4th Cir. 2002), *Foster v. D.C. Bd. of Educ.*, 553 EHLR 520 (D.D.C. 1982).

Finally, the District Court of Maryland recently issued its decision in *Jacobs v. Hairston*, Memorandum Order, Civil Action No. RDB-06-942 (D. Md. April 24, 2007) (a copy of which is attached) – a case directly on point with N██████ A████████ case. Here, the parents sent a letter and notified the school system of their intent to remove their son from his publicly-funded private educational placement, and then sought support from the school system for their son's placement in a new more appropriate private program. Similar to N█████████ case, the school system failed to respond to this letter. The Court found that in situations in which a parent requests a change in placement, "the IDEA requires [the school system] to provide an immediate response to [the parents]. [The school system's] failure to provide such a response constitutes a procedural violation of the IDEA." *Id.* at 12. The Court went on to consider whether the violation denied the student a FAPE.

In the *Jacobs* case, the hearing officer below failed to hold a hearing on the merits, and thus failed to make factual determinations as to the appropriateness of the student's educational placements. Accordingly, the Court was unable to determine whether the school system denied the student a FAPE, and remanded the case for further determination on the appropriateness of the programs. Here, however, no such problem exists. The Hearing Officer has already concluded that **"The autism program at Ludlow-Taylor ES was not appropriate for the student and constitute a Denial of FAPE."** Conclusions of Law II. Here, because the Hearing Officer has already determined that DCPS denied this student a FAPE, and because the parents

7

clearly sought support for N██████ placement at the Ivymount Asperger's program,
reimbursement is the appropriate remedy.

    **B.**    FINDING OF FACT 8 DIRECTLY CONTRADICTS FINDING OF FACT 2.

    Finding of Fact 2 makes clear that, "[b]y letter dated July 21, 2006, Counsel for the
Parents requested DCPS to place the student at the Ivymount School Model Asperger Program
for the 2006-2007 School Year." That letter, included in the record as NA-2, clearly states that,
"Pursuant to *Patsel v. District of Columbia*, this letter constitutes notice to DCPS of my clients'
plan to change N██████ educational placement from his home-schooling program to The
Ivymount School's Aspergers program. I would ask that the school system now support
N██████ placement at Ivymount, commencing with his enrollment there at the start of the
2006-2007 school year." This letter, accepted into evidence at the hearing, makes clear the
parents' request/ "expectation" that DCPS fund N██████ placement at Ivymount *at the start of*
*the 2006-2007 school year*. It is unclear how the Hearing Officer, in light of his Finding of Fact
2 and this letter, then determined that the parents failed to provide proper notice to DCPS that
they wanted his 2006-2007 placement to start at the beginning of the 2006-2007 school year.

    **C.**    THE DCPS DELAY IN PROPOSING A PLACEMENT CANNOT BE USED TO AVOID
        RESPONSIBILITY FOR PROVIDING FAPE TO N██████ A██████.

    The Aldermans requested that DCPS place N██████ at Ivymount in July 2006 – "prior to
removal from home instruction or enrollment at the new placement" as required by Finding of
Fact 8 and the CFR. The only reason N██████ was not placed at Ivymount by the beginning of
the school year, as requested by the parents, was the DCPS failure to timely convene an IEP
meeting upon learning that the private home-based program was no longer appropriate for

8

N███████. (Conclusion of Law II ("DCPS knew of the request of the Parent(s) for a change in placement in July 2006 and took until January 23, 2007 to propose an educational placement for the student")). It took DCPS six months to propose a strikingly-inappropriate placement, and during this entire period, the parents were clear and vocal that Ivymount was the only appropriate program from N███████. (*E.g.*, NA-2; DCPS-07). As a result, DCPS had more than sufficient notice that the parents had "expected" DCPS to fund N███████ at Ivymount in August 2006, and their unlawful delays cannot be used to relieve them of their obligation to provide a FAPE.

## CONCLUSION

If the Hearing Officer were correct – if, after complying fully with the IDEA and the CFR, the Aldermans were required to take some additional step not found in the IDEA or the CFR while DCPS denied a FAPE to their son for six months – the disastrous impact on the already insufficient DCPS procedures is clear. In effect, the Hearing Officer would be telling DCPS that, if a parent requests a private placement, DCPS should delay as long as possible in considering the request and proposing that or a different placement, because it will not be responsible for the student during this time period. This result would be true even if the school system clearly understood what was being requested, because that is what the facts are here. DCPS will use all possible delay tactics going forward, and this conduct will have been sanctioned by the Student Hearing Office.

Instead, we request that the Hearing Officer reconsider Finding of Fact 8 and Conclusion of Law III and order DCPS to fund N███████ A███████ placement at Ivymount retroactive to August 28, 2006, as called for in both the IDEA and the CFR.

Respectfully Submitted,

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for N██████ A███████ and his parents

---

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to Donna Russell, Esq., counsel for DCPS, on May 2, 2007

Michael J. Eig

10

128

FAXED

MAY - 2 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRADLEY JACOBS, | * | |
| *a minor, by his parents and next friends,* | | |
| *Charles and Elizabeth Jacobs, et al.,* | * | |
| | | |
| Plaintiffs, | * | |
| | | |
| v. | * | Civil Action No. RDB-06-942 |
| | | |
| DR. JOE A. HAIRSTON | * | |
| *(officially as), Superintendent,* | | |
| *Baltimore County Public Schools, et al.,* | * | |
| | | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Charles and Elizabeth Jacobs, in their own right and on behalf of their son, Bradley

Jacobs (collectively, "Plaintiffs"), bring this action against Dr. Joe Hairston in his official

capacity as Superintendent of Baltimore County Public Schools and the Board of Education of

Baltimore County (collectively, "Defendants") alleging violations of the Individuals with

Disabilities Education Act, as amended, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504" or "Rehabilitation Act"), 42 U.S.C. §

1983, and Maryland law. Plaintiffs appeal the January 31, 2006 decision of Administrative Law

Judge David Hofstetter of the Maryland State Office of Administrative Hearings denying their

request for reimbursement of tuition and costs to send Bradley to the Friendship School, a

private school offering individualized education for children with disabilities, during the 2005-

2006 school year. Pending before this Court are the parties' cross-motions for summary

judgment. The parties' submissions have been reviewed and oral arguments were heard at a

hearing held on April 23, 2007, pursuant to Local Rule 105.6. For the following reasons,

EXHIBIT

1 29

Plaintiffs' Motion for Summary Judgment is DENIED, Defendants' Motion for Summary

Judgment is DENIED, and the case will be REMANDED to the Maryland Office of

Administrative Hearings for additional proceedings consistent with this Memorandum Opinion.

<u>BACKGROUND & PROCEDURAL HISTORY</u>

**A.     The Individuals with Disabilities Education Act**[1]

Congress enacted the Individuals with Disabilities Education Act ("IDEA") in 1990 "to

ensure that children with disabilities have available to them a free appropriate public education"

or "FAPE."[2]  20 U.S.C. § 1400(d)(1)(A) (2006).  In order to achieve this objective, states can

receive federal funding for education as long as they make a FAPE available to all of their

disabled children.  *Id.* § 1412(a).  A FAPE must "provide such children with meaningful access

to the educational process" and "be reasonably calculated to confer some educational benefit

. . . ."  *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 526 (4th Cir. 2002) (citing *Bd. of

Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 192,

207 (1982)).  A disabled child must be educated in the "least restrictive environment" possible,

but he or she should also be given opportunities to participate in classes and activities with non-

---

[1] Although the Complaint alleges violations of the IDEA, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and Maryland law, the background of the case and the parties' submissions focus primarily on alleged violations of the IDEA.

[2] A FAPE includes "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [the IDEA]."  20 U.S.C. § 1401(9) (2006).

disabled children where appropriate.  20 U.S.C. § 1412(a)(5)(A) (2006).

In order to ensure that disabled students receive a FAPE, the IDEA requires that states create and update annually an individualized education program ("IEP") for each disabled child, identifying the child's levels of functioning and academic performance, setting specific academic and functional goals to be achieved during the school year, and describing an educational plan that will achieve those goals.  *Id.* § 1414(d).  An IEP is created and reviewed by an "IEP team" consisting of the child's parents, regular and special education teachers, representatives of the applicable school district, and the child if appropriate.  *Id.* § 1414(d)(1)(B).  If an IEP recommends that the child be placed in a non-public school offering special education, the school district must pay for the private education.  *See id.* § 1412(a)(10)(B)(i).  *See also* Md. Code Ann., Educ. § 8-406(c)(1)-(2) (LexisNexis 2004 & Supp. 2005).

The IDEA provides a series of procedural safeguards for both parents and school districts.  20 U.S.C. § 1415 (2006).  For example, if parents are dissatisfied with their child's IEP, ultimate school placement, or progress, they can file a complaint with the state or local educational agency and request an impartial due process hearing.[3]  *Id.* § 1415(f).  The parties must hold a resolution session prior to the hearing to try to resolve the issues.  *Id.* § 1415(f)(B). If no agreement is reached, an impartial hearing officer will preside over a due process hearing and decide "whether the child received a free appropriate public education."  *Id.* § 1415(f)(3)(A), (E).  The hearing officer's decision may be appealed within ninety days to a federal district court.  *Id.* § 1415(f)(3)(g), (i)(2).

---

[3] In Maryland, complaints must be filed with the State Board of Education, while requests for a due process hearing are submitted to the applicable local school district and the Maryland Office of Administrative Hearings.  Md. Code Ann., Educ. § 8-413(d) (LexisNexis 2006).

## B.     Factual Background

Bradley Jacobs ("Bradley") was born on February 5, 1992. He and his parents, Charles and Elizabeth Jacobs ("the Jacobs") reside in Baltimore County, Maryland. Bradley has been diagnosed with numerous learning disabilities and is therefore eligible to receive a free appropriate public education under the IDEA. Beginning with the 2000-2001 school year, the Jacobs enrolled their son in The Lab School of Washington, Baltimore campus ("Baltimore Lab"), a private school offering special education services. Pursuant to a settlement agreement between the Jacobs and the Baltimore County Public Schools ("BCPS"), BCPS funded his placement at Baltimore Lab for academic years 2002-2003, 2003-2004, and 2004-2005.

On January 11, 2005, the Jacobs requested that BCPS continue to pay for Bradley's education at Baltimore Lab for the 2005-2006 academic year. BCPS held a meeting to discuss Bradley's IEP on April 13, 2005. Present were Mrs. Jacobs, a representative of Baltimore Lab, a representative of the public middle school in the area, and other teaching staff. At the meeting, the IEP team recommended—and Bradley's mother agreed—that a variety of observations and assessments needed to be performed in order to update Bradley's IEP. The recommended observations were conducted, and the IEP team met for a second time on June 23, 2005, to review the results. At this meeting, a psychologist from Baltimore Lab was also present. The team decided that an educational assessment was needed, and Mrs. Jacobs again gave her consent. On July 29, 2005, the IEP team met for a third time to review the educational assessment. The team drafted an IEP that set a variety of goals for Bradley in areas of reading, math, writing, speech, and fine motor skills, as well as addressing social, emotional, and behavioral issues. Bradley's mother was present at the meeting and agreed to the IEP's

4

132

conclusion that Bradley continue to receive private special education.

On August 10, 2005, the Jacobs received notice from BCPS that Baltimore Lab was able to implement Bradley's IEP for the 2005-2006 academic year. At some point during the summer, they questioned whether Baltimore Lab was providing a sufficient education and decided that their son would be better served at the Friendship School ("Friendship"), another private school offering special education. In late August 2005, with no notice to BCPS, the Jacobs secured Bradley's admission to the Friendship School, and he began attending on September 6, 2005.

On September 12, 2005, the Jacobs sent notice to BCPS of their decision to enroll Bradley in Friendship rather than Baltimore Lab, because "he would be more appropriately placed at the Friendship School." (Defs.' Mem. Supp. Summ. J. Ex. 8.) Their letter requested that BCPS fund Bradley's placement at Friendship. BCPS did not respond to the Jacobs' letter.[4] The Jacobs sent a second letter on November 17, 2005, requesting a response to their first letter. They sent a third letter four days later, on November 21, 2005, notifying BCPS of their intention to file a complaint for a due process hearing. They filed for a due process hearing on December 9, 2005. As a prerequisite to the due process hearing, the parties attended a resolution session on December 16, 2005, but were unable to reach an agreement.

The case was assigned to Administrative Law Judge David Hofstetter ("A.L.J. Hofstetter") of the Maryland State Office of Administrative Hearings ("OAH"), and a hearing on

---

[4] At the hearing held on April 23, 2007, counsel for Defendants indicated that someone in BCPS called the Jacobs after the school district received their letter and forwarded it to the appropriate office. However, the subject of the phone call is unknown. Regardless, counsel for Defendants conceded that a written response was necessary.

the merits was scheduled for January 31, 2006.  On January 24, 2006, the Jacobs filed a motion

for summary decision on the ground that Bradley did not receive a FAPE because BCPS failed to

comply with the IDEA's procedural requirements.  (*See* Defs.' Mem. Supp. Summ. J. Ex. 28.)  In

particular, they argued that BCPS failed to provide them with notice that it would not fund

Bradley's transfer to Friendship after they sent the school district a letter.[5]  (*Id.*)  BCPS filed a

cross-motion for summary decision on the grounds that it had not violated the IDEA, because its

failure to respond to the Jacobs' letter, even if it could be considered a procedural violation, did

not amount to a denial of a FAPE to Bradley.  (*See* Defs.' Mem. Supp. Summ. J. Ex. 29.)  On

January 31, 2006, A.L.J. Hofstetter did not hold a hearing on the merits as scheduled, but rather

held a motions hearing on the cross-motions for summary judgment.  A due process hearing on

the merits was postponed until March 7, 2006, in the event that the motions were not dispositive.

A.L.J. Hofstetter issued a Decision on February 21, 2006, granting BCPS's motion for

summary decision and denying the Jacobs' motion.  *Jacobs v. Baltimore County Public Schools*,

O.A.H. No. MSDE-BCNY-OT-05-60161, at 14 (Md. Office Admin. Hrgs., Feb. 21, 2006)

(A.L.J. Hofstetter) [hereinafter "A.L.J. Decision"].  He first concluded that BCPS violated the

procedural requirements of the IDEA by ignoring the Jacobs' letter requesting reimbursement of

Bradley's enrollment at Friendship.  *Id.* at 12.  However, he did not find that this procedural

violation resulted in the denial of a FAPE to Bradley.  *Id.* at 13.  A.L.J. Hofstetter reasoned that

BCPS had already agreed to fund Bradley's placement at Baltimore Lab to implement the child's

---

[5] Under the IDEA, a school district must provide prior written notice to parents of a
disabled child whenever it "(2) refuses to . . . change the . . . educational placement of the child.
. . ." 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503 (2007).

IEP. *Id.* at 11. He also noted that "[i]t is further undisputed that such a placement is

'appropriate' (even if it is not the Parents' preferred placement)." *Id.* In support of this

conclusion, he cited the language of both the Jacobs' September 12, 2005 letter to BCPS stating

that Bradley would be "more appropriately placed" at Friendship and their December 9, 2005

request for a due process hearing stating that Friendship would be a "better educational fit." *Id.*

He further noted that in the hearing, the Jacobs "essentially conceded that the placement at the

Lab School was legally appropriate." *Id.* Relying on case law holding that the IDEA only

guarantees an appropriate education, not the *most* appropriate education, A.L.J. Hofstetter held

that Bradley was not denied a FAPE and granted BCPS's motion for summary decision. *Id.* at 8,

14.

      The Jacobs filed a four-count Complaint with this Court on April 12, 2006, against Dr.

Joe A. Hairston, Superintendent of the Baltimore County Public Schools, and the Board of

Education of Baltimore County appealing the administrative decision. Count I alleges that

BCPS denied Bradley a FAPE in violation of the IDEA, Section 504 of the Rehabilitation Act,

42 U.S.C. § 1983, and Maryland law. Count II claims that the failure of A.L.J. Hofstetter to

order the Defendants to place and fund Bradley in an appropriate program violates the IDEA and

Maryland Law. Count III alleges that the Defendants violated the IDEA, Section 504 of the

Rehabilitation Act, 42 U.S.C. § 1983, and Maryland law by failing to provide the Jacobs with

due process. Finally, Count IV alleges that A.L.J. Hofstetter denied the Plaintiffs due process

when he failed to "render a proper decision" on substantive grounds. The Plaintiffs seek

declaratory, injunctive, and monetary relief, including the costs of Bradley's enrollment in the

Friendship School for the 2005-2006 school year. On October 30, 2006, Plaintiffs filed a Motion

for Summary Judgment (Paper No. 11), and Defendants filed a Motion for Summary Judgment

(Paper No. 12). On April 23, 2007, a hearing was held on the motions.

<u>STANDARD OF REVIEW</u>

The United States Court of Appeals for the Fourth Circuit Court has articulated an

appropriate standard to be applied in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged
> to conduct a modified de novo review, giving "due weight" to the
> underlying administrative proceedings. In such a situation, findings
> of fact made in administrative proceedings are considered to be *prima
> facie* correct, and if a reviewing court fails to adhere to them, it is
> obliged to explain why. The court is not, however, to "substitute [its]
> own notions of sound educational policy for those of local school
> authorities."

*MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted).

The IDEA itself provides the test that a due process hearing officer, and now this Court, must

apply to determine if a child was denied a FAPE. Generally, "a decision made by a hearing

officer shall be made on substantive grounds based on a determination of whether the child

received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i) (2006). However,

> [i]n matters alleging a procedural violation, a hearing officer may
> find that a child did not receive a free appropriate public education
> only if the procedural inadequacies-- (I) impeded the child's right to
> a free appropriate public education; (II) significantly impeded the
> parents' opportunity to participate in the decisionmaking process
> regarding the provision of a free appropriate public education to the
> parents' child; or (III) caused a deprivation of educational benefits.

*Id.* § 1415(f)(3)(E)(ii). Thus, this Court's analysis differs depending on whether the alleged

violation of the IDEA was substantive or procedural.

This Court must also consider the standard set forth in Rule 56(c) of the Federal Rules of

Civil Procedure that summary judgment is granted only where there is no genuine issue as to any

8

136

material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.

*Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006). In *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained that only "facts that

might affect the outcome of the suit under the governing law" are material. *Id.* at 248.

Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Id.* The Court further explained that, in

considering a motion for summary judgment, a judge's function is limited to determining

whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of

the matter to a jury for resolution at trial. *Id.* at 249. In that context, a court is obligated to

consider the facts and all reasonable inferences in the light most favorable to the nonmoving

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also*

*E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, the

nonmoving party must bring forth evidence upon which a reasonable fact finder could rely.

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Where, as here, both parties file motions for summary judgment, the court applies the

same standards of review to each motion. *Monumental Paving & Excavating, Inc. v.*

*Pennsylvania Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citing *ITCO Corp. v.*

*Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve

genuine issues of material fact on a motion for summary judgment – even where . . . both parties

have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S.

1215 (1985)). The role of the court is to "rule on each party's motion on an individual and

separate basis, determining, in each case, whether a judgment may be entered in accordance with

9

137

the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985).

<u>DISCUSSION</u>

Both the Plaintiffs and the Defendants have moved for summary judgment, contending that there are no genuine issues of material fact on this appeal from the administrative proceeding. However, at the hearing on April 23, 2007, counsel for the parties acknowledged that there is not a full record in this case with respect to factual findings as to a FAPE for Bradley Jacobs ("Bradley"). This Court finds that there is a genuine issue of material fact as to whether Bradley was denied a FAPE, and that both parties should have had an opportunity during the administrative process to present testimony and other evidence as to the appropriateness of both the Baltimore Lab and Friendship schools. Accordingly, both motions for summary judgment will be denied and this matter will be remanded to the Maryland Office of Administrative Hearings ("OAH") for a due process hearing on the merits.

A.    **Individuals with Disabilities Education Act**

The Plaintiffs' Complaint principally alleges that the Defendants violated the Individuals with Disabilities Education Act by failing to provide their son Bradley with a free appropriate public education. As noted above, the standard that an administrative law judge should apply is provided by the statute itself, and differs depending on whether the Plaintiffs allege a substantive or procedural violation of the IDEA. The Jacobs' motion for summary decision alleged that Bradley was denied a FAPE because BCPS failed to respond to their September 12, 2005 letter requesting reimbursement for Bradley to attend the Friendship School—allegedly a procedural violation under 20 U.S.C. § 1415(b)(3) (2006). Thus, this Court must apply the following

standard:

> In matters alleging a procedural violation, a hearing officer may find
> that a child did not receive a free appropriate public education only
> if the procedural inadequacies-- (I) impeded the child's right to a free
> appropriate public education; (II) significantly impeded the parents'
> opportunity to participate in the decisionmaking process regarding
> the provision of a free appropriate public education to the parents'
> child; or (III) caused a deprivation of educational benefits.

*Id.* § 1415(f)(3)(E)(ii).

First, however, this Court must determine whether there was in fact a procedural

violation. Defendants argued before A.L.J. Hofstetter that the Jacobs' September 12, 2005 letter

requesting that BCPS reimburse the costs of sending Bradley to Friendship did not trigger the

notice requirements of 20 U.S.C. § 1415(b)(3) because the letter itself did not comply with the

requirements for a parent's formal request to change placement. (Defs.' Mem. Supp. Summ. J.

Ex. 29.) Under Maryland law implementing the IDEA, if parents do not provide prior written

notice that they intend to enroll their child in a private school, the school board does not have to

reimburse them. Md. Code Ann., Educ. § 8-413(i)(1)[6] (LexisNexis 2004 & Supp. 2005). The

notice must formally reject the placement proposed by the school board and include the reasons

for the rejection. *Id.* While these requirements specifically apply to parents moving their child

from a public school to a private school, the IDEA and accompanying Maryland laws still

require that parents provide adequate notice for unilateral transfers between private schools.

The Jacobs' letter simply said the parents had decided to move Bradley to Friendship and

---

[6] Section 8-413 of the Education Article of the Maryland Code was amended, effective
July 1, 2006. S. 107, 2006 Leg., 421st Sess. (Md. 2006). The amendments eliminated the notice
requirements, among other things. However, this Court must apply the version of the statute that
was in effect at the time of the events leading to this lawsuit.

11

sought reimbursement for the new school. The parents did not ask to reopen the IEP process,

provide reasons why the existing IEP was inadequate, or state that the Lab School was an

inappropriate placement; it merely said Bradley would be "*more* appropriately placed" at

Friendship. (Defs.' Mem. Supp. Summ. J. Ex. 8 (emphasis added).) Nonetheless, even though

their letter lacked specificity, the IDEA required BCPS to provide an immediate response to Mr.

and Mrs. Jacobs. BCPS's failure to provide such a response constitutes a procedural violation of

the IDEA. Accordingly, the next inquiry under Section 1415(f)(3)(E)(ii) is whether that

violation "(I) impeded the child's right to a free appropriate public education; (II) significantly

impeded the parents' opportunity to participate in the decisionmaking process regarding the

provision of a free appropriate public education to the parents' child; or (III) caused a

deprivation of educational benefits."

### 1.    Impeding the Right to a FAPE

As to the first prong, in order to find that the procedural violation impeded Bradley's

right to a FAPE, there must be a factual determination as to whether Baltimore Lab would have

offered Bradley a FAPE in the 2005-2006 school year. If Baltimore Lab were not an appropriate

placement, then there must be a determination with respect to whether Friendship could offer a

FAPE.[7] As this case is an appeal from an administrative decision, this Court must ordinarily

---

[7] The Plaintiffs concede that Friendship has not been certified by the state of Maryland as a state-approved special education school. (Pls.' Mem. Supp. Summ. J. 25.) Under the IDEA, in order for a school to offer a FAPE, the school must "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B) (2006). However, because the record lacks any evidence as to BCPS's decisionmaking process when it selected Baltimore Lab to implement Bradley's IEP during the 2005-2006 school year, it is unclear at this time whether that factor would preclude Friendship from even being considered as a potential placement. This issue should be explored on remand.

give deference to any factual findings made by the administrative law judge, because "findings of fact made in administrative proceedings are considered to be *prima facie* correct. . . ." *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted). However, there was no factual determination made in this matter as there was never a due process hearing on the merits.

In his decision, A.L.J. Hofstetter concluded as a matter of law that Bradley was not denied a FAPE because the Baltimore Lab school offered an appropriate education. A.L.J. Decision at 13. Specifically, he noted that "[i]t is . . . undisputed that such a placement is 'appropriate' (even if it is not the Parents' preferred placement)." *Id.* at 11. The fact that Baltimore Lab had been deemed appropriate for the prior school years is not necessarily conclusive that it and not the Friendship school was appropriate for the academic year in question without presentation of evidence and testimony and a factual finding by the administrative law judge. Indeed, the record in this case indicates that BCPS offered to introduce evidence that Friendship was an inappropriate placement, in recognition of the fact that legal arguments would not necessarily suffice to support a factual determination. (Hearing Tr. 27:8-10, Jan. 31, 2006.)

In reviewing the administrative record in this case, it is the view of this Court that there is insufficient evidence concerning the two schools to make a factual finding as to a free appropriate public education for Bradley Jacobs. Quite simply, this matter should not have been resolved on summary decision motions but should have been resolved after a due process hearing on the merits. Thus, the admitted procedural violation of BCPS may have impeded Bradley Jacobs's right to a free appropriate public education.

13

141

2.    **Significantly Impeding the Parents' Involvement**

As to the second prong of this standard, this Court finds that BCPS's procedural violation did not "significantly" impede the Jacobs' involvement in the decisionmaking process. In January of 2005, the Jacobs requested that Bradley continue to attend Baltimore Lab for the 2005-2006 school year, and Mrs. Jacobs participated in a thorough IEP process in the spring and summer of 2005. At no time did the Jacobs question the appropriateness of Baltimore Lab. Thus, the Plaintiffs cannot argue that they were denied access to the original IEP process. They also waited until September 12, 2005—after Bradley was enrolled and taking classes at Friendship—before notifying BCPS of their decision to move him to that school. At the motions hearing held on April 23, 2007, counsel for the Plaintiffs even conceded that the Jacobs could have notified the school board earlier than September 12, 2005. Thus, although BCPS should have provided some kind of written response to the Jacobs' letter, its failure to do so did not deny the parents involvement in the decisionmaking process.

3.    **Depriving Education Benefits**

As to the third prong, the Plaintiffs do not contend that Bradley was denied educational benefits as a result of BCPS's procedural violation. On the contrary, they argue that Bradley made significant progress at Friendship. (Pls.' Mem. Supp. Summ. J. 24-25; Jacobs Decl. ¶ 9.) Thus, there is no basis to support a finding that BCPS's failure to respond in writing to the Jacobs' September 12, 2005 letter caused a deprivation of educational benefits.

Accordingly, this case shall be REMANDED to the Maryland Office of Administrative Hearings to make a factual determination as to whether Baltimore Lab or the Friendship School was an appropriate placement to implement Bradley's IEP during the 2005-2006 school year.

14

142

B.    **The Rehabilitation Act of 1973**

Plaintiffs allege that the Defendants denied their son Bradley a free appropriate public

education in violation of Section 504 of the Rehabilitation Act of 1973.  Section 504 provides:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 7(20) [29 U.S.C. § 705(20)], shall, solely
> by reason of her or his disability, be excluded from the participation
> in, be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance or
> under any program or activity conducted by any Executive agency or
> by the United States Postal Service.

29 U.S.C. § 794 (2006).  It is undisputed that Section 504 applies to BCPS, and that the school

system cannot deny disabled students access to a public education based on their disabilities.

Defendants argue, however, that Plaintiffs' Section 504 claims are identical to their IDEA claims

and therefore cannot survive summary judgment.  (Defs.' Mem. Supp. Summ. J. 16-17.)  This

Court has previously held that where a plaintiff's "IDEA and § 504 claims are identical, and

their IDEA claim failed, their § 504 claim must fail as well."  *Alexis v. Bd. of Educ. for*

*Baltimore County Pub. Sch.*, 286 F. Supp. 2d 551, 560 (D. Md. 2003) (citations omitted);

*Steinberg v. Weast*, 132 F. Supp. 2d 343, 349 (D. Md. 2001); *Jones v. Washington County Bd. of*

*Educ.*, 15 F. Supp. 2d 783, 787 (D. Md. 1998).  In light of the fact that the case will be remanded

to OAH for a factual finding on the appropriateness of Baltimore Lab, this Court will reserve

judgment on Plaintiffs' Section 504 claims until a disposition has been made on their IDEA

claims.

C.    **42 U.S.C. § 1983**

Plaintiffs also allege that Defendants' actions violated 42 U.S.C. § 1983.  To prevail on a

section 1983 claim, the Plaintiffs must show (1) that they were "deprived of a right secured by

143

the Constitution or laws of the United States, and (2) that the deprivation was committed by a

person acting under color of state law." *Alexis,* 286 F. Supp. 2d at 560 (citing *West v. Atkins,*

487 U.S. 42, 48 (1988)).  Defendants allege that "Plaintiffs' Section 1983 claims should . . . be

dismissed since Section 1983 is merely a vehicle Plaintiffs have selected for asserting violations

of federal statutes. . . . Section 1983 does not provide a separate claim for relief." (Defs.' Mem.

Supp. Summ. J. 17.)  Defendants are correct that, if "the Plaintiffs have not shown that they were

deprived of a right secured by the Constitution or by federal law, they cannot defeat summary

judgment." *Alexis,* 286 F. Supp. 2d 551, 560 (D. Md. 2003); *Hodge v. Jones,* 31 F.3d 157, 167

(4th Cir. 1994) (quoting *Clark v. Link,* 855 F.2d 156, 161 (4th Cir. 1988)) ("If there is no

violation of a federal right, there is no basis for a Section 1983 action. . . .").  In light of this

Court's ruling remanding the case to OAH for an evidentiary hearing, Plaintiffs' Section 1983

claims need not be addressed at this time.

CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED, and

Defendants' Motion for Summary Judgment is DENIED, and the case will be REMANDED to

the Maryland Office of Administrative Hearings for additional proceedings consistent with this

Memorandum Opinion.  A separate Order follows.

/s/_____
Richard D. Bennett
United States District Judge

Date:  April 25, 2007

16

144

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |
| Of Counsel: | | | |
| Matthew B. Bogin | MD, DC | | |

# FAX

## URGENT: THIS REQUIRES IMMEDIATE ATTENTION FROM HEARING OFFICER H. St. CLAIR
### *** PART TWO of TWO ***

**To:**          Sharon Newsome
                 Student Hearing Coordinator
                 **DCPS-Student Hearing Office**
**Fax Number:**  (202) 442-5556
**From:**        Michael Eig
**Date:**        May 2, 2007
**Time:**        4:03 pm

**Total Pages:**     16
**(including cover)**

**Re:**          N███████ A███████

**cc:**          Rashida J. Wilson, Esq.
                 (202) 442-5097

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

145

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig    MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr    CA, DC

Of Counsel:
Matthew B. Bogin    MD, DC

# FAX

## URGENT: THIS REQUIRES IMMEDIATE ATTENTION FROM HEARING OFFICER H. St. CLAIR

### *** PART ONE of TWO ***

| | |
|---|---|
| **To:** | Sharon Newsome |
| | Student Hearing Coordinator |
| | **DCPS-Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael Eig |
| **Date:** | May 2, 2007 |
| **Time:** | 3:52 pm |
| **Total Pages:** | **12** |
| (including cover) | |
| **Re:** | N▮▮▮▮ A▮▮▮▮▮ |
| cc: | Rashida J. Wilson, Esq. |
| | (202) 442-5097 |

2007 MAY -2 PM 4:07
DC PUBLIC SCHOOL SYSTEM

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

146

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF N██████ A████████
     DATE OF BIRTH ███████, 1995

HEARING DATE:  APRIL 17,2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.  (301) 277-5711

<u>APPEARANCES</u>

HEARING OFFICER:                              HERBERT ST. CLAIR


ATTORNEY ADVISOR FOR
     DISTRICT OF COLUMBIA
     PUBLIC SCHOOLS                          ROSHITA WILSON

ATTORNEY FOR PARENT

PARENT OF N███████, A███████          CLAUDIA ALDERMAN

Program Director for the
For the Ivy Mount School Model               KATIE ALEXANDER

Attorney for parents                         Mr. EIG

1      HEARING OFFICER: Good Morning this is the Inaudible) of

2   N███████ A████████ who was born on ███████, 1995. This

3   confidential administrative hearing concerns the Special

4   Education services being provided to N████████ by the District

5   of Columbia Public Schools. Today is Tuesday, April 17,2007.

6   It's now 9:37 in the morning. This Hearing is authorized by

7   Public law 108-446, the Individuals With Disability Education

8   Improvement Act of 2004. This Hearing is conducted under the

9   auspices of the District of Columbia Public Schools, hereinafter

10  referred to DCPS. We are I Hearing Room Number one. This

11  Hearing is confidential and will be closed to the Public unless

12  you Ms. Alderman, expressly state that it should be an open

13  Hearing, a Public Hearing. This Hearing is being recorded either

14  party may request a copy of the recording or transcript by

15  making a written request of both or either to the Student

16  Hearing Office, DCPS. My name is Herbert St. Clair. I'm the

17  Hearing Officer. That's is spelled S T. C L A I R. I'm going

18  to ask everyone here to please state his or her name. Let's

19  begin with the attorney advisor.

20      MS. WILSON:  Good Morning Rashida Wilson, Attorney Advisor,

21  DCPS.

22      MS. ALDERMAN:  Claudia Alderman, parent of N████████

23  A████████.

1          MS. ALEXANDER:  Katie Alexander, Program Director of the

2     Ivy Mount School, Asperger Program.

3          HEARING OFFICER: I think we have a microphone that we can

4     dedicate to each --. Yes, because your voice of kind of --.

5          MS. ALEXANDER: It's a quiet voice. Katie Alexander, Program

6     Director for the Ivy Mount School Model Asperger Program.

7          MR. EIG:  Whether you like it or not, Michael Eig,

8     counselor for N██████ and his parents.

9          HEARING OFFICER:  Mr. EIG does Ms. Alderman waive the

10    review of her rights.

11         MR. EIG: Yes, we waive them.  We are well aware of her

12    rights.

13         HEARING OFFICER: All right.  Now.  I have a disclosure here

14    that I am going to place into the record of unless I hear an

15    objection.

16         MS. WILSON:  Well DCPS has an objection to this disclosure

17    that was received on the tenth - April tenth and not the ninth.

18         HEARING OFFICER:  And what does that mean?

19         MS. WILSON:  That it wasn't disclosed within five days,

20    because yesterday was a holiday.

21         MR. EIG: It wasn't a holiday for us.  I do understand.

22              MR. EIG:  It wasn't a holiday for us.  I do

23    understand.

4

1      HEARING OFFICER:  Now what do you want me to do?

2      MS. WILSON:  What do you mean – I don't want the disclosure

3   into the record.

4      HEARING OFFICER:  What I'll do maximum is continue with the

5   cure.

6      MR. EIG: What's the prejudice?

7      HEARING OFFICER:  Just a minute.  Just a minute.  I'm not

8   going to dismiss the parent on a disclosure.  What I'll do, if

9   you insist.  First let me make sure there is a violation.  The

10   tenth.  One, two, three, four, five.  So you're – okay.  What –.

11      MS. WILSON:  Yesterday was a holiday.  So on holidays you

12   have to send your disclosure – I mean this is not – I'm not –

13   This is not something I'm making up.

14      HEARING OFFICER: In other words you're saying you should

15   have been clocked on the tenth.

16      MS. WILSON: On the Ninth.  On the same day that I sent my

17   mine in. You had the fax confirmation.

18      MR. EIG: Well we received her all right.  Well I'm sorry,

19   let me back up.  It came – no her's is late too, because it came

20   after hours.  It came at 6:18 pm.  Technically and that's the

21   next day.

22      HEARING OFFICER: After the close of business.

23      MR. EIG: Yes, but – that – that—I'm not, but hers is late

5

1    too, but that not. There is no prejudice to us and it's no

2    prejudice to them.  And it wasn't a holiday for us, by the way

3    because we're in Maryland.  But I do understand that --. I

4    understand that Ms. Wilson wasn't working yesterday. And if

5    indeed there is some prejudice that she can suggest for having

6    her disclosure all last week, and you know, I can't imagine.

7        HEARING OFFICE: Is there any prejudice?

8        MS. WILSON: Well you know the only prejudice is that DCPS

9    is held to a very strict standard for disclosures and the fact

10   that the other side will not be held to same standard is I do

11   believe is a prejudice.

12       MR. EIG: Federal law –

13       HEARING OFFICER: Just a minute.  If that's the only

14   prejudice that you see then I am going to overrule your

15   objection.  All right the disclosures is into the record.

16       MR. EIG: Thank you.

17       HEARING OFFICER: Mr. EIG.

18       MR. EIG:  Oh, I'm sorry for the record I have no

19   objections.

20       HEARING OFFICER:  Mr. EIG, why are we here? What would

21   satisfy Ms. Alderman?

22       MR. EIG: Thank you.  I first note just for record because

23   we're making a record, we started thirty-five minutes later, so

6

1   because of the D.C. counsel wasn't here.  And I'm sure that if

2   needed we can have thirty-five minutes late, (inaudible) that's

3   all.  Now as far what this case is about, N████ is a young man

4   with Aspergers, with a little background, but double as an

5   opening statement of course, is a young man with Asperger

6   syndrome who has been (inaudible) with Special Education and on

7   the autism spectrum for a number of years by DCPS. For the past

8   two years, not this one, he was the parties' settled – he's in a

9   home school program of his mother's set-up.  Because it wasn't

10  an appropriate placement, but the school system and the parents

11  agreed and the mother set up a home school program and the

12  school system supported it. This year a new program was

13  available (inaudible) Ivy Mount out of Montgomery county that

14  was actually the brain child of this parent and another parent

15  who years ago started the trying to get this in (inaudible).

16  That's the program. There are kids from DCPS (inaudible) that

17  are receiving education.  (inaudible) In July of this is already

18  NA2.

19       HEARING OFFICER:  2006.

20       MR. EIG: 2006, July 21st, we on behalf of the Alderman's

21  wrote Ruth Blank in DCPS asking for the school system to support

22  his placement in the new Ivy Mount program because we explained,

23  that was the appropriate placement.  That started the process of

1   what's traditionally known as a (inaudible).

2        HEARING OFFICER: When did N██████ start? - N███████, when

3   did he start?

4        MR. EIG: Right around the first of September.

5        MS. ALEXANDER: It would have been August 28th.

6        MR. EIG: Thank you very much August 28th.  Thank you very

7   much.  And what we have now, this is why we want to sort of

8   suggest how we - the school system went through an evaluation

9   process, an IEP process - a placement process. Lots of issues

10  and problems that we legally everything I just said, but

11  eventually identified a placement that in the DC public schools

12  that the parent has going out to the observe.  We believe that

13  everything the school system has done in this case has been

14  inappropriate and illegal and I am not - that's overstated.

15  Everything. To begin with as I said they started the process in

16  July. The placement isn't wherever made and we don't have a

17  Notice of Placement and we don't have a completed IEP in the

18  disclosure (inaudible) was made in January. Through no fault,

19  complete cooperation from the parents as you'll see, okay -- the

20  school system didn't have any place for N█████ to go to school

21  even though they had been supporting his placement for the last

22  two years, and the parents had made a request.  And no placement

23  to go to school in September, October, November, December,

8

1  January.  Okay.  So the placement is woefully late.  That's

2  number one.  Two. They didn't evaluate him.  But I'll move right

3  on number three. The IEP that they came up with up, and that's

4  the reason I asked Ms. Wilson before we went on, to make sure

5  I'd had the whole thing, is that DCPSA - I would respectfully

6  ask you to look at DCPSA. You will see that on the front, that's

7  the front of an IEP.  That is a front of an IEP. You'll see the

8  date of that is 11/13/06.  And then on the bottom you'll see

9  1/23/07.  And if you turn over there are two pages.  This is the

10  OT section of the IEP.  There's nothing else.  They then

11  proposed a placement that it is for kids who are strikingly,

12  strikingly, strikingly different.  I'm sorry at Ludlow Taylor

13  (inaudible) different from than N███ who is a very bright above

14  grade level in some things, kid with Asperberger symptoms.  A

15  lot of communication and social problems.  The program - the

16  class that is ought to know what to see as non-verbal low-

17  functioning kids who are maybe being properly educated in that

18  class. That's not why we are here, but remarkably wrong.  We

19  would - we would - in view of the fact - and what - in answer to

20  your question in order to satisfy Ms. Alderman is placement in

21  Ivy Mount for the 06 -07 school year.  Unless the school system

22  disputes the fact that there is an incomplete IEP, no Notice of

23  Placement.  Once again, that please - based upon a completed

9

1    IEP, and the placement wasn't – was made some time other than

2    the middle of the school year if was made at all.  I would

3    suggest that the school system should be found in persuasive

4    violation.  I think those facts are undisputed is my point, and

5    if that's true, then all we need to is present – and if the

6    school system doesn't agree as to the appropriateness of the

7    benefit of Ivy Mount, then we present Ivy Mount.  But I suggest

8    that the following facts are not in dispute.  That the school

9    system was asked on July 21st faxed on that day to consider

10   placing N███ at Ivy Mount for the upcoming school year.  That

11   the school system, according to all the evidence that we know

12   and all the evidence in the record, has presented a woefully

13   incomplete IEP with no Notice of Placement, but if a placement

14   were made – it was made halfway through the school year and a

15   placement by the way, that only goes to his age so he would have

16   to move on next year anyway, ironically.  And that therefore the

17   school system should be – based on those undisputed facts should

18   be found to -- that not be, should be deemed as not have

19   provided an appropriate education to him. If I'm wrong about any

20   of those things, then I have of course you have evidence.

21        MS. WILSON:  Well, I mean we certainly would object to any

22   at the table – essentially what amounts to a motion for summary

23   decision from the Hearing Officer with DCPS having no notice of

1    that, and specifically the Complaint that we're here on, dated

2    January 26, 07 does not include the majority of the issues that

3    counsel asserted. It is true that the issues presented are

4    whether or not DCPS denied FAPE to the petitioner by refusing to

5    allow the parents to participate in the placement decision and

6    failing to offer an appropriate placement, challenging the

7    placement at Ludlow Taylor and also requesting the Hearing

8    Officer to find that Ivy Mount is the proper placement. So all

9    these issues as it relates to the IEP are not something that

10   DCPS was on notice that they were - that the petitioner was

11   going be asserting today based on the Complaint as it is

12   written. So, unless the Hearing Officer is also going to allow

13   counsel to amend their Complaint at the table contrary to what

14   IDA allots for, we would object to having to move forward on

15   those issues.  We didn't receive anything in writing prior to

16   requesting the Hearing Officer to make a decision that, that we

17   could have responded to.  And lastly I just to note that for the

18   record, I would not have an - the SOP allows for I believe

19   thirty minutes and I would have not an issue waiting thirty

20   minutes for petition and petitioner's counsel and I was here,

21   but trying to deal with another hearing that I  -- was a

22   scheduling conflict that I was not aware of until today.

23          HEARING OFFICER:  Mr. EIG - did you Complaint about the

11

1    IEP?

2        MR. EIG: Yeah, we did complain about the IEP.

3        HEARING OFFICER:  Where? Where? In your Complaint?

4        MR. EIG:  The delay in the IEP that – I'm sorry, let me go

5    back.  Let me start.  The delay about the timing of the IEP

6    started in the middle of the fax in the reasons for Complaint,

7    under G, in the middle of the first page.

8        HEARING OFFICER:  I remember that.

9        MR. EIG: Okay, what is the nature.  Okay.  Then we

10   complained about the – I'm sorry – the ---IEP keys decision-

11   making, the bottom the first page, going over to the second.

12       HEARING OFFICER:  What numbered page?

13       MR. EIG: Bottom of 3, top of 4.  But that was in the

14   decision-making process, that the IEP team went through. Let me-

15   --let me---. The IEP that was disclosed by the school system we

16   couldn't raise in this hearing application, because the

17   disclosure as you well know, comes a month or so after the

18   hearing application, and it became a demand at that point. All I

19   am pointing out as far that goes, is that IEP that they

20   disclosed as two pages and that's it.  How you would be able to

21   find out appropriate or inappropriate, well you could if you

22   found it inappropriate based upon all of these.  All I'm saying

23   is you don't have evidence in the record to show an appropriate

1    IEP. Did they do more of an IEP? Of course they didn't work on

2    IEP. They didn't disclose. That's the whole point there. We

3    can leave that one aside, okay. All right. You complain about

4    the placement of course, the notice of the placement, we

5    complained about the way they made the placement. I don't see

6    the notice in here too. But once again, we don't need that.

7    They proposed their placement legally sufficiently in the middle

8    of a school year. And we did say all through the update and she

9    hasn't respond to that. We don't have to do it as motion, I can

10   present a case in fifteen minutes too. Okay, twenty. Okay,

11   right now just on these bare bones, but I'm just trying to

12   efficient here, if indeed the school system doesn't have a case

13   as to why they didn't respond until when they did respond. I

14   don't think is very difficult, but I'll present my case.

15        MS. WILSON: Excuse, me if we could just clarify those, so

16   that I'm clear. Because there's been, as far as the Hearing

17   Officer is concerned, what are the issues that we are.

18        HEARING OFFICER: The issues are set out in the Complaint.

19        MR. EIG:  The hearing.

20        MS. WILSON. Okay.

21        MR. EIG: Yeah.

22        HEARING OFFICER: We'll follow the three, that Mr. EIG set

23   out in the Complaint.

1      MR. EIG: Absolutely. Okay, it'll be Ms. Alderman first.

2      HEARING OFFICER: Ms. Alderman I'm going to ask you to draw

3 that microphone to yourself.

4      MS. ALDERMAN: Thank you.

5      HEARING OFFICER: Ms. Alderman do you solemnly affirm that

6 the testimony that you're about to give in the course of this

7 procedural will be the truth, the whole truth and nothing but

8 the truth?

9      MS. ALDERMAN:  I do.

10      HEARING OFFICER:  The Hearing Officer is alerted as to the

11 red light.

12      MR. EIG: There is a red light that's on.

13      HEARING OFFICER: It goes off.

14      MR. EIG:  It goes off - oh okay. Please state your name for

15 the record.

16      MS. ALDERMAN: Claudia Alderman.

17      MR. EIG: And how do you know N██████ A██████?

18      MS. ALDERMAN: I am the mother of N██████.

19      MR. EIG: Where is N██████ right now?

20      MS. ALDERMAN: At Ivy Mount School, Asperger Program.

21      MR. EIG: How long has that Asperger program been in

22 existence.

23      MS. ALDERMAN: Since the program, planning for the program

14

1    began a year 2005, and the program actually started on August

2    27-28, 2006.

3        MR. EIG: Now Ms. Alderman, does N███████ - you call him

4    that?

5        MS. ALDERMAN: N████. Yes.

6        MR. EIG: Does N████ have any educational disabilities that

7    you or DCPS have agreed on?

8        MS. ALDERMAN: Yes, back when N████████ was in first grade,

9    the IEP, John Ethan which was his home school, he was diagnosis

10    as in the autism spectrum, gifted special needs child.

11        MR. EIG: Gifted special needs child on the autism spectrum.

12        MS. ALDERMAN: Yes.

13        MR. EIG: Has he at any point received a formal diagnosis of

14    Asperger?

15        MS. ALDERMAN: Yes, several times he has been evaluated, at

16    least every two years and the Asperger diagnosis has been

17    confirmed as well as attention deficit in the executive function

18    disorders.  Some of the associated issues, anxiety, and I think

19    that's about it. Anxiety related to his Asperger syndrome.

20        MR. EIG: So the 04/5 and the 05/6 school years, two years

21    before, where was N████ educated?

22        MS. ALDERMAN: N████ was home-schooled in a program that I

23    help prepare together with a teacher.  The reason that we had to

15

1    home school him was because he had had a very unsuccessful year

2    at Kingsbury Day School and there were really no alternatives

3    for us anywhere that we looked for him to receive the proper

4    education. And I saw my child was going just downhill. Getting

5    more and more stressed and getting fewer and fewer and out of

6    school.

7         MR. EIG:  Ms. Alderman did you make a request for DCPS to

8    financially support from that placement?

9         MS. WILSON: I'm going to object. I didn't have an issue

10   with the leading questions at the beginning but I am going to

11   object.

12        MR. EIG: What's leading about that?

13        HEARING OFFICER:  Just a minute.  Counsel are not to speak

14   to each other.

15        MR. EIG: No.  I'm talking to you.  What's leading about

16   that?  That was an unleading question as we can have, did you

17   make a request?

18        HEARING OFFICER:  All right.  Let her finish.  And if I

19   need to ask you for a reply, I'll ask you.

20        MR. EIG: All right.  I don't automatically reply. Okay.

21   I've been trained for most of my years that I make a reply

22   before --.

23        HEARING OFFICER:  Just wait.  Wait until.

16

1    MS. WILSON:  That was it.  That's all I had to say.

2    HEARING OFFICER: Overruled.

3    MR. EIG: Did you make that request?

4    MS. ALDERMAN: Yes I did.

5    MR. EIG: And did you reach an agreement, settlement

6  agreement, I don't' want you to get into the terms if any, if

7  you reached it?  Did you reach any type of agreement with DC

8  where they did fund that?

9    MS. ALDERMAN: Yes I did.

10    HEARING OFFICER:  Mr. EIG, I do want you to –

11    MR. EIG: It's just background information.

12    HEARING OFFICER:  But trying – Just a minute.  Ask your

13  questions, but don't go on the couch and tell the witness how to

14  answer it please.

15    MR. EIG: The only reason I did it for that question is

16  because, lay witness may not automatically know not to talk

17  about the term of settlement agreement.  That is the only reason

18  I did.

19    HEARING OFFICER: Okay.

20    MS. WILSON: Again, I have to note for the record that this

21  question is irrelevant, as it relates the issues and why we're

22  here.

23    HEARING OFFICER:  The relevancy may come up later.

1       MR. EIG:  Just a brief background.

2       HEARING OFFICER: Just a minute.  Mr. EIG.  I asked you a

3   question Mr. EIG.

4       MR. EIG: Very well and I did.  Yes I did and her answer was

5   yes.

6       HEARING OFFICER: All right.

7       MR. EIG: Why is it N██████ in that home school program this

8   year?

9       MS. ALDERMAN: Because there was a much better alternative.

10  Throughout my discussions with DCPS, even though they approved

11  the home schooling program because there was no alternative, I

12  think we all agreed that were there to be a program – a school

13  program that met his needs, that was preferable over home

14  school.  This is the realization that he was missing out by

15  being home schooled.  At the time when there was no option made

16  sense, simply because of all the other issues that were going

17  on.  Once a program is available, where he could be in a

18  therapeutic setting with professionals that could give not only

19  the schooling, but also social skills, training and behavioral

20  management, etc., plus the benefits of being with other

21  children, outweighed the benefits of home schooling.  So once a

22  program became available, it made sense ship him.

23      MR. EIG: Did you have any role at all in the creation of

1    the Ivy Mount Asperger program<

2         MS. ALDERMAN: Yes, having exhausted my research as to

3    programs on- that could serve, properly serve children with

4    Asperger syndrome, we visited some schools that were being in

5    New York City, which were actually serving the Asperger

6    population, looked around in DC, Maryland and Virginia and there

7    was nothing of that sort. So we prepared a, with together with

8    another parent, we prepared concept note and approach and we

9    discuss the possibility of doing a charter school which did not

10   work out, did not make sense. So we approach Ivy Mount School

11   and met with the staff, presented our idea and then met their

12   Board of Directors and obtained about twenty letters of

13   endorsements for professionals in the area, psychologists,

14   psychiatrists, educational specialists who said, who wrote to

15   Ivy Mount saying it made sense to have such a program. They have

16   seen the need in the community and Ivy Mount did agreed to take

17   on the program. My role since has been as a parent to support

18   the program; I am not in the staff of the program. I am simply a

19   supportive parent.  Ivy Mount took over the program and staffed

20   it with professionals, teachers, etc. and the program is

21   entirely an Ivy Mount program. And if I may add, you know us

22   parents that was the best of both worlds.

23        MR. EIG: Ms. Alderman?  Tell us a little bit about how

1   N████ functions, first of all academics. Is he way below grade

2   level, is he on grade level, is he above grade level?

3      MS. ALDERMAN: Academically N████████ is probably above

4   grade level in every subject. He has been tested.  His testing

5   results show a lot of unevenness.  For example, he functions in

6   certain --.

7      HEARING OFFICER: Is there an evaluation you can refer the

8   Hearing Officer that would substantiate?

9      MS. ALDERMAN: No.

10     MR. EIG: Well the IEP --.  Can I tell her?

11     HEARING OFFICER:  Please don't, wait until I ask you a

12  question Ms. Wilson.

13     MR. EIG:  What you will see I will direct you to at a grade

14  which is the Ivy Mount IEP that has very extensive present

15  levels of educational --.  I believe that is the best copy.

16     Hearing Officer. All right.

17     MR. EIG:  Okay?

18     HEARING OFFICER: All right.

19     MR. EIG: Now, so you're saying academically he's uneven --.

20     MS. ALDERMAN: No. No. No.  Academically  I'm sorry.

21  Academically he is pretty much above grade level in every area.

22  For example, but on the other areas that is where's the

23  unevenness.  In response to your question, academically he's

1  above grade level almost in every subject.

2      HEARING OFFICER:  When you say academically, you mean

3  reading, math, social studies and his course work?

4      MS. ALDERMAN: Course work – yes.

5      HEARING OFFICER: He is above grade level?

6      MS. ALDERMAN: Correct. Or at grade level or above grade

7  level.

8      HEARING OFFICER:  All right.

9      MR. EIG: Before I ask you to describe a little bit more,

10  did you attend some IEP meetings with District of Columbia

11  Public Schools in the fall or the winter of this school year?

12      MS. ALDERMAN: I don't have the dates at the top of my head.

13      MR. EIG: During the school year?

14      MS. ALDERMAN: Yes.

15      MR. EIG: During the school year?

16      MS. ALDERMAN: Yes. Yes, yes yes. Late November, December

17  January – that's what I meant.

18      HEARING OFFICER: 2006.

19      MS. ALDERMAN: Yes.

20      MR. EIG: Into 2007?

21      MS. ALDERMAN: Into 2007.  The meeting I believe --.

22      MR. EIG: I got the dates alright?

23      MS. ALDERMAN: Okay.

1      MR. EIG:  Only because the documents tell (inaudible).

2      MS. ALDERMAN: Okay.

3      MR. EIG:  At some point did the school system and you

4  discuss how much Special Education N███████ required?

5      MS. ALDERMAN:  Yes.

6      MR. EIG:  On his IEP?

7      MS. ALDERMAN:  Yes. Yes.

8      MR. EIG: Did you and the school system agree as to the

9  percentage of time he should be in Special Ed?

10     MS. ALDERMAN:  There was a discussion because DCPS wanted

11  it in terms of how many hours a week --.

12     MR. EIG:   I'm talking about percentage.

13     MS. ALDERMAN:  100% the Special Education.

14     MR. EIG:   Okay, did you think that was appropriate?

15     MS. ALDERMAN:  Yes.

16     MR. EIG:   Did the school system put that on the IEP, 100%

17  Special Ed?

18     MS. ALDERMAN:  I believe so.

19     MR. EIG:   Okay. And if we look at this – if you look at

20  DCPS8, it says 100% okay. Now. You just talked about kid who is

21  basically academically – we go back to N█████ now – above grade

22  level in academics and yet the school system said 100% Special

23  Education, go on and describe your perception he needs 100%

1    Special Ed.

2         MS. ALDERMAN:  N█████ requires almost a one-on-one teaching

3    environment.  He is cannot work for long periods of time on a

4    particular subject.  He needs frequent breaks.  He gets

5    frustrated very easily.  When he starts getting frustrating and

6    escalating, he is not available for learning. He takes a lot of

7    effort to calm him down and get him re-focused on tasks. And

8    when things escalates, he elopes. He'll leave the classroom or

9    the situation and at that time he is not safe.

10        MR. EIG:   What? What frustrates him?

11        MS. ALDERMAN:  It is almost I would say unpredictable.  Ms.

12   ALEXANDER knows better because she sees him on a daily basis at

13   school. We don't know things often what triggers him is a

14   mystery to me.

15        MR. EIG:   Ms. Alderman what can you tell us about his

16   relationships with peers?

17        MS. ALDERMAN:  He'll love being with the other classmates,

18   but he often, when he gets frustrated with people don't do what

19   he wants, when he doesn't understand what's being asked of him,

20   he gets frustrated and again, have a meld down.  With adults

21   when he's good he's good, and when he's bad he's awful.

22   Basically he can be the most normal wonderful kid ten minutes a

23   day, and the next day he can be - wake up or go to school

1    cheerfully and come home having had a big temper tantrum in

2    school. ·He's so variable that he is very difficult. And I think

3    it's all related to stress, unfortunately how he perceives the

4    world and how we perceive it is very different.

5        MR. EIG: Okay, I'm going to stop you right now, because Ms.

6    ALEXANDER is the Special Education teacher.  Did you in July of

7    this past year, ask for placement --.

8        HEARING OFFICER: Can you refer the Hearing Officer?

9        MR. EIG: At A2.  Did you direct A2 to be written?

10       MS. WILSON: And I'm going to object because I do think the

11   question is leading?

12       HEARING OFFICER: Overruled.

13       MS. ALDERMAN: Yes I did ask Mr. EIG to request placement at

14   Ivy Mount?

15       HEARING OFFICER:  All right.

16       MR. EIG: When did the best to your recollection after July,

17   did you get a response - but been told about any response from

18   DCPS, you remember?`

19       MS. ALDERMAN: Probably November or December 2006.

20       MR. EIG:   Where did you understand that the District of

21   Columbia Public Schools wanted N████ to go school as of August

22   28th of 2006?

23       MS. ALDERMAN: No information at all.

1  MR. EIG: When you were contacted in the Fall, by the school

2 system, were you contacted directly?

3  MS. ALDERMAN: No.

4  MR. EIG:   Were you contacted through counsel's office?

5  MS. ALDERMAN: Yes, but not til the winter, I believe.

6  MR. EIG: Did you participate, did you cooperate with the

7 District of Columbia Public Schools in the IEP/MDT meetings that

8 occurred during the winter or even fall?

9  MS. ALDERMAN: Yes, I was available whenever DCPS wanted us

10 to be available and N███████, was available for testing and

11 evaluation whenever DCPS wanted him available.

12  MR. EIG: Did the District of Columbia Public Schools ask

13 for an interview to available for testing?

14  MS. ALDERMAN: Yes they did and in some case, I brought him

15 for OT, I believe.  The brought him to the CARE Center, downtown

16 and in some cases the school.  The DCPS came to Ivy Mount, I

17 believe the psychologist came to Ivy Mount and observed him

18 there.

19  MR. EIG: Are you aware of any time when you did not

20 cooperate with the school system during the fall/winter?

21  MS. ALDERMAN: No, I was always available.

22  MR. EIG: Did you eventually attend an IEP meeting with the

23 school, wherein an IEP was either discussed or finished?

1      MS. ALDERMAN: Yes.

2      MR. EIG:    Do you remember when that was?

3      MS. ALDERMAN: January 2007?

4      MR. EIG: Okay.  And is - did the school system put 100%

5  Special Ed on then or was that the fall?

6      MS. ALDERMAN: I should clarify.  I believe there was a

7  meeting in December as well.  One in December and one in

8  January.  Because the one in December was the whatever - the IEP

9  wasn't finished and it wasn't until January that we were

10  presented and we finalized the IEP.

11      MR. EIG: Okay. Did you, whenever you finalized the IEP,

12  whether December or January, did it call for 100% Special

13  Education?

14      MS. ALDERMAN: Yes.

15      MR. EIG: Did the school identify a placement at that time

16  where they either formally or informally proposed that

17  (inaudible), did the where the IEP (inaudible).

18      MS. ALDERMAN: Yes at that time they told me that the

19  placement that had carefully selected for N█████ was the Ludlow

20  Taylor School in D.C.

21      MR. EIG:    And is there a Special Ed class at Ludlow

22  Taylor?

23      MS. ALDERMAN: Yes, they told me that had  a autism class at

1  Ludlow Taylor.

2      MR. EIG: Did – was that – did the school system tell you

3  whether that was their formal Notice of Placement?

4      MS. ALDERMAN: I don't know formal or informal, they just

5  told me that after review that his records, that's where they

6  thought he should be placed.

7      MR. EIG:  Did you express any interest – had you heard

8  about the autism classes at Ludlow before that day?

9      MS. ALDERMAN: No.

10      MR. EIG: Did you express any interest in observing him?

11      MS. ALDERMAN: Yes.

12      MR. EIG:  Did you observe it?

13      MS. ALDERMAN: I did observe it.

14      MR. EIG: And did you observe shortly thereafter?

15      MS. ALDERMAN: I believe that within a couple of days, I

16  immediately contacted and they gave me the phone number of the

17  school. I called the school within the next couple of days and

18  made an appointment to visit the school a week later.  A couple

19  of days before the meeting, I got a phone call from the school,

20  from Ludlow Taylor that they realized that that was a parent

21  teacher day, and that they was not going to be possible for me

22  to visit and that the next available date was about a month

23  hence.  I asked if there was any sooner date and I was told no.

1    MR. EIG:   On or about February 28th, did you go to Ludlow

2  Taylor and observe?

3    MS. ALDERMAN: Correct.

4    MR. EIG: And did you receive cooperation there as far as

5  being able to see and ask questions?

6    MS. ALDERMAN: Yes.  I met with the principal and with the

7  special needs coordinator who were both friendly and welcoming.

8    MR. EIG:  What you saw at and/or heard there, what was your

9  opinion as to whether that class was appropriate for N██████.

10    MS. ALDERMAN: I believe I sat there for several – a couple

11  of hours. I believe that N█████ would not have fit there for many

12  reason. First of all the grade level wasn't his grade level.

13  Second of all

14    MR. EIG: Wait a minute. One at a time.  When you said grade

15  level, you mean the kid's (inaudible) level or the official

16  grades that the kids are were in, what do you mean by grades?

17    MS. ALDERMAN: The official grades. The teachers told me

18  that class was for children from the second grade to fifth

19  grade. N█████████ is a sixth grader.

20    MR. EIG:   How far does Ludlow children go?

21    MS. ALDERMAN: Ludlow children go to sixth grade, and I

22  asked, and that was one specific question, what would happen to

23  N█████ if N████ were to attend Ludlow Taylor, what would happen?

28

1    They said he would age-out of the program, he would have to be

2    assigned to different school.

3        MR. EIG: Okay.  Now about the kids functioning level, would

4    they be appropriate for N████ in your opinion?

5        MS. ALDERMAN: According to the teacher, three of the

6    children were mentally retarded and two other children were very

7    low functioning autistic children who were not verbal.

8        MR. EIG:   How many kids altogether?

9        MS. ALDERMAN: They told me the class had six kids, but

10   there were only five present on the day of the visit.

11       MR. EIG: About - would you consider the five children you

12   just described to be appropriate for your son?

13       MS. WILSON: Object.

14       MR. EIG:  Oh. Oh.

15       MS. ALDERMAN:  What I observed.

16       HEARING OFFICER:  Just a minute.  Excuse me.

17       MS. ALDERMAN: What I observed.  Sorry.

18       HEARING OFFICER:  The parent can give us her opinion as to

19   her appreciation of what DCPS offered.  Now, questionably, a

20   professionally trained opinion would have more weight.  But I

21   can still listen to the parent's opinion.  Overruled.  Please

22   answer the question Ms. Alderman.

23       MS. ALERDMAN: What I observed for example was the spelling

1   class. The words that the teacher was discussing were words such

2   as "I", "he" and "she". N████████ is spelling at approximately

3   at a high school level. His spelling is extremely good.  There

4   were discussing, they were sitting at a table and the teacher

5   saying is a very small and I mean a slow voice - "What has two

6   wheels?."  And the children were asked to point at pictures as

7   to which has two wheels.  They were looking at a story and it

8   was an all picture story with very short sentences. Again, Natty

9   is capable of reading full chapter books. So academically the

10  class was probably the equivalent of a first to second grade

11  level class, when N████ is in sixth grade. There were no - the

12  materials that they had in the classroom - the toys, the

13  puzzles, were probably first and second grade.  N████████ would

14  probably have been four grades below his academic level.

15      MR. EIG: You said some of the kids were non-verbal?

16      MS. ALDERMAN: Yes, that's what the teacher said to us.

17      MR. EIG:   Okay.  How verbal is your son?

18      MS. ALDERMAN: N████████ has a - probably way above grade

19  level. I think his vocabulary is close to high school.  He

20  speaks very, very well.  He is very articulate.

21      MR. EIG: Is there (inaudible) he relate to in your opinion

22  in that class?

23      MS. ALDERMAN: Oh absolutely not.  I would give you an

1  example, N█████ writes books.  He writes twenty page books.  The

2  children were looking at spelling words with one or two, you

3  know "I", "he", "she."  Absolutely no.  Academically, and Natty

4  would probably have left the class, If I could give you my

5  opinion, N█████ would have lasted ten minutes.  He would have

6  been furious and would have left the school.

7      MR. EIG: And that's the other question I want to ask you

8  about.  Ludlow Taylor is - did you have any safety concerns

9  about him there?

10     MS. ALDERMAN:  I did.  Because I realize that if he was

11 there, I know N█████.  When he's upset, he elopes.  And I would

12 ask, what would you do with the child who tried to leave. And I

13 was not - the answer that I was given was, oh we have people who

14 would be able to control him.  I have seen what happens when

15 N█████ wants to elope.  It has sometimes has taken six or seven

16 professionals trained people to stop him.  He is very strong and

17 very determined.  He was upset one time, he walked six miles.

18 Just to - on his own.

19     HEARING OFFICER:  How much does he weigh?

20     MS. ALDERMAN: Probably 100 pounds.  May I say one thing?

21     HEARING OFFICER: Yes.

22     MS. ALDERMAN: When he was restrained last time and I asked

23 him what did he learn from the experience?  He told me that I

1  better get stronger.

2      HEARING OFFICER: Laughter.

3      MS. ALDERMAN: Laughter.  He is a very strong.  I could not

4  restrain him now.  Now days.  He is very strong and very

5  determined.

6      MR. EIG: He's taller than you now?

7      MS. ALDERMAN: He's taller than me.

8      HEARING OFFICER:  And you are?

9      MS. ALDERMAN: I am 4'11".  He's about—he just about past

10  me.

11      MR. EIG: Now, let me ask you about quickly - how do you

12  think he is doing there?

13      MS. ALDERMAN: I think he is striving.  I can give you an

14  example.  I received an email from a friend with whom he had a

15  playdate with recently. And the email said to me, I - you know.

16  I haven't seen N███ for several months, I am amazed at the

17  progress that he has made. He is some much more able to talk to

18  people. He is so much calmer.  He is just a different child. I

19  think he is doing great. I think he is receiving about the best

20  possible education that a child with his needs can receive.

21      MR. EIG:   And what is that (inaudible)?

22      MS. ALDERMAN: N███ loves being in school with other kids.

23  He - you know. He is doing very well academically.  We just got

32

1    his report card.  And he is doing very well on his report card.

2    Obviously he wishes he could be in a normal school.  But that's

3    what he goes a normal school, there is no – there's no – even a

4    chance that he could be in regular school without getting

5    expelled by the – you know – by they too.

6        MR. EIG: You believe that he's better (inaudible).

7        MS. ALDERMAN: Greatly. He's learned a lot of coping skills.

8    He's learned a lot of social skills.  I think that he is – he

9    feels saved – safe.  He loves his teachers.  He rode after

10   (inaudible) when he had to be restrained, he wrote to an apology

11   letter to the teacher, as he should have.  And he said, I know

12   the teachers at Ivy Mount, I forget their exact words, are the

13   best teachers ever, or something to that effect.

14       MR. EIG:   Ms. Alderlman, I thank you very much.

15       HEARING OFFICER:  Ms. Wilson

16       MS. WILSON: I have no questions for Ms. Alderman.

17       HEARING OFFICER:  Ms. Alderman, on this IEP where it says

18   100%. What does that mean to you?  100% out of regular

19   education.

20       MS. ALDERMAN: What it means to me is that N█████ would not

21   be able to function in a class with a – which did not have a

22   close to a one-on-one ratio and people who are trained to deal

23   with him when he starts going into these spirals, temper

33

1    tantrums, difficult moments.

2        HEARING OFFICER:  Do you think he would benefit from any

3    contact with children who are not disabled?

4        MS. ALDERMAN: He contact – he has daily contact with

5    brother, who is probably one of his best friends who is not

6    disabled.  He does not seem to learn by observing other

7    children.

8        HEARING OFFICER: So you don't think he would benefit with

9    having any contact with children who are not disabled?

10       MS. ALDERMAN: I don't think he could handle it.  I think

11   that when – when he is out in public in a cafeteria for example,

12   this smells bother him, the noise bothers him, these are the

13   types of things that trigger a very negative reaction. And being

14   in a large group, I cannot take him to large groups.  For

15   example, I cannot him for example to a restaurant because the

16   bustle and noise and bumping and people just triggers a very

17   anxiety and a temper tantrum.

18       HEARING OFFICER: Redirect Mr. EIG.

19       MR. EIG: Nothing.

20       HEARING OFFICER: Re-cross Ms. Wilson?

21       MS. WILSON: No.

22       HEARING OFFICER: Next witness Mr. EIG.

23       MS. WILSON:  Before we do that, considering the time, I

1  would just ask for two minute just to call my witnesses, I was

2  anticipating that we were going to, with counsel requesting a

3  full day, I though we were go a little longer.  So If I could

4  just take two minutes to just run and call them and tell them--.

5      HEARING OFFICER:  Oh, you want to use this phone?

6      MS. WILSON:  I mean if -.

7      HEARING OFFICER:  No. No. No.  Sure.  We can take a brief

8  recess.

9      HEARING OFFICER:  Okay, we're back on the record. Call your

10  next witness Mr. Eig.

11      MR. EIQ: Ms. Katy Alexander.

12      HEARING OFFICER: Ms. Alexander do you solemnly affirm that

13  the testimony that the testimony that you are about to give

14  during the course of the preceding would be the truth, the whole

15  truth and nothing but the truth?

16      MS. ALEXANDER:  I do.

17      HEARING OFFICER:  Please begin Mr. Eig.

18      MR. EIG:  Your full name?

19      MS. ALEXANDER:  Katie Chafe Alexander

20      MR. EIG:  And Katie is not a nick name, that's the name?

21      MS. ALEXANDER:  That is my full name.

22      MR. EIG:  K-A-T-I-E. All right.  I have a daughter by the

23  name of Katherine who goes by the name of the Kay, and if anyone

1    calls hers Katie, she'll kill them. (Laughter).  I'm very happy

2    to show her that someone is very proud of that name.  How are

3    you at this point?  That's irrelevant. (laughter)

4        HEARING OFFICER: Thank you.

5        MS. ALEXANDER:  I am employed as the program director of

6    the Ivy Mount School Model Asperger program.

7        MR. EIG:  What's your educational background?

8        MS. ALEXANDER:  I have my undergraduate degree, a clinical

9    degree in occupational therapy and then went on to get an

10   advanced graduate degree in occupational therapy, taking all of

11   my electives coursework in Special Education program with an

12   emphasis in autism through the University of Kansas.

13       MR. EIG:  And have you been in the field of education for

14   amount of year?

15       MS. ALEXANDER:  Oh, Altogether – in this professional

16   capacity or all types of – cause I work this paraprofessional?

17       MR. EIG:  All types.

18       MS. ALEXANDER:  I'm sorry, give me a second for the math.

19   I guess, 15 years.

20       MR. EIG:  Okay.  How long have you been working in the

21   field of education you are focusing on – autistic children?

22       MS. ALEXANDER:  Since 98. So, nine years now.

23       MR. EIG:  And how long have you been in your current

1  position?

2      MS. ALEXANDER:  This is - I am completing my second year.

3      MR. EIG:  Second year - I'm sorry, your official title as?

4      MS. ALEXANDER:  As Program Director of the Ivy Mount

5  School, Asperger Program. I started in September of 2006.

6      MR. EIG:  And when did the students?

7      MS. ALEXANDER:  I'm sorry, I started in September 2005, the

8  students started in September of 2006.

9      MR. EIG:  Do you - are you required to or do you hold any

10  certifications for licensures?

11      MS. ALEXANDER:  I hold licensures in Occupational Therapist

12  in the State of Maryland and also in the District of Columbia.

13      MR. EIG:  Okay. And what - is N██████ in your program?

14      MS. ALEXANDER:  He is.

15      MR. EIG:  Why don't you describe the program's that N██████

16  in

17      MS. ALEXANDER:  Our program is a self-contained program. We

18  have, we are really looking to design a model program to serve

19  the population and we also investigated other programs and found

20  that in order to best meet the needs of this population that we

21  needed to address social skills, communication, academic needs,

22  motion regulation and daily living needs of the student

23  population with equal emphasis, not necessarily equal time.

1    That being the case, we have two classrooms.  Shall I just focus

2    on N███████ classroom?

3        MR. EIG:  Yes, his classroom.

4        MS. ALEXANDER:  N██████ classroom in the fifth and sixth

5    grade classroom.  Our curriculum is aligned to statewide,

6    especially Maryland's state law (inaudible) curriculum, but we

7    also aligned to Virginia standards as well as well as D.C.

8    standards.  And we also have a social skills curriculum that is

9    - we're designing it based on what's available from the

10   research, which is unfortunately limited and also pulling from

11   programs that are generally accepted and considered to be the

12   best practices for the population.  And we're also working with

13   our professional advisory board tincture that what we're

14   providing is for the - in the best interests of our students. We

15   also look to provide generalization, opportunities for our

16   students as well. Opportunities for them to be mainstream

17   populations and scaffolded structured and supervised way.

18       MR. EIG:  Specifically, looking at N██████ classroom, how

19   many kids?

20       MS. ALEXANDER:  There are now seven students in that

21   classroom with the capacity of eight.

22       MR. EIG:  And staffing?

23       MS. ALEXANDER:  There are - specific to that classroom or

38

1   the whole program?

2       MR. EIG:  Well, I mean, specific to that class room but if

3   there are staff (inaudible).

4       MS. ALEXANDER:  Okay.  Specific to the classroom there is

5   one head teacher, two assistant teachers. Currently one of our

6   students carries a IEP one-on-one Aid and that person is in the

7   classroom as well.  We also have an occupational therapist,

8   speech therapist and psychologist with the program.  They are

9   all integrated part of the service delivery. So for example, the

10  occupational therapist is in the classroom providing typing and

11  handwriting instruction the classroom.   She works with the

12  teacher in providing programming. The speech language

13  pathologist comes in at lunch time to facilitate communication

14  and work on individualize language goals and socialization.

15      MR. EIG:  The teacher in the program, Special Education

16  teacher or not?

17      MS. ALEXANDER:  She is.

18      MR. EIG:  You said assistant teachers?

19      MS. ALEXANDER:  Correct.

20      MR. EIG:  You said two?

21      MS. ALEXANDER:  Two assistant teachers, one IEP Aid.

22      MR. EIG:  Okay.  The two assistant teachers, are those Aids

23  or do they have teaching credentials?

1    MS. ALEXANDER:  They are teaching aids.  They have a

2  college degree, actually one of aids is - I'm sorry - has his

3  graduate degree in educational counseling.

4    MR. EIG:  Now, why is there that intensive of a staffing in

5  that classroom?

6    MS. ALEXANDER:  Because of the nature of the needs of

7  student population.  These are students who in common literature

8  are coming know as Asperger's plus kids.  These are students who

9  have a diagnosis of Asperger's Syndrome.  High functioning

10  autism or pervasive developmental disorder not otherwise

11  specified with Kune-morbid diagnoses of new disorder attention

12  disorder, conduct disorder, or behavior disorder.

13    MR. EIG:  What do the kids generally function at in that

14  classroom academically?

15    MS. ALEXANDER:  They are at least on grade level to above.

16    HEARING OFFICER:  Excuse me.  What grade is N██████ in?

17    MS. ALEXANDER:  He's in sixth grade.

18    HEARING OFFICER:  He's at the sixth grade level

19  academically?

20    MS. ALEXANDER:  Correct.  At or above depending on the

21  specific level - I mean the academic area.

22    HEARING OFFICER: Excuse me Mr. Eig.

23    MR. EIG:  And the other kids are similar to N████?

1      MS. ALEXANDER:  Correct.

2      MR. EIG:  (inaudible) where do they function, (inaudible)

3      MS. ALEXANDER:  My favorite quote is if you met with one

4   child with an autism spectrum disorder, you've met one child

5   with an autism spectrum disorder and that is true for the

6   classroom as well.  That each student present really in a

7   completely different way, which brings some lovely heterogeneity

8   to the classroom, but certainly some complexity from a

9   programming standpoint. But they're all - and I mean they all

10   have language skills, speech skills.  They all have age-expected

11   or above vocabulary.  This population is known for being little

12   professor, and usually they have over-formalized speech and this

13   is true for most of the students in that classroom.  But you

14   know we might have one student who does really wells with

15   greetings and starting a conversation, and where another student

16   really struggles in that area globally they all have

17   difficulties with pragmatic language, but its - but there is

18   quit a bit of heterogeneity.

19      MR. EIG:  The problems that N███ have with encountering

20   lots of frustration that - (inaudible) and the way he responds

21   to that - first of all is that consistent with your knowledge of

22   N████?

23      MS. ALEXANDER:  Yes.

1      MR. EIG:  Do you have other kids who (inaudible)?

2      MS. ALEXANDER:  Yes.  To varying degrees.

3      MR. EIG:  Is N█████ well(inaudible)?

4      MS. ALEXANDER:  Yes.

5      MS. WILSON:  I am going to object her giving the opinion

6   testimony.

7      HEARING OFFICER: Overruled. Just a minute.  Go ahead.

8      MS. WILSON:  The witness has not been offered as an expert,

9   so what is the Hearing Officer's--.

10     HEARING OFFICER: She is testifying as to her personal

11   experience with the child.   Fact witness.

12     MS. WILSON: But a fact witness is allowed to give their

13   opinion?

14     HEARING OFFICER: No. In this context she is a trained,

15   licensed occupational therapist—.

16     MR. EIG:  I can qualify her as an expert, I'll offer--.

17     HEARING OFFICER: Just a minute Mr. Eiq. I'm going to

18   overrule the objection.  Just Repeat the question.

19     MS. ALEXANDER:  Repeat the question, I'm sorry.

20     MR. EIG:  The question was is N█████ receiving benefit as

21   (inaudible)?

22     MS. ALEXANDER:  He is.

23     MR. EIG:  Why?

1     MS. ALEXANDER: Why? He is well placed because this program

2    meets his academic needs, is able to meet his social skills

3    needs, he's emotional regulation we're already seeing progress.

4    At the beginning of the year we would see disengagement from the

5    classroom up to 30% of the time and now we're down to 0% on many

6    days, and at most 10% or so.  And those are taken in fifteen

7    minute intervals at the data that is.  Should I wait?

8     MR. EIG:  No, let her break.

9     MS. ALEXANDER:  And he has a group of peers—okay.

10    MR. EIG:  He has a group.

11    MS. ALEXANDER:  Okay, the peers that are in that group,

12   they enjoy one another, so from a peer context, it gives him a

13   satisfying context.  With – we are seeing the benefits of the

14   program and N███ is profiting from his placement in the program

15   through generalizing the skills that he is learning within the

16   program. We have also seen decreased frequency and intensity of

17   the elopement and physical aggression.

18    MR. EIG:  Now, when he has eloped --.

19    MS. ALEXANDER:  Yes.

20    MR. EIG:  Acted out from some frustration--.

21    MS. ALEXANDER:  Yes.

22    MR. EIG:  Once again please agree or disagree with the

23   mother's description of what it applies (inaudible).

1        MS. ALEXANDER:  I agree.

2        MR. EIG:  NA3 is what?

3        MS. ALEXANDER:   This is the IEP that Ivy Mount educational

4    team drafted for N██████ with the family?

5        MR. EIG:  Were you part of that?

6        MS. ALEXANDER:  I was not directly a part of this?

7        MR. EIG:  Have you reviewed the site?

8        MS. ALEXANDER:  I have reviewed it.

9        MR. EIG:  And was the mother a part of the IEP process?

10       MS. ALEXANDER:  Yes.

11       MR. EIG:  Is the IEP (inaudible)?

12       MS. ALEXANDER:  Yes.

13       MR. EIG:  (inaudible)

14       MS. ALEXANDER:  No. No.

15       MR. EIG:  And does Ivy Mount team, I'm talking about the

16   educational team, now, not just you as a director, but the

17   teacher, the speech language, the OT, all those people, do they

18   .. what is their opinion as to whether this is an appropriate

19   program or not?

20       MS. WILSON:  I'm going to object to that question, I mean

21   no only is it asking member's of the team opinions about

22   something, but certainly, the witness has already testified, she

23   was not at the IEP meeting so how she can respond as to someone

1   else's opinion that not even here, we vehemently object to and

2   her review the IEP would be the same in terms of the Hearing

3   Officer's review of the IEP, he has the document and can review

4   whatever notes are comment are in that document.

5       HEARING OFFICER:  As a matter of fact, that is what the

6   Hearing Officer was doing when you asked that question. Please

7   re-ask the question, I didn't hear it. I was reading - I

8   apologize.  I was reading the IEP.

9       MR. EIG:   I just wanted to know whether - let me back off

10  and do a foundation.  Have you discussed N██████ IEP with team

11  members?

12      MS. ALEXANDER:  Yes.

13      MR. EIG:  Do they believe it is an appropriate IEP? That's

14  what she objected to.

15      MS. WILSON: Right.  Well I objected to him asking what was

16  the team members opinion about the IEP?

17      HEARING OFFICER: Well that is hearsay, but I can listen to

18  that.

19      MS. WILSON: Okay. I mean I don't know. I find to hard to

20  believe that every single question that I've asked, every single

21  objection that I've raised as been unfounded and specifically

22  with related to opinion testimony --.

23      HEARING OFFICER: If you were in a trial Ms. Wilson, I would

1  have sustained your objection.  But we're not in a trial, this

2  is a Hearing.

3      MS. WILSON: That's true, but in Hearings, we do still,

4  while we're not in a trial we do still follow some of the same

5  procedures that are followed in trials.  And I know that

6  certainly for someone to be able to respond as to another

7  person's opinion, that not here, we are - I just want to

8  continue to make my record about our objections.

9      HEARING OFFICERS:  Your objections are so noted.  And I'm

10  going to listen to the hearsay.  Please answer the question Ms.

11  Alexander.

12      MS. ALEXANDER: Yes the team is in agreement on this

13  document.

14      MR. EIG:  And do you - how often do you see Natty?

15      MS. ALEXANDER:  I see N███ everyday.

16      MR. EIG: You talked about, about an answer ago about his

17  improvements, has he benefited from the program?

18      MS. ALEXANDER: Yes.

19      MR. EIG:  No further questions.

20      HEARING OFFICER: Ms. Wilson, now you can possibly point out

21  any misunderstanding, any flaw in the testimony to help the

22  Hearing Officer understand.

23      MS. WILSON: Well - I think at this point the Hearing

1    Officers has allowed all the questions, so I'll ask the few that

2    I have.  Ms. Alexander, can you tell me, you said there were two

3    classrooms at the program.  There is a fifth and sixth grade

4    class based on your testimony, and what's the other class?

5        MS. ALEXANDER:  Third and fourth.

6        MS. WILSON: So currently, the – third and fourth – fifth

7    and sixth –I have no further questions for the witness, thank

8    you.

9        MR. EIQ:  How can I (inaudible) based on that. If it is a

10   fifth and sixth grade program, N████ is a sixth grade she said,

11   will he able to get (inaudible)?

12       MS. ALEXANDER: Yes.  Because the program is developing.

13   This is a new program. When we looked around the country for a

14   model program to adopt, and we didn't find one that satisfied

15   that – the criteria we had. We determined that we needed to

16   develop one and we thought it to big a task to develop a K

17   through 12 program, and bring in and innovate new practices and

18   bring in researched-based practices. So we started with a class

19   that we thought would best meet the needs of the community with

20   an intent to develop on. So next year, we will have a seventh

21   grade, the following year an eighth grade on into high school.

22       MS. EIG: Thank you. Nothing further.

23       HEARING OFFICER:  Re-cross Ms. Wilson?

1      MS. WILSON: Yes. What  is there - your testimony is that

2    there is currently a plan to have a seventh grade classroom?

3      MS. ALEXANDER: Yes.

4      MS. WILSON: And when will that classroom be available?

5      MS. ALEXANDER:  July, 2007.

6      MS. WILSON: Thank you.

7      HEARING OFFICER: Thank you Ms. Alexander.

8      MS. ALEXANDER: You're welcome. Thank you.

9      HEARING OFFICER: Next witness.  Opening statement, if you

10    have an opening statement.

11      MS. WILSON: Wow. The abuse of DCPS continues; that's a

12    joke.  That was a joke.

13      MS. EIQ:  I would know it in the same way, that the abuse

14    were to continue if the Hearing Officer and Opposing counsel

15    didn't say, Oh yeah, you should get get, okay.  But you didn't

16    remember.

17      MS. WILSON:  That's why I said it was joke.

18      HEARING OFFICER:  Ms. Wilson.

19      MS. WILSON:  Our position in this case, is I somewhat

20    started talking about at the beginning is that based on the

21    Complaint that was filed, we are here on three specific issues.

22    One, the whether or not the DCPS refuse to allow the parents to

23    participate in the placement decision; two, whether or not the

48

1    autism classroom at Ludlow Taylor is an appropriate placement;

2    and three, if that is not, if the placement at Ivy Mount.  Our

3    contention is that the first two issues are the two threshold

4    issues at our position being that – and you will hear testimony

5    that DCPS and in no way refused the parent participation in the

6    placement process.  And that the placement, or that the

7    classroom setting at Ludlow Taylor can implement the IEP that

8    the parent signed off and the agreement with the IEP and you

9    will hear testimony as to the parent ability – excuse me – as to

10   the school's ability to do that.  In addition, you will hear

11   testimony that the parent did participate in the meeting and at

12   no point denied the ability to talk, ask questions and in fact,

13   she did do so.  So our position is that DCPS has not denied the

14   petitioner FAPE.  And if the petitioner, and if it is the

15   petitioner's position that the program at Ivy Mount where the

16   Petitioner wants to be, then certainly DCPS would not stop him

17   from being there; but to say that the school system must fund

18   that placement, that is where we have the disagreement, because

19   we feel that we have provided – we do have the legal right to

20   look at – to place a student within our borders first.  And we

21   have provided and offered a setting that can implement the

22   agreed IEP to provide the petitioner with FAPE.  And on the

23   basis of that, we feel that the Hearing Officer should not order

1  placement at Ivy for the 06/07 school year.

2       HEARING OFFICER: First witness, Ms. Wilson.

3       MS. WILSON: Is going to be Gloria Everett from the CARE

4  Center.

5       HEARING OFFICER: Are there two "R's" in Ms. Everett's name?

6       MS. WILSON: Hi, is Ms. Everett available?

7       HEARING OFFICER: No, one.

8       MR. EIG: Two "T's."

9       HEARING OFFICER:  Two "T's."

10      MS. WILSON: Hi Ms. Everett, I'm calling in now from the

11 Hearing.  Are you able to testify?  I'm going to put you on

12 speakerphone.  The Hearing Officer will swear you in.  In the

13 room is Michael Eig, attorney for the petitioner and Ms.

14 Alderman and Ms. Alexander from the Ivy Mount School.  Hold on.

15      HEARING OFFICER:  Ms. Everett?

16      MS. EVERETT: Yes.

17      HEARING OFFICER:  This is Herbert St. Clair.  Good Morning.

18      MS. EVERETT: Good morning to you sir.

19      HEARING OFFICER: All right.  Ms. Wilson was good enough to

20 tell you who is in the room with us.

21      MS. EVERETT:  Okay.

22      HEARING OFFICER: Ms. Everett I am spelling your name

23 capital E-V-E-R-E-T-T?

50

1        MS. EVERETT: That's correct.

2        HEARING OFFICER: Ms. Everett do you solemnly affirm that

3   the testimony that you are about to give during the course of

4   this proceeding will be the truth, the whole truth, and nothing

5   but the truth?

6        MS. EVERETT: Yes I do.

7        HEARING OFFICER: Please begin Ms. Wilson.

8        MS. WILSON: Ms Everett can you state your full name for the

9   record please?

10       MS. EVERETT: Gloria Thomas Everett

11       MS. WILSON: And can you tell us who you are employed by?

12       MS. EVERETT:  District of Columbia Public Schools as a

13  Social Worker as a Case Manager.

14       MS. WILSON: Okay.  Is there anyway that you can speak up a

15  little bit, because I think the mike might be difficult time

16  picking you up?

17       MS. EVERETT:  Okay. Is that better?

18       MS. WILSON: Yes, that is better. Okay.  Okay, can you tell

19  us how long you have been employed with DC Public Schools.

20       MS. EVERETT:  I began in 1978.

21       MS. WILSON: Can you describe for us briefly what your

22  duties are as case manager?

23       MS. EVERETT:  Duties include case manager of the team of

1    all the professionals who are psychologists, perhaps another

2    social worker, speech and language, OT and PT.  My job is when I

3    receive a case, which I don't select, is given to me.  My job is

4    to pull together a team that I think is appropriate to work on a

5    particular case that I am given.  Also my job is to make sure

6    that evaluations are completed, completed in timely manner, to

7    maintain contact with the family and/or the family's

8    representative to set up dates where we will meet and discuss

9    completed evaluations.  Also I'm part of the MDT meeting.  I

10    conduct that as well the IEP meetings and the MDT meetings, just

11    to make sure that everyone's input is taken into consideration

12    to help draw conclusions to whatever the discussion was to

13    determine a child's eligibility for Special Education.  Also is

14    to make sure that IEP is appropriately written and also to make

15    sure that we discussed placement that would be appropriate for

16    the student's IEP to be implemented.

17         MS. WILSON: Okay, can you tell me if you are familiar with

18    the student N███████ A███████?

19         MS. EVERETT:  Yes I am.

20         MS. WILSON: And how are you familiar with that student.

21         MS. EVERETT:  Okay. Hold on please. I am familiar with that

22    case, as that case was assigned to me last year if I remember

23    correctly.  And at that time, we were to follow through on

52

1  making sure the evaluations were completed and again, to come to

2  the MDT table as well as the IEP meeting.  (inaudible) his

3  reports.  I was able to get copies of his report from the

4  previous school.

5      MS. WILSON: Excuse me. Ms. Everett, let me stop you right

6  there and back up a bit. You said that you became familiar with

7  the student last year? Can you tell us when the case was

8  assigned to you?

9      MS. EVERETT: N██████ A██████, he was assigned to me –

10  are you asking me for a specific date?

11     MS. WILSON: As close as – as close as you can get.

12     MS. EVERETT:  Oh, I have to wrack my brains for that one.

13  Bear with me for a minute, okay.  As close as I could get –

14  maybe September or October.  I think it was the beginning of the

15  school year.

16     MS. WILSON: Okay.  That would be what actual calendar year?

17     MS. EVERETT:  That was – let's see. I think it was – I

18  think it was – what did I say, the beginning of the school year.

19  I think it was – I would probably say, maybe not the beginning

20  of the school year, maybe spring of last year, April May.

21     MS. WILSON: When you are saying year, what year?

22     MS. EVERETT:  of 06.

23     MS. WILSON: 06.

1        MS. EVERETT:  06. Okay.

2        MS. WILSON: So, exactly what is your testimony as to when

3    you began aware the student?

4        MS. EVERETT:  Probably I'm going to say May 06.

5        MS. WILSON: Probably how did you become aware of the

6    student in May of 06.

7        MS. EVERETT:  He was assigned to me.

8        MS. WILSON: What happened next after you received the case.

9        MS. EVERETT:  I think we met with Mr. Eig and the Mom to

10   talk about the case.  They gave me some history on this child,

11   he was now, the family felt that he could now participate in a

12   school - structured school program.  That was a meeting that we

13   held, and my job at that point to make the sure that the current

14   evaluations were completed and/or reviewed evaluations that were

15   already completed.  I think that background mostly came from the

16   mother, where he had been for the last two years, in terms of

17   his academics and where he was receiving instructions.

18       MS. WILSON: Okay, what was your understand as to where that

19   had been?

20       MS. EVERETT:  Prior to coming to us he was home-schooled.

21       MS. WILSON: What if any evaluations did you receive or

22   conduct on behalf of this student?

23       MS. EVERETT:  I remember now.  His teacher was also

54

1    involved in that meeting, and the Mom were involved with that

2    meeting.  The teacher gave us some verbal input in terms of what

3    she was doing with him currently.  I was able to get some

4    previous school records when he attended a school in DCPS.  And

5    then we made a determination of what needed to be done to bring

6    up his - to make everything comprehensive and current.  At that

7    time we did a speech, language and a psycho-ed.

8        MS. WILSON: And you said you did - can you clarify when you

9    say we did?  What does that mean?

10       MS. EVERETT:  Oh, the team that I was able to pull together

11   to pull together to work on this case.  That was the

12   psychologist as well as the speech language therapist.  That

13   team - in reviewing the records a determination was made that he

14   needed current psycho-ed, as well as a current speech and

15   language evaluation.

16       MS. WILSON: And this was determined when?

17       MS. EVERETT:  In May of last year '06.

18       MS. WILSON: Okay, and what happened next?

19       MS. EVERETT:  Well we completed - the team completed the

20   evaluations.  Those evaluations were sent to Mr. Eiq for his

21   review.  We also requested a date to meet, to convene a MDT IEP

22   meeting.

23       MS. WILSON: And what happened - was there a time when an

55

1    MDT IEP was held?

2         MS. EVERETT: Yes it was.

3         MS. WILSON: And when was that?

4         MS. EVERETT:  I don't remember the exact date.

5         MS. WILSON: Do you remember the month that the meeting was

6    held?

7         MS. EVERETT:   No I don't.

8         MS. WILSON: Do you remember what was discussed at that

9    meeting?

10        MS. EVERETT:   Yes.  We discussed, we discussed his needs

11   from - we compared I think some notes from previous schools,

12   what the diagnosis was, and what was offered through DCPS at

13   that time when he was attended DC Public Schools. We determined

14   that the student continued to have problems.  As far as having -

15   being able to be educated in a structured environment.  We made

16   that determination at the meeting.  We developed his IEP.  We

17   also talked about how many hours he would need with a

18   specialized instructor. Also the hours he would need for speech

19   and language services.  I can't remember if we finished at that

20   time or if we came at a second time.  We talked about

21   implementation of the IEP.

22        MS. WILSON: And what happened at the implementation of the

23   IEP phase?  What happened at that - during that discussion?

1      MS. EVERETT:  We determined that he would need very

2  intensive intervention and I explained to the parent that in my

3  position, I was not aware of all the programs at DC Public

4  Schools that could meet his needs and I would need to get some

5  input.

6      MS. WILSON: Okay, and what happened next?

7      MS. EVERETT:  What did I do after that?

8      MS. WILSON: Yes.

9      MS. EVERETT:  Okay.  I sent his package down to our person,

10  and who looks over information and who would know what schools

11  and programs that are available. I had a discussion with her and

12  she came back with a suggested placement where the IEP could be

13  implemented.

14      MS. WILSON: Did there come a time when you met – when the

15  team convened where that suggested placement was discussed?

16      MS. EVERETT:  Yes.

17      MS. WILSON: And when was that?

18      MS. EVERETT:  When was it?

19      MS. WILSON: Yes.

20      MS. EVERETT:  I am so fuzzy on dates.

21      MS. WILSON: Do you recall what the discussion was?

22      MS. EVERETT:  Yes. The discussion was that Ludlow Taylor

23  seemed to be appropriate, based on our research. Based on what

1    was being offered in the DC Public School system, that Ludlow

2    Taylor seemed appropriate placement for the student.  Also, we

3    always look at the neighborhoods schools.  So, there were two

4    suggested placements.  The neighborhood school with supported

5    services or Ludlow Taylor who had a program that we thought

6    would be more appropriate for his needs.

7        MS. WILSON: Do you recall if the parent participated in

8    that discussion?

9        MS. EVERETT:  Yes.  The person from Ludlow Taylor was on

10   the telephone and she was able to ask questions of the person

11   from Ludlow Taylor.

12       MS. WILSON: Do you recall if anyone at the meeting

13   prohibited the parent from participating in that discussion.

14       MS. EVERETT:  That would never be the case.  The parents

15   are free and I encourage parents to freely to be involved in

16   that discussion.

17       MS. WILSON: Do you recall if there ever a time that the

18   parent signed off on the IEP?

19       MS. EVERETT:  She agreed to the content of the IEP – yes.

20       MS. WILSON: Thank you no very questions.

21       Hearing Officer: Mr. Eig.

22       MR. EIG:  Thank you.  Ms. Everett, good morning.

23       MS. EVERETT:  Good Morning to you sir.

1      MR. EIG:  Just a couple.  There was a letter that is in

2   evidence that Ms. Alderman had, her lawyers, said in July of

3   2006 that DC asking for the school system to consider placing

4   N███ at the Ivy Mount as for his class. Have you ever seen that

5   letter?

6      MS. WILSON:  I am going to object to that question as being

7   outside the scope –

8      MR. EIG:  Hold on. Hold on.

9      HEARING OFFICER: Yes, Ms. Wilson?

10     MS. WILSON: My objection is that that question is outside

11   the scope of direct?

12     HEARING OFFICER: This is cross-examination. I'm going to

13   allow latitude. This document is in the record and it bears

14   directly on when this matter came to the attention of DCPS.  So

15   I'm going to overrule your objection. Ms. Everett – Excuse me,

16   go ahead Mr. Eig.

17     MR. EIG:  Have you ever seen that letter?

18     MS. EVERETT:  I would have to see it.

19     MR. EIG:  If you can't recall it that is a perfectly good

20   answer, if you can't recall.  Were you aware at any point during

21   your dealing with the IEP process that Ms. Aldelman was asking

22   for placement at Ivy Mount?

23     MS. EVERETT:  Yes. I was aware of that.

59

1       MR. EIG:  Do you remember how you became aware of that?

2       MS. EVERETT:  We had – our team members visited Ivy Mount.

3  Mr. Perkins and Ms. Hinton.

4       MR. EIG:  So that indicate that when –that you knew that

5  N███ was at Ivy Mount, right?

6       MS. EVERETT:  Yeah, we knew that.

7       MR. EIG:  Now, you just don't remember how you initially

8  were – became aware of the parent's request? – whether it was a

9  letter or a conversation or anything?

10      MS. EVERETT:  I think it was a meeting with Ms. Alderman,

11  that she talked about the program that she and some parents had

12  developed, and that is where she wanted her son to be.

13      MR. EIG:  Okay. I am looking at a DCPS – I am assuming that

14  you don't have our documents in front of you – is that right?

15      MS. EVERETT:  Excuse me?

16      MR. EIG:  I am assuming you do not have our Hearing

17  documents in front of you?

18      MS. EVERETT:  I do not.

19      MR. EIG:  Okay.  I am looking at DCPS 6, which is a student

20  evaluation plan for N████, that's dated on a meeting on a

21  meeting of May 5, 2006.

22      MS. EVERETT:  Okay.

23      MR. EIG:  Okay. I see your name there.  And this is – and

60

1    would this have been time and then the meeting --.

2       MS. EVERETT:  You know what - you're coming across very

3    muffled - I'--.

4       MR. EIG:  All right.  I'll slow down too.  Would this have

5    been the time when the meeting happened to agree on how to re-

6    evaluate N███████?

7       MS. EVERETT:  You have to start over. You were ruffling

8    papers and I didn't hear your entail statement?

9       MR. EIG:  Would this have been the time when there was a

10   meeting to agree to how to re-evaluate N█████?

11      MS. EVERETT:  What would have been the time, I didn't hear

12   what you said.

13      MR. EIG:  The May 5, 2006 meeting that had an SEP?

14      MS. EVERETT:  Was my name on that?

15      MR. EIG:  I'm not allowed to answer, I'm can only ask them?

16      MS. EVERETT:  Oh, I'm sorry.

17      MR. EIG:  Cause on the documents, yes you signed it?

18      MS. EVERETT:  Okay.

19      MR. EIG:  Would that have been the meeting when the re-

20   evaluation was agreed to?

21      MS. EVERETT:  Yes.

22      MR. EIG:  It says that there would be review of a speech

23   and language--.

1        MS. EVERETT:  Okay.

2        MR. EIG:  Does that mean that the school system would have

3   been provided a speech and language by the mother but they would

4   review?

5        MS. EVERETT:  That would have meant that we had a outside

6   evaluator to review?

7        MR. EIG:  It says the same thing for OT, an OT review.

8        MS. EVERETT:  Okay.

9        MR. EIG:  And it says a Neuro Psych review and it says an

10  observation. Okay?

11       MS. EVERETT: Okay.

12       MR. EIG:  So those are the things that were supposed to

13  happen after that meeting, right?

14       MS. EVERETT:  Yes.

15       MR. EIG:  Okay.  Do you have any recollection, I know Ms.

16  Wilson asked you this - but I'm allowed to ask you again, do you

17  have any recollection when the team got back together to discuss

18  the evaluations or the reviews?

19       MS. EVERETT:  We discussed the reviews at the MDT table.

20       MR. EIG:  Do you have any idea when that was?

21       MS. EVERETT:  I don't have it in front of me.

22       MR. EIG:  Do you know whether it was during the summer or

23  whether it was doing the school year, the '06 -'07 school year.

1  MS. EVERETT:  During the school year.

2  MR. EIG:  Now, we also have a document that is identified

3 as DCPS 8, and that is an IEP front page from DC, that is dated,

4 a couple of days, but the most recent date is January 23, 2007,

5 and let me make sure you're there.  I don't see your name on it.

6 And the – have you seen N███████ proposed IEP from DCPS for this

7 current school year?

8  MS. EVERETT:  I'm sure I have.

9  MR. EIG:  Do you remember if it has anything more than two

10 pages of occupational therapy goals?

11  MS. EVERETT:  I don't remember.

12  MR. EIG:  Well you would think – well you would think that

13 it would have many more areas to be addressed than his

14 occupational therapy, right?

15  MS. WILSON:  He's banderging the witness, the witness

16 already answered.

17  HEARING OFFICER:  This is cross-examination.

18  MR. EIG:  N███████ IEP had much more than occupational

19 therapy in it right?

20  MS. EVERETT:  Yes.

21  MR. EIG:  I think you said, I want to make sure, Ms.

22 Alderman agreed to the 100% Special Education and the related

23 services and the goals and the objectives of the IEP to the best

1  of your recollection right?

2      MS. EVERETT:  That - may I --

3      MR. EIG:  Sure.

4      MS. EVERETT:  There was another case manager also working

5  on his case, because I was out for a moment.

6      MR. EIG:  So, maybe you weren't there at the end?

7      MS. EVERETT:  Right.

8      MR. EIG:  Okay.  Were you at the meeting where Ludlow

9  Taylor was discussed?

10     MS. EVERETT:  Yes.

11     MR. EIG:  And do you remember questions and concerns raised

12 by Ms. Alderman and her attorney at that time who I believe was

13 Ms. Sear?

14     MS. EVERETT:  Yes.

15     MR. EIG:  Okay.

16     HEARING OFFICER: Re-direct.  But before you go - before --.

17 Ms. Everett, this is Herbert St. Clair.

18     MS. EVERETT:  Yes.

19     HEARING OFFICER: Would you explain to me what your

20 understanding is of the expression 100% out of general

21 education?

22     MS. EVERETT:  It would mean that the student would not have

23 a general education teacher at any time.

1        HEARING OFFICER:  Is the student supposed to have any

2   contact with non-disabled peers?

3        MS. EVERETT:  That's correct.

4        HEARING OFFICER: Let me see if I understand.  When you say

5   100%, you mean that all of the instruction is supposed to be

6   provided in a Special Education setting and the child is not to

7   have any contact with non-disabled peers during the entire

8   school day, is that correct?

9        MS. EVERETT: That is correct.

10       HEARING OFFICER:  Mr. Eiq, can I ask you not to participate

11  by head movement?

12       MR. EIG: Yes.

13       HEARING OFFICER:  All right.  Re-direct.

14       MS. WILSON:  I had nothing further for the witness.

15       HEARING OFFICER: Re-cross.  Ms. Everett this is Herbert St.

16  Clair again.

17       MS. WILSON: Yes.

18       HEARING OFFICER:  Thank you very much.

19       MR. EIG. Thank you.

20       MS. WILSON: Thank you.

21       HEARING OFFICER:  Next witness.

22       MS. WILSON: Hi, is this Ms. Kinsler?

23       MS. WILSON: Hi, this is Rashida and I was calling to see if

1   you were still able to testify?  Okay.  I am going to put you on

2   speakerphone and in the room is Mr. St. Clair the Hearing

3   Officer, Michael Eiq, the attorney for the petitioner, Ms.

4   Alderman on behalf of the petitioner and Ms. Alexander from Ivy

5   Mount.

6          HEARING OFFICER:  Good Morning.

7          MS. KINSLER:  Good Morning.

8          HEARING OFFICER:  This is Herbert St. Clair, the Hearing

9   Officer, and I want to make sure your name is --.

10         MS. WILSON: Ms. Kinsler.

11         HEARING OFFICER: Oh, Ms. Kinsler?

12         MS. WILSON: Yes.

13         HEARING OFFICER:  Oh, Dr. Kinsler, Brenda Kinsler?

14         MS. KINSLER:  Not quite.

15         HEARING OFFICER: Oh, Okay.  Ms. Kinsler, Ms. Wilson was

16  kind enough to identify everyone in the Hearing. So I'm just

17  going to proceed to administer the oath to you.

18         MS. KINSLER:  Okay.

19         HEARING OFFICER: Ms. Kinsler do you solemnly affirm that

20  the testimony you're about to give during the course of this

21  proceeding will be the truth, the whole truth, and nothing but

22  the truth?

23         MS. KINSLER: Yes.

1         HEARING OFFICER:  Please begin Ms. Wilson.

2         MS. WILSON: Ms. Kinsler can you tell us who you are

3    employed by?

4         MS. KINSLER: I'm employed by DC Public Schools.

5         MS. WILSON: And what is your position with DC Public

6    Schools?

7         MS. KINSLER: Psychologist.

8         MS. WILSON: And can you describe for us what your duties

9    are as a psychologist for DC Public Schools?

10        MS. KINSLER: Well, primary my duties are - I'm housed at

11   Ludlow Taylor and I work with not only the Special Ed students,

12   but those who are not in Special Ed, but probably need some

13   additional psychological support. So in addition to seeing

14   children according to what is on their IEP's, I see also

15   children in general education as a means of prevention.  I also

16   test the children here at the school, do IEP meetings, sit in on

17   IEP meetings those kind of things.

18        MS. WILSON: Can you tell me if you are familiar with the

19   student N⬛⬛⬛ A⬛⬛⬛?

20        MS. KINSLER:  Only by paper.

21        MS. WILSON: And can you tell me when you first became aware

22   of N⬛⬛⬛ A⬛⬛⬛.

23        MS. KINSLER: I was asked to participate in a telephone

1    conference in January.

2        MS. WILSON: And can you tell us what type of telephone

3    conference that was?

4        MS. KINSLER:  It was Ms. Everett who had called indicating

5    that there was a student that was identified as Ludlow Taylor

6    could meet his needs and asked if I would testify as to - do I

7    think that the program can meet his needs.

8        MS. WILSON: Can you describe for us, the - your discussion

9    at that January meeting?

10       MS. KINSLER: From what I recall, they basically asked about

11   whether his related services could be addressed here at the

12   school, which they can. They also asked about the classroom they

13   - the proposed classroom and talked the proposed classroom and

14   the concern that they had, were there other children in the

15   class with Asperger's and I could not attest to that because I

16   don't know - I don't work with all the children in the

17   classroom.  But I do know that there is Asperger's child who is

18   here, who is no longer in a self-contained classroom.  He's been

19   moved out into a general ed classroom which he still gets

20   support from Special Ed.  They were also questions about, you

21   know use of standards and the teacher basically follows the IEP,

22   but she kinds of breaks it down according to the - you know -

23   the standard, making sure that it is somehow address with the

1  students.

2     MS. WILSON: Are you aware as to how many students there are

3  currently in that classroom?

4     MS. KINSLER:  If I recall correctly, there are six children

5  in the class?

6     MS. KINSLER: That's not me is it?

7     MS. WILSON: No, that's the phone in here.

8     MS. KINSLER: Okay, the six children in the classroom, and

9  there is a teacher and an aid  — two aids.

10     MS. WILSON: Do you recall what the maximum is for that

11  classroom?

12     MS. KINSLER:  I want to say eight, but I am not sure.

13  MS. KINSLER:

14     MS. WILSON: You testified that the teacher works from the

15  IEP, correct?

16     MS. KINSLER: Correct.

17     MS. WILSON: What is your understanding of the teacher's

18  ability to implement an IEP for six different students.

19     MS. KINSLER:  Well I do know her class all the students are

20  at different levels. And I see her usually in the morning where

21  she is putting together whatever their assignments are for the

22  day, that is usually different packets.  They usually talking

23  about the - she does like a general, because I've observed her

1    classroom, she does like a general lesson of what is they are

2    going to do, but everybody is different, because everybody

3    grasps the information differently.   Everybody has to utilize

4    different skills in order to understand whatever she is

5    discussing in class.

6         MS. WILSON: Do you recall – in your testimony you said

7    that, they ask question about being in the Asperger's program

8    and who is the "they" that you are referring to?

9         MS. KINSLER: Can you say your question again?

10        MS. WILSON: Sure.   During your testimony you indicated that

11   "they" asked various questions of you when you participated in

12   that January meeting. And my question is who is the "they" that

13   you are referring to?

14        MS. KINSLER:   It was the parents.

15   MS. KINSLER:

16        MS. WILSON: Do you recall any questions about – from the

17   parent about – let me rephrase the question.   What questions if

18   any did you receive from the parent regarding safety?

19        MS. KINSLER: Oh, she indicated that he's a student that

20   does like to run.   And he's not the only here that does run.

21   And I said that we have a system in place here. Usually, you

22   know the teachers do keep close tabs on the children, you know

23   if it gets to the point where he does run, they will contact the

1   office and myself and we have two other social workers here. We

2   will go out and we also have the Special Ed coordinator. And go

3   out and look for the student. Before they get downstairs there

4   is usually, he has to go past the security guard on one end and

5   at the other end he can't go out those doors, he has to go past

6   classes and somebody will see him. By the time they buzz

7   upstairs, someone is upstairs, and we have—we will have made

8   contact with the student.

9       MS. WILSON: Okay. Can you tell us if – do you recall any

10  other aspects of the program or if the classroom that you

11  discussed at the January meeting?

12      MS. KINSLER:  There was concern about learn about were

13  there other Asperger's students in the classroom, which again I

14  could not address.  There was a question regarding, you the

15  student is extremely bright. Will the teacher be able to address

16  his academic needs where he could progress academically?  And

17  Ms. Vitorez, who is the teacher for the identified class, can do

18  that.  I think that's only what I can recall.

19      MS. WILSON: Thank you Ms. Kinsler, no further questions.

20      HEARING OFFICER: Mr. Eiq.

21      MR. EIQ. Ms. Kinsler, how are you?

22      MS. KINSLER:  I'm fine, what about yourself?

23      MR. EIQ: Fine thanks.  Nice talking to you again.  A couple

71

1  of questions.

2      MS. KINSLER:  Okay, there is a lot of static.

3      MR. EIQ.:  Yeah, we know that, I think it is all these

4  mikes.  How's this?

5      MS. KINSLER:  Okay that's better.

6      MR. EIQ.: All right, we'll try it that way.  Ms. Kinsler do

7  you remember anything about N███████ IEP?

8      MS. KINSLER:  Primarily he had OT goals, I didn't see any

9  academic goals which he knows he's on target.  He is supposed to

10  have speech but I didn't' see any speech goals either.

11      MR. EIQ: And you didn't see any behavior goals either did

12  you?

13      MS. KINSLER:  No I didn't either.

14      MR. EIQ: And that would probably be the number one area

15  that we should be looking for, don't you think?

16      MS. KINSLER:  That's true but I did not participate in that

17  aspect, and I --.

18      MR. EIQ: Maybe you didn't see the whole IEP? Yeah, that's a

19  possibility, right?

20      MS. KINSLER:  Yes, that could be it, but that is all that I

21  have - that I have.

22      MR. EIQ: Okay, yeah.  That's all that we have in disclosure

23  too, which is why that - that's all that we have in disclosure.

1  Now, do you know there was a psychological or neuropsychological

2  review that was – going to be done from May of 2006, you are not

3  the psychologist who did that neuro-psych review are you?

4      MS. KINSLER:  No I'm not.

5      MR. EIQ: Do you remember who that was?

6      MS. KINSLER:  No, I don't know who that was.

7      MR. EIQ: Okay.

8      MS. KINSLER:  I've never met that person, is that what

9  you're asking me?

10      MR. EIQ: No. No. No.  I just wanted to know if you know who

11  did it, that's all.

12      MS. KINSLER:  Well yeah, I do know who did it.

13      MR. EIQ: Who did it?

14      MS. KINSLER:  It was somebody by the name of Germane

15  Perkins?

16      MR. EIQ: Okay. So DCPS had another psychologist review the

17  – the neuropsych right?

18      MS. KINSLER:  They reviewed the independent evaluation.

19      MR. EIQ: Right. Okay. Now, you know why the IEP wasn't

20  finished or being worked on until January of 2007?

21      MS. WILSON:  I'm going to object again, because that

22  question is completely outside the scope of direct for this

23  witness, and the witness has already testified that she did not

73

1   participate in that part of the process.

2        HEARING OFFICER: Well this is cross-examination, I'm going

3   to allow leeway. Overruled.  Please answer the question Ms.

4   Kinsler.

5        MS. KINSLER:  Can you repeat it again?

6        MR. EIQ: Do you know why the IEP wasn't finished until

7   January of 2007?

8        MS. KINSLER:  No, I don't.  All I know that two weeks

9   before I was to testify, that I received a call indicating that,

10  you know they would probably need to me testify – excuse me

11  testify to the appropriateness of the program.

12       MR. EIQ: When you say testify, you mean talk about it?

13       MS. KINSLER:  Right, at the IEP meeting in January, and I

14  don't know why, because I was not a part of that of that

15  process.

16       MR. EIQ: Have you formed an opinion as to the program's

17  appropriateness as to the time you received that phone call?

18       MS. KINSLER:  They basically gave me some information about

19  the student and based on what they gave me, he appeared to be

20  appropriate.

21       HEARING OFFICER: I'm going to overrule the objection.

22       MS. WILSON:  I think you're his buddy. (Chuckle)

23       HEARING OFFICER:  That's good. Good catching that.

1    (Chuckle)

2        MR. EIQ: Nah.  Now, Ms. Kinsler, the class that N███ was

3    proposed for at Ludlow Taylor, his mother went and observed and

4    that class in late February, were you there then?

5        MS. KINSLER: I was there but, the Special Ed coordinator

6    was here, so the Special Ed coordinator kind of took over that

7    because I my other responsibilities that I had to do.

8        MR. EIQ: Let me tell you a couple of things she said this

9    morning in testimony and I want you to tell me whether it is

10   accurate or not - Okay?

11       MS. KINSLER:  Okay.

12       MS. WILSON:  Again, I'm going to object to - I mean I don't

13   understand how the Hearing Officer  -- I understand how the

14   Hearing Officer is saying leeway, but I mean I don't understand

15   how the Hearing Officer is going to continue to allow that much

16   leeway that the witness would be able to ask questions that are

17   completely outside the scope of the direct examination.  The

18   cross-examination is not the time for you to ask any question

19   that you could possibly want to ask --.

20       HEARING OFFICER:  Yes, you will, but let her finish!

21       MR. EIQ:  It was finished -.

22       HEARING OFFICER:  Go ahead.

23       MS. WILSON:  I was finished.

1    HEARING OFFICER:  All right now, go ahead.

2    MR. EIQ:  I understand the way you have been responding as

3    the Hearing Officer allowing these questions.  I want to at

4    least get on the record so that it is understand, I haven't

5    asked a single question that has been outside the scope of

6    anything that she's asked. She presented a chronology for this

7    witness, a brief one and something about the classroom about

8    Ludlow Taylor which is where this witness is at.  I'm asking him

9    more specifics. They are very well within the scope, that's all

10    I want to say.

11    HEARING OFFICER: Here is what I want you to do. Just ask if

12    she knows anything about Ms. Alderman --.

13    MR. EIQ: I want to ask her about the specifics about the

14    population in the classroom?

15    HEARING OFFICER: Oh, you can do that?

16    MR. EIQ: That's what I'm doing.

17    HEARING OFFICER:  Sure. Sure.

18    MR. EIQ: Ms. Alderman said that it --.

19    HEARING OFFICER: No. No. No.

20    MR. EIG: Fine!

21    HEARING OFFICER: Wait.  Ask her if she knows anything about

22    the specifics in the classroom.

23    MR. EIQ: Do you know anything about the population of that

1   classroom?

2       MS. KINSLER:  Yes I do.

3       MR. EIQ: Are two of the children non-verbal?

4       MS. KINSLER:  Non-verbal?

5       MR. EIQ: Non-verbal.

6       MS. KINSLER:  I know of one – he's got limited verbal

7   abilities.  That's the only one I know of.

8       MR. EIQ: Are three of the children mentally retarded?

9       MS. KINSLER:  I only know of two.

10      MR. EIQ: Are all of the children significantly below their

11  academic chronological levels?  Do you understand what I mean by

12  that?

13      MS. KINSLER:  Yeah.

14      MR. EIQ: Significantly?

15      MS. KINSLER:  I would say, -- yeah.

16      MR. EIQ: Thank you.

17      HEARING OFFICER:  Redirect.

18      MS. WILSON: Nothing further.

19      HEARING OFFICER:  Ms. Kinsler?

20      MS. KINSLER:  Yes.

21      HEARING OFFICER:  This is Herbert St. Clair.

22      MS. KINSLER:  Yes.

23      HEARING OFFICER: What does 100% out of general education

1    mean?

2        MS. KINSLER:  They are in a self-contained classroom or

3    there in a school that there are - that's a separate school.

4        HEARING OFFICER: Okay, let me ask you this.  As opposed to

5    a self-contained classroom, or in a separate school, how would

6    that would be reflected in the percentage figure of out of

7    general education?

8        MS. KINSLER:  It would be considered 100%.

9        HEARING OFFICER:  Both of them?

10       MS. KINSLER:  Anyway between 61 to 100%.  Yeah, because we

11   have students here now, who are in self-contained classrooms,

12   and their IEP's are 100%.

13       HEARING OFFICER:  All right, well let me ask you this.

14   Let's supposed a child is supposed to have education in Special

15   Education setting and the child is supposed to have some contact

16   with non-disabled peers, that is lunch, assembly, recess.  What

17   percentage out of general education would that be?

18       MS. KINSLER:  I couldn't tell you that.  Because I can tell

19   you what we have here.  All our students are in self-contained

20   classrooms.  --.

21       HEARING OFFICER: So, you're not sure what 100% out of

22   general education means?

23       MS. KINSLER:  Well to me—Special Education should not even

1  be a location, it should be where you get your services. And if

2  he is getting his services 100% of his services is Special Ed,

3  that's 100% of Special Ed.  Why are you looking at a place.

4  It's about getting what you need.

5      HEARING OFFICER:  What I am trying to get at is --.

6      MS. KINSLER:  And too - to me, if you're talking about

7  100%, and you want totally separate place, you know to me --. If

8  he is - you know for some children - for that are so severe -

9  yeah, they probably need that.  But again, when you separate

10  children like that, in a sense that is a form of discrimination.

11  And in your allowing a child to be placed where they have no

12  contact - that is a form of discrimination.  You're telling them

13  that, you're not as good as they are - you're not giving them

14  something they look forward to - or to learn to be a part of a

15  general population.  Our Special Ed students here even though

16  they are in self-contained classroom, they are still allowed to

17  go on field trips.  Because that is a part of learning and

18  they've got to learn to be a part of general society.

19      MS. WILSON: I'm going to object at this point, to intervene

20  because we've gone way beyond -.

21      HEARING OFFICER: Just a minute.  Thank you Ms. Kinsler.

22  You have another question Ms. Wilson?

23      MS. WILSON? No, thank you.

1      HEARING OFFICER: You have another question, Mr. Eiq?

2      MR. EIQ:  Yes I do.

3      MS. WILSON: Well - before - is the question based upon the

4    Hearing Officer's--.

5      MR. EIQ:  Just based on what he said, the 100%.

6      MS. WILSON: I'm going to object to that?

7      HEARING OFFICER: Why?

8      MS. WILSON: The question and than the - okay, go ahead. I

9    think that both parties finished asking their question, and it

10   was a question that the Hearing Officer obviously wanted his own

11   knowledge and then to say, to allow, --.

12     HEARING OFFICER:  What about the knowledge of the case?

13     MS. WILSON: Again, I still object.  I'm sure the Hearing

14   Officer past objections are any indicators is going to overrule

15   the objection, but I am objecting for the record.

16     HEARING OFFICER: Well overruled.  Mr. Eig what is your

17   question?

18     MR. EIQ: Ms. Kinsler, on the front of N██████ IEP, it says,

19   it speaks to setting. And it's says, out of the regular

20   education setting, and its says 100% okay?  You've seen that

21   right?

22     MS. KINSLER:  Wait a minute, I'm looking for it right now.

23     MR. EIG: Right. If the setting says 1005 of the time out of

80

1  regular education setting, does that mean that the student would

2  have no contact with regular education students?

3      MS. KINSLER: Yes.  But I need to go back and ask you a

4  question.

5      MR. EIQ: No. No. No. No. No.

6      MR. KINSLER:  Now.  Okay, but this leads to that.  You see

7  its close to 100% out of regular education, but it turns of

8  asking for

9      HEARING OFFICER: Ms. Kinsler.

10     MS. KINSLER:  specialized instruction, but he is not

11 getting specialized instruction because there are no goals for

12 specialized instruction, so technically he really shouldn't be

13 in 100% if he doesn't have goals for all the various areas of

14 suspected disability.

15     MR. EIQ:  You know Ms. Kinsler, it's hard to argue with

16 you, where are the combinations in the IEP that you saw?  Where

17 are the present levels of performance?  It's not an whole IEP is

18 it?

19     MS. KINSLER: No, I don't see that.  So, technically he

20 should not even be at 100%.

21     MR. EIQ: Okay.  Thank you Ms. Kinsler.  The only question

22 that I cared about was the first one.

23     HEARING OFFICER:  Listen.  Ms. Wilson.

81

1       MS. WILSON: What.

2       HEARING OFFICER: I thought you wanted to say something.

3       MS. WILSON: I thought he already withdrawn it so I have no

4   response to it.  He withdrew his last question so --.

5       HEARING OFFICER:  To mean the 100% figure placed there is

6   very important as it was explained to me by DCPS who impressed

7   me with understanding what that figure meant.

8       HEARING OFFICER: Next witness.

9       MR. EIG: Thank you Ms. Kinsler.

10      MS. WILSON: Thank you Ms. Kinsler.

11      HEARING OFFICER:  Ms. Kinsler.

12      MS. KINSLER: Thank you, you're welcome.

13      MS. WILSON:  DCPS doesn't have any more witnesses.

14      HEARING OFFICER: That brings us to argument.  Mr. Eig you

15  are going to have the first and the last word.

16      MR. EIG: Thank you sir. Briefly.  First of all, we have no

17  closed rebuttal, to make the record clear.  We believe that the

18  indicates that in many, many ways the school system has denied

19  N███████ A███████ an appropriate - a free and appropriate

20  public education.  First of all, the parents, when I started our

21  case, I pointed to the July letter asking for consideration of

22  Ivy Mount and we know through no suggestion whatsoever, but

23  anything but complete cooperation from the parent.  The school

1    system in the middle year before they even identified Ludlow

2    Taylor. We still haven't seen a prior notice by the way, or

3    obviously we haven't seen a complete IEP.  Okay.  But let's look

4    at the placement.  It wasn't proposed until halfway through the

5    year and the placement which by the way, he would have aged out

6    and gone physically somewhere else in a few months, even if it

7    had been appropriate.  But just on timing, a school system is

8    required under the federal regulations and under (inaudible) to

9    have an IEP in place and placement in place at the beginning of

10   the school year. Especially in N▆▆▆▆ case, because as we found

11   out through the school system, they were working on this case as

12   well they should have  because he was a DC student in Special

13   Ed.  Two and one-half months before that letter that Ms.

14   Alderman had us write in early May, they were as a school system

15   on (inaudible) doing a re-evaluation file which is very

16   appropriate to do, for as complicated as this.  And they had to

17   come up with a placement, and somehow and absolutely through no

18   indication in this record, with parental (inaudible) I keep

19   saying, the school system didn't propose a placement until the

20   midway through the next school year.  Clearly, they had an

21   obligation to have that.  So, that's as far as, with all due

22   respect, you really need to go in the school system's case. If

23   you go beyond that, you clearly can't find the proposed and

1   appropriate IEP as we pointed. The document that they submitted

2   isn't their whole IEP.  Their own witness, the last witness was

3   telling that this can't be the whole IEP and it can't.  There

4   are no present levels, no no – there is only OT.  So obviously

5   there was a copying error there.  And all I am saying that,

6   (inaudible) evidence for a appropriate IEP. You know however, is

7   what the school system did do is as far as the paper program,

8   wasn't of any significant concern to Ms. Alderman, because she

9   agreed to that.  We don't dispute their testimony. She agreed to

10  100% out of Special Education setting.  We'll talk about your

11  concern in a second about that 100% number because I do think it

12  very important.  The goals and objectives combination and its

13  related services, apparently that was okay.  By the way, if

14  you'll look at – (inaudible) Ivy Mount IEP, if you'll at, at

15  least the front of the school's system's IEP, I think you'll see

16  where the school system got their IEP, by that point.  It was

17  from the outside evaluations and from (inaudible).  They

18  proposed a placement and we don't have to go through the

19  procedural things where the placement decision was apparently

20  made by somebody going to somebody else to in the school system,

21  (inaudible),which is in our IEP – which is in our Hearing

22  application.  I think it is clear from the testimony that's what

23  happened.  But you don't have to rule on that.  Because what

1    they did propose was a autism class at Ludlow Taylor that is as

2    inappropriate class as you can possibly get just from what you

3    heard.  N████ is light years beyond those kids.  Let's talk for

4    one second - that's what we never much about - autism, Asperger

5    syndrome is a social educational disability.  That is the

6    primary thing. As we heard, N████ is above grade - at or above

7    grade level in most of is academics. He just has trouble like

8    most autistic kids getting along with the rest of the world.

9    Understanding how the socially pragmatics of language, and how

10    to stick in when you get frustrated, and how not to go balling

11    off with the least little thing stops him.  That's what he

12    needs.  And they proposed placement in a class which the only

13    testimony he had about the class in from the mother.  Okay.  You

14    have it under oath, where the kids are very low functioning and

15    Ms. Kinsler can speak to that, where there are mentally retarded

16    which might make them appropriate for that class - I don't know.

17    But we know it wouldn't be appropriate for N████.  Who would he

18    relate to?  Non-verbal kids?  One or two, okay.  He bolts

19    according to his mother, who knows him very well and the

20    question is how they'd stop it, which is another concern.  Well,

21    it's much too late, they don't have an appropriate IEP in front

22    of you, because they don't have an clean IEP in front of you.

23    And the placement itself is woefully inappropriate.  There is no

1    question as to the appropriateness of Ivy Mount, based upon the

2    testimony of those in question for a moment. There was even

3    indications of how he is getting better and being able to be

4    more social and the IEP (inaudible).  Let's talk about 100%.

5    Some children and not many, of course, are so disable that the

6    decision is made by their parents and the Special Educators and

7    all the other people in the school system that they require

8    full-time outside of general education.  That is what 100%

9    means.  That's not the amount of Special Ed he needs.  Of

10   course.  That is the amount of time he is outside general

11   education. There are two different things.  When you are 100%

12   you get both of them. You get 100% Special Education, and 100%

13   outside.  You can 100% Special Education and 0% outside, and

14   that is what is called an inclusion program.  Where the Special

15   Education is provided in a mainstream setting throughout the

16   day.  There are such program. N█████ the other way around, we

17   sort of heard why, you can see it in the documents.  That means

18   as their witnesses said, and that – and I believe that it is

19   reasonable to agree that could support a fully self-contained

20   classroom where you can be there all day or a separate school.

21   They are both 100% Special Education settings.  The question is,

22   if you don't get that in this case, but if you ever had those

23   two programs with an appropriate IEP and a timely proposal, you

1    know. If you could pick between the two of them, if the child at

2    that point could benefit from some social interaction, as you

3    were talking about most recently, then - then - that would be

4    preferable, because that would be less restrictive.  It may not

5    show up in the 100%, you know which I think it should by the

6    way, let's just say that.  But that's not N███████ case is what I

7    want to get to.  The only evidence you hear right now, is that

8    he doesn't benefit from that.  The parent tries on the outside

9    to give him - as any good parent good, to give him some contact

10   with the real world, so to speak.  She has to do (inaudible) she

11   can't take him to restaurant.  He's anything - anything can set

12   him off, he's erratic and its really dangerous when he gets set

13   off, and it doesn't seem to benefit from. So the decision has

14   been made, I think by both sides, here that he doesn't.  The

15   last thing in the world, I think we would want him to go

16   playground, where the elementary school cafeteria and something

17   frustrates him, and he runs.  And that's what would happen.

18   That's what his mother said.  That's what happens. It's not

19   normal (inaudible) learn from that, but it is a question, but

20   it's a question is he is going to be safe.  There is no

21   testimony as how they control that even if all the other things

22   were taken into consideration.  We ask you find because of the

23   finding, the unexplained maintenance of the proposal, not having

1    an IEP in placement at the beginning of the school year because

2    of the absence of evidence as to appropriate IEP, and because of

3    the clearly in appropriate placement for N█████ at Ludlow Taylor

4    for any and all of those reasons, we find it inappropriate.

5    Clearly he is benefiting from Ivy Mount. There is no other

6    testimony there.  And I would (inaudible) even you felt – and I

7    don't believe the evidence support, if you Mr. St. Clair felt

8    that he could benefit from a little social brush of non-disabled

9    children, and once again I don't think he can, that doesn't rule

10   out the reimbursement on part (inaudible) for Ivy Mount because

11   (inaudible) because the parents are not bound by that same

12   restrictive mandate they don't have a full range of programs

13   like the school system (inaudible) 06-07 school year

14   (inaudible).

15       HEARING OFFICER:  Ms. Wilson:

16       MS. WILSON: Yes. Again DCPS would go back to the three

17   issues in the Complaint. None of which include the

18   appropriateness, the completeness or the existence of an IEP.

19   So that is not – the issue of an IEP is not something that we

20   are here on.  It is not something – it is our view that the

21   Hearing Officer has jurisdiction to hear on the basis of this

22   Complaint.  The testimony that you did hear was that the Care

23   Center began working on this case in May and that is

1    supplemented by the SEP notes, that are in the record that I

2    believe DCPS 06, and there have been several meetings with the

3    parent participation trying to secure and identify once the IEP

4    was created, the location where the service be implemented.  And

5    (inaudible) was very clear that we are and the school system

6    does have the ability prior to coming to the meeting to find out

7    the various locations that we have within its borders that could

8    implement the IEP.  That's not a predetermination of placement,

9    that's simply the school system doing its job by coming to the

10   meeting prepared, which is exactly what happened at this case.

11   The parent, you heard the testimony that there were several

12   questions from the parent of Ludlow Taylor.  The parent

13   certainly was not denied in anyway the ability to participate in

14   the meeting to determine where the IEP would be implemented. You

15   heard testimony that the teacher in the autism classroom is more

16   than capable of implementing the student's IEP and is the

17   individualized education program that drives the instruction

18   that the student receives. So the fact that there are other

19   students there in the classroom, one that has limited verbal

20   ability and two that may have a diagnosis of MR was - does not

21   impede the school's systems ability or the teacher's ability to

22   implement the IEP that has been signed off on and agreed to by

23   the parent.  There was testimony that there is a self-contained

1    classroom and we feel that there has been no denial of FAPE and

2    that the Hearing Officer should order placement at - order the

3    petitioner to attend Ludlow Taylor.

4        HEARING OFFICER:  Last word Mr. Eig.

5        MR. EIG: I don't have one.

6        HEARING OFFICER:  Ladies, Mr. Eiq, thank you very much for

7    your patience and attention.

8        MS. WILSON:  Thank you.

9

10

11

12

13

14

15

16       MS. EVERETT:

17

18