# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

N.A.,  *et al.*,

      Plaintiffs,

      v.

DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

C.A. No. 07-CV-01355 (RJL)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs respectfully request that this Court enter summary judgment in their favor.  The grounds for this motion appear in the accompanying memorandum of points and authorities.

WHEREFORE, plaintiffs respectfully request that this motion be granted.

Respectfully submitted,

/s/ (filed electronically)

Michael J. Eig      #912733
Patricia Cyr       #490755
Paula Rosenstock   #494580
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| N.A., *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 07-CV-01355 (RJL) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

In the summer of 2006, N.A., a student with Asperger's Syndrome, had just finished a

second year of home schooling, which was funded by the District of Columbia Public Schools

("DCPS" or "the school system"), because the school system admittedly did not have an

appropriate placement for him in any public or non-public school.  While home schooling her

son, N.A.'s mother also worked with a private special education program, the Ivymount School,

to create a placement for children with Asperger's, like N.A., to fill the void.  In the process of

accomplishing this impressive task, Mrs. Alderman wrote to DCPS in July, 2006 to request that

N.A.'s placement be changed from home schooling to the new Model Asperger's Program at

Ivymount, effective the beginning of the 2006-2007 school year.  After a string of unexplained

delays, DCPS finally responded to her request by proposing an inappropriate placement for N.A.

in January 2007 - six months later and five months after the school year for which the Aldermans

had requested funding began.

At a Due Process hearing on this matter, the Hearing Officer agreed that DCPS had

denied N.A. a Free Appropriate Public Education ("FAPE") in violation of the Individuals with

Disabilities Education Improvement Act ("IDEA") by engaging in inexcusable delay and

ultimately proposing a wholly inappropriate placement.  He then placed N.A. in the Model Asperger's Program.  However, in contravention of all record evidence *and his own Findings of Fact*, the Hearing Officer concluded that the Aldermans had not given timely notice to DCPS regarding the change of placement and, as a result, were not entitled to reimbursement for the first semester of the 2006-2007 school year – a semester in which N.A. had *no* placement from DCPS.  The Aldermans promptly filed for Reconsideration and pointed out the error, but received no response from the Hearing Officer.  This civil action and motion follow.

There is no dispute about material facts, as all of the evidence - including the Hearing Officer's Findings of Facts - make clear that the Aldermans gave more than the necessary notice regarding N.A.'s change in placement and that only the DCPS delay led to his not having a timely placement for the 2006-2007 school year.  There is nothing in the record below to support the Hearing officer's contradictory Finding that the Aldermans had not given timely notice.  As a result of the DCPS denial of FAPE and the clear error of the Hearing Officer below, the Aldermans respectfully request that this Court order that the Aldermans be reimbursed for the first semester of the 2006-2007 school year, along with fees and costs.

## I.     FACTUAL BACKGROUND

N.A. is a twelve-year-old child who has been diagnosed with many significant education disabilities, including Asperger's Syndrome, Attention-Deficit/Hyperactivity Disorder ("ADHD"), a Receptive Language Disorder, a Disorder of Written Output, a Mood Regulation Disorder, Oppositional Defiant Disorder, and difficulties with sensory processing and modulating

sensory output.  (Complaint ¶ 7; Admin. Rec. 107.)[1]  DCPS has correctly assigned N.A. a disability code of "Multiple Disabilities."  (Complaint ¶ 8; Answer ¶ 8; Admin. Rec. 107.)  With this code, N.A. is eligible to receive special education and related services under an Individualized Education Program ("IEP").  (Complaint ¶ 8; Admin. Rec. 107.)  In fact, N.A.'s multiple disabilities were recognized and diagnosed by first grade, with DCPS placing and funding him at Kingsbury Day School ("Kingsbury") for second and third grades.  (Complaint ¶ 9.)  However, Kingsbury could not manage the disruptive behaviors resulting from N.A.'s disabilities and told his family that he could not come back for the 2004-05 school year. (Complaint ¶ 9.)

After N.A. left Kingsbury, neither the Aldermans nor DCPS could find an appropriate public or private placement for him.  (Complaint ¶ 10.)  The school system therefore placed and funded N.A. in a home-school program designed and implemented by his mother for the 2004-05 and 2005-06 school years.  (Complaint ¶ 10.)  During the 2005-06 school year, Mrs. Alderman looked for schools that could appropriately educate her son.  (Complaint ¶ 11.)  N.A. was performing at or above grade level academically in his home instruction, but his parents wanted him to move out of home instruction and have more opportunities for social interaction by learning in a school setting with his peers.  (Complaint ¶ 11.)  When she was unable to find an appropriate school setting in the Washington, D.C. metropolitan area, Mrs. Alderman and another parent of a child with Asperger's Syndrome approached the Ivymount School, a private

---

[1]    Citations to the Complaint will be noted as "Complaint ¶ ."  Citations to the Defendant's Answer will be noted as "Answer ¶ ."  Citations to the Administrative Record, which includes the hearing officer's decision, will be noted as Admin. Rec. ___.  The Administrative Record was filed on March 31, 2008.

school for disabled children in Montgomery County, Maryland, about the possibility of

organizing a program for children with Asperger's at Ivymount that would be similar to programs

Mrs. Alderman had researched in the New York City metropolitan area.  (Complaint ¶ 12.)  After

consulting school staff as well as outside psychiatrists, psychologists and teachers, the Board of

Directors of the Ivymount School authorized the Ivymount School Model Asperger's Program.

(Complaint ¶ 12.)  Eligible children, including N.A., would be able to enroll in the program at the

beginning of the 2006-07 school year.  (Complaint ¶ 12.)

On July 21, 2006, the Aldermans, through counsel, sent a letter to DCPS requesting a

Multi-Disciplinary Team ("MDT") meeting to consider and approve placement for N.A. in the

new Asperger's Program at the Ivymount School.  (Complaint ¶ 13; Admin. Rec. 22, 34.)  The

letter specifically put DCPS on notice that the Aldermans planned to change N.A.'s placement

from home-schooling to Ivymount, and specifically requested that DCPS support N.A.'s

placement at Ivymount.  (Complaint ¶ 13; Admin. Rec. 34.)  The letter, accepted into evidence at

the Due Process hearing as NA-2, stated:

> Pursuant to *Patsel v. District of Columbia*, this letter constitutes notice to
> DCPS of my clients' plan to change [N.A.'s] educational placement from his
> home-schooling program to The Ivymount School's Aspergers program.  I
> would ask that the school system now support [N.A.'s] placement at
> Ivymount, commencing with his enrollment there at the start of the 2006-
> 2007 school year.

The parents received no response to this letter.

In the Fall of 2006, N.A. began attending the new Asperger's Program at Ivymount.

DCPS had not yet convened an MDT meeting nor responded in any other way to the Aldermans'

letter of July 21.  (Complaint ¶ 14; Fact 3.)  DCPS finally convened an IEP meeting for N.A. on

October 10, 2006.  (Complaint ¶ 15; Admin. Rec. 22, 107.)  However, no placement was discussed during this meeting and the Aldermans were asked to return for a follow-up meeting. (Complaint ¶ 15; Admin. Rec. 22, 107.)

The follow-up IEP meeting was held on November 13, 2006.  (Complaint ¶ 16; Admin. Rec. 22.)  The IEP team, which included Mrs. Alderman and representatives from Ivymount in addition to DCPS personnel, finalized N.A.'s IEP.  (Complaint ¶ 16.)  The team determined that N.A. required placement 100% outside of a general education setting.  (Complaint ¶ 16.)  Again, however, no placement decision was reached.  (Complaint ¶ 16; Admin. Rec. 22.)  Angel Hunter, the acting DCPS case manager, informed Mrs. Alderman that N.A.'s package would be sent to a site review committee to determine placement.  (Complaint ¶ 16.)  The Aldermans were not allowed to speak to the committee making the placement decision.  (Complaint ¶ 16; Admin. Rec. 22.)  Ms. Hinton told Mrs. Alderman that she would hear back from the committee in a week or two with the placement decision.  (Complaint ¶ 16.)

One month later, on December 13, 2006, the Aldermans still had not heard back from DCPS regarding N.A.'s placement.  (Complaint ¶ 17.)  Counsel for the Aldermans sent a letter to DCPS on this date to inquire about the status of N.A.'s placement and renew the Aldermans' objection to the placement decision being made without their participation.  (Complaint ¶ 17; Admin. Rec. 72.) In this letter, the Aldermans again gave DCPS notice that they were requesting placement at Ivymount.  (Complaint ¶ 17; Admin. Rec. 72.)  DCPS did not respond to this letter. (Complaint ¶ 17.)

On January 23, 2007, six months after the Aldermans first requested a change in placement, Mrs. Alderman attended another meeting with DCPS and was informed of the site

review committee's placement decision.  (Complaint ¶ 18; Admin. Rec. 22, 73, 93, 105.)  The committee had decided to place N.A. in an autism classroom at Ludlow-Taylor Elementary School in Northeast D.C.  (Complaint ¶ 18; Admin. Rec. 22.)  During the meeting, Mrs. Alderman spoke with a psychologist from Ludlow-Taylor and asked questions about the autism class.  (Complaint ¶ 19.)  She determined that it was not an appropriate placement, and again asked the team gathered at the meeting to consider Ivymount.  (Complaint ¶ 19.)  She was informed that the IEP team could not make placement decisions, that neither she nor the IEP team could speak with anyone on the site review committee, and that the IEP team was not authorized to consider private placements even when no appropriate public placement was available.  (Complaint ¶ 19; Admin. Rec. 22, 74-76.)

Mrs. Alderman later visited the autism class at Ludlow-Taylor, and learned that the program ended at sixth grade.  (Complaint ¶ 20; Admin. Rec. 74-76.)  Since N.A. was already in sixth grade, and because DCPS had engaged in such significant delay, this meant that he would only be able to attend the autism class at Ludlow-Taylor for the four and a half months remaining in the 2006-07 school year, and would then have to go back to DCPS and begin the placement process again.  (Complaint ¶ 20; Admin. Rec. 74-76.)  Mrs. Alderman also learned that all of the students in the class performed well below N.A.'s level.  (Complaint ¶ 20; Admin. Rec. 74-76.)  Whereas N.A. was performing at or above grade level in academics at Ivymount, as he had during home schooling, the students at Ludlow-Taylor were performing well below grade level. (Complaint ¶ 20; Admin. Rec. 22, 74-76.)  Two of the students in the class were non-verbal, low-functioning autistic students, and three of the students were mentally retarded.  (Complaint ¶ 20; Admin. Rec. 22, 74-76.)  None of the children had Asperger's Syndrome.  (Complaint ¶ 20;

Admin. Rec. 74-76..)  It was not difficult for Mrs. Alderman to conclude that this placement

would be highly inappropriate for N.A.  (Complaint ¶ 20.)

Although N.A.'s transition from home schooling to Ivymount was long and difficult, he

has made great progress at Ivymount and continues to succeed both academically and socially.

(Complaint ¶ 21; Admin. Rec. 35-57, 88-91.)  He continues to perform at or above grade level

academically while making steady progress on his social and organizational goals.  (Complaint ¶

21; Admin. Rec. 35-59, 88-91.)

On January 26, 2007, the Aldermans filed a Due Process hearing request, alleging that

DCPS denied N.A. a FAPE by delaying the IEP process, refusing to allow the parents to

participate in the placement decision, and failing to offer an appropriate placement.  (Complaint ¶

22, Admin. Rec. 2-8.)  They further alleged that Ludlow-Taylor was not an appropriate

placement and that the Asperger's Program at Ivymount was a proper placement for N.A.

(Complaint ¶ 22, Admin. Rec. 2-8.)  Under federal and D.C. law, DCPS was obligated to

convene a Due Process hearing within thirty-five days of the parents' request, or by March 16,

2007.  (Complaint ¶ 23, Admin. Rec. 10-11.)  A Due Process hearing was not convened until

April 17, 2007, before Impartial Hearing Officer H. St. Clair, Esq.  (Complaint ¶ 24; Answer ¶

24.)

At the hearing, Mrs. Alderman testified to her son's disabilities, his academic history and

the progress he had made at Ivymount.  (Complaint ¶ 25, Transcript 14-34.)[2]  She also testified as

to the extremely delayed IEP process of the 2006-07 school year.  (Complaint ¶ 25, Tr. at 14-34.)

---

[2]       The transcript of the due process hearing was filed as part of the administrative record.
However, it is not paginated as part of the record.  Therefore, the citations to the transcript will
refer to the actual transcript page and appear as Tr. at ___.

The Program Director of the Model Asperger's Program at Ivymount School testified about the program and how it serves the needs of disabled yet high-performing children with Asperger's. (Complaint ¶ 25, Tr. at 35-48.)  The Director explained that N.A. was at grade level academically and that he could continue on in the Asperger's Program at Ivymount through the high school curriculum and would continue to receive educational benefit.  (Complaint ¶ 25, Tr. at 35-48.) The school psychologist for Ludlow-Taylor testified that, as Mrs. Alderman had observed, all of the students in the autism class at Ludlow-Taylor were academically low-performing and did not have Asperger's.  (Complaint ¶ 26, Tr. at 66-82.)

On April 30, 2007, Hearing Officer St. Clair issued a final administrative decision. (Complaint ¶ 27, Admin. Rec. 17-25.)  He concluded that the decision-making process employed by DCPS in this case, and particularly denying the parents the right to participate in the placement of the student, constituted a denial of FAPE.  (Complaint ¶ 27, Admin. Rec. 23.)  He further found that the autism program at Ludlow-Taylor Elementary School was not an appropriate placement for N.A. and that the placement constituted a denial of FAPE.  (Complaint ¶ 27, Admin. Rec. 23.)  He also found that N.A. could receive educational benefit at Ivymount and ordered DCPS to place and fund him at Ivymount for the remainder of the 2006-07 school year.  (Complaint ¶ 27, Admin. Rec. 24.)  However, the Hearing Officer improperly denied the parents' request for reimbursement for the time N.A. had already spent at Ivymount.  (Complaint ¶ 27, Admin. Rec. 23-24.)  This time includes nearly the entire 2006-07 school year, before and during which the Aldermans repeatedly tried to get N.A. an appropriate placement through DCPS.  (Complaint ¶ 27.)  The Hearing Officer's stated reason for not reimbursing the first part of the school year at Ivymount was that the record did not show that the parents informed DCPS

that they expected reimbursement for this time, as required by federal law.  (Complaint ¶ 27,
Admin. Rec. 23-24.)

At no time prior to or during the hearing did DCPS argue that there had been an absence
of notice regarding the parents' expectation of reimbursement for the entire 2006-07 school year.
(Complaint ¶ 28.)  The Aldermans did in fact give DCPS written notice, in July of 2006, of their
intent to place N.A. at Ivymount for the entire 2006-07 school year and request for the support of
the school system at that time.  (Complaint ¶ 29, Admin. Rec. 34.)  They provided written notice
a second time on December 13, 2006, when they again wrote DCPS requesting placement for
N.A.  (Complaint ¶ 29, Admin. Rec. 72.)  They verbally stated their request for placement at
Ivymount at the October, November and January IEP meetings.  (Complaint ¶ 29.)

Because these requests were part of the record before the Hearing Officer, on May 2,
2007, the Aldermans timely filed a motion for reconsideration of Finding of Fact 8 and
Conclusion of Law III of the Hearing Officer's April 30, 2007 decision.  (Complaint ¶ 35,
Admin. Rec. 119-46.)  Finding of Fact 8 states that the parents did not inform DCPS of their
expectation for reimbursement, and Conclusion of Law III denies the reimbursement.
(Complaint ¶ 35, Admin. Rec. 22-24.)  After timely filing the motion for reconsideration, the
parents repeatedly inquired of the Student Hearing Office as to a ruling on that motion.
(Complaint ¶ 36.)  No opposition was filed by DCPS, but the Hearing Officer  never ruled on the
motion.(Complaint ¶ 36.)

The parents filed the current action on July 25, 2007.  The Complaint alleges that the
Aldermans complied with all federal and local law to the best of their abilities, and that only the
repeated delays of DCPS caused the issue in this case.  (Complaint ¶ 30.)  The Hearing Officer

9

misinterpreted and misapplied federal and D.C. statutory law by concluding that the Aldermans are not entitled to full reimbursement.  (Complaint ¶ 31.)  Further, the Hearing Officer abused his discretion by failing to award full reimbursement for the 2006-07 school year to the Aldermans, when no binding legal authority barred him from doing so, and the facts in the record fully supported the claim.  (Complaint ¶ 32.)  The Hearing Officer's decision not to award full reimbursement to the Aldermans for the entire 2006-07 school year at Ivymount was arbitrary and capricious.  (Complaint ¶ 33.)  For example, the Hearing Officer directly contradicted his own findings by first finding that the Aldermans requested that DCPS place and support N.A. at Ivymount in July, but later finding that they never informed DCPS of their expectation that DCPS pay for such a placement.  (Complaint ¶ 34.)

## II.    ARGUMENT

Summary Judgment for the Aldermans is appropriate because the Hearing Officer's decision is inconsistent on its face.  The finding that the Aldermans failed to give proper notice to DCPS regarding the change in N.A.'s placement was not regularly made and, as a result, is accorded no deference.  Furthermore, a review of the complete record, which is proper in cases rising from an administrative hearing under the IDEA, reveals that the Aldermans did give notice to DCPS regarding the change in placement.  Finally, Summary Judgment is appropriate because – despite the fact that they did give notice to the school system about the change in placement – a review of the section of the IDEA upon which the Hearing Officer based his decision reveals that no notice actually was required.

A.    **Summary Judgment in Favor of the Plaintiffs Is Appropriate Because There are No Material Facts in Dispute.**

Summary Judgment is appropriate because there are no material facts in dispute and the Aldermans are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©).  An issue of fact is considered to be "genuine" if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here, no such disputes exist between the parties.  The Hearing Officer denied the Aldermans reimbursement for the first semester of the 2006-2007 school year based on a Finding of Fact for which there was no record support and which was actually contradicted by a different Finding of Fact in the same Opinion.

In the context of the IDEA, a federal court must give "due weight to the findings of the local and state educational agencies even though it must also make an independent decision based upon a preponderance of the evidence."  *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 205-06 (1982).  The primary source of evidence in an IDEA case comes from the administrative hearing, and the administrative proceedings must not be considered a dry run for protracted litigation in federal court.  *Springer v. Fairfax Co. Sch. Bd.*, 134 F. 3d 659, 667 (4th Cir. 1997); *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd sub nom. School Comm. v. Dep't of Educ.*, 471 U.S. 359 (1985).

Although an ALJ's findings of fact are considered *prima facie* correct, the Court is required to make an independent decision based upon the preponderance of the evidence, giving due weight to the *regularly made* findings of fact at the administrative level.  *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991) (emphasis supplied).  However, where these

11

findings are not regularly made, or the application of the law to the facts is erroneous, the

decision does not merit deference. *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th

Cir. 1993).[3]

Finding of Fact 8, upon which the Hearing Officer based his decision to deny a semester

of funding, was not regularly made and should not be given any deference by this Court. In fact,

Finding of Fact 8, for which there is no record support, is directly contradicted by Finding of Fact

2, which is supported by evidence in the record:

> *Finding of Fact 8*: "The Parent(s) did not inform DCPS of their expectation
> for reimbursement for the cost of education prior to removal from home
> instruction or enrollment at the new placement at [*sic*] as required 34 CFR
> 300.148."

> *Finding of Fact 2*: "By letter dated July 21, 2006, Counsel for the Parents
> requested DCPS to place the student at the Ivymount School Model Asperger
> Program for the 2006-2007 school year."

(Admin. Rec. 22.) This letter, accepted into evidence as NA-2, states, "Pursuant to *Patsel v.*

*District of Columbia*, this letter constitutes notice to DCPS of my clients' plan to change [N.A.'s]

educational placement from his home-schooling program to The Ivymount School's Aspergers

program. I would ask that the school system now support [N.A.'s] placement at Ivymount,

commencing with his enrollment there at the start of the 2006-2007 school year." Admin. Rec.

34. The letter makes clear the parents' request/ "expectation" that DCPS fund [N.A.'s]

placement at Ivymount *at the start of the 2006-2007 school year* and prior to removal from home

instruction and enrollment at the new placement. *Id.*

---

[3]     This rule of law was also adopted in *Sarah M. v. Weast*, 111 F. Supp.2d 695, 698 (D. Md.
2000).

There is nothing in the record that would support Finding of Fact 8 – in fact the record

refutes it – and, tellingly, DCPS never argued lack of notice.  Thus, at least as regards Finding of

Fact 8, along with the resulting Conclusion of Law III, the normal deference to the ALJ's

findings and conclusions is not warranted, as they are so inconsistent with the facts presented that

they cannot be termed "regularly made."

**B.    A REVIEW OF THE COMPLETE RECORD, AS IS APPROPRIATE IN IDEA CASES, ALSO REVEALS THAT SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS IS APPROPRIATE.**

A defense to this motion for summary judgment would arise where a consideration of all

of the evidence in the record reveals material issues of fact.  In such a review, it is important to

note that the administrative decision does not represent the absolute boundaries of the Court's

review; rather, this decision represents but a single source for review.[4]  "Despite being termed

summary judgment, the district court's decision is based on the preponderance of the evidence."

*Heather S. v. State of Wisconsin*, 125 F.3d 1045 (7th Cir. 1997); *see also*, 20 U.S.C. § 1415(e)(2);

*Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994), *cert. denied*, 513 U.S. 839 (1994).  A

---

[4]    The correct judicial inquiry in IDEA cases, unlike in actions based on other administrative decisions, requires deferential, but independent, examination of the entire record, and then a decision rendered based on the preponderance of the evidence.  The IDEA instructs that a district court, upon hearing an action brought for review of administrative proceedings, "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(e)(2).  *See, e.g., Burlington*, 736 F.2d at 791 ("Congress intended courts to make bounded, independent decisions -- bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."); *Hunger*, 15 F.3d at 669 (holding that "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.").  Instead of considering solely the facts that both parties have specifically pleaded, the Court must also make a "bounded" decision by reviewing and weighing the entire administrative record, and then make an "independent" decision based on a preponderance of the evidence.

proper summary judgment inquiry in the present case thus requires the Court to conduct a review of the entire administrative record.

Moreover, in its review of the administrative record, a district court is not required to accord controlling deference to the decision of the ALJ. While the Court does afford "due weight" to the administrative decision, "the [Court must [also] independently evaluate" the facts contained in the administrative record, from both witnesses' testimony and evidence. *Heather S.*, 125 F.3d at 1053. It would be improper to accept as unassailable either the factual findings in the administrative decision, or the decision itself. Rather, before determining whether factual disputes exist, a proper analysis must first consider all of the evidence. Only then can the Court make a determination of whether the ALJ erred in his decision, or departed from the normal decision-making process. Should this Court determine that the ALJ did make findings of fact or a decision in error, the Court should not accord the resulting decision any deference.

As discussed *supra*, these are the circumstances surrounding Finding of Fact 8 in the present case. A review of the evidence reveals that N.A. did provide notice of the change in placement request before his parents enrolled him at Ivymount and, as a result, and based on the Hearing Officer's finding of a denial of FAPE, the parents are entitled to reimbursement for the entire school year. There is no argument or evidence in the record to the contrary. However, DCPS did not refute that the letter actually was sent, did not deny receiving the follow-up letters sent with the same request and included in the record, did not contradict testimony about the multiple requests for placement and funding at Ivymount during the IEP meetings and, perhaps most significantly, never argued throughout the entire proceedings that they had not received notice that N.A.'s family was requesting placement and funding at the Ivymount Asperger

14

Program.  Therefore, while we submit that a complete evidentiary review is not required based

on the Findings of Fact included in the Order and supported by evidence, such a review would

not reveal any evidence to support the Hearing Officer's erroneous finding.

     **C.**    **SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE PARENTS WERE NOT EVEN REQUIRED TO COMPLY WITH CFR § 300.148, THOUGH THE RECORD IS CLEAR THAT THEY DID.**

What is also clear from the record is that the notice requirements relied upon by the

Hearing Officer plainly do not apply to N.A.  If they did, the parents did everything humanly

possible to comply with them.

     *1.*    *There is no such thing as a Notice of Expectation for Reimbursement.*

First of all, there is nothing in the IDEA or the CFR that requires separate notice from the

parents that their timely request for a change in placement has to be supplemented with

additional notice once DCPS fails to timely respond.  Here, despite the parents' full cooperation,

DCPS engaged in unlawful and unconscionable delay, did not place a very disabled child for six

months, and never even acknowledged that this was a child the system was supposed to be

monitoring.  Then the school system placed N.A., with no parental participation, in a wholly

inappropriate setting where he would have received no educational benefit.  Under these facts,

the suggestion that such additional notice is or would be required is nonsensical, which is

probably one of the reasons DCPS never even argued such an absence of notice.

The Aldermans sent a letter in July of 2006 notifying DCPS that N.A. required a new

placement and requesting that DCPS place him at Ivymount for the 2006-2007 school year.  *See*

Admin. Rec. 34.  Did they really have to clarify their "expectation" that this placement would

start at the *beginning* of the 2006-2007 school year?  Of course not; it was only the DCPS delays

and continued violations of the IDEA (Admin. Rec. 22-23), that turned the Alderman's timely and lawful request for placement (Admin. Rec. 22, 34), into a Due Process Hearing Request for reimbursement. Admin. Rec. 3-8.  In other words, the school system clearly understood what these parents were seeking.  They just failed to respond in a timely or appropriate manner.

### 2. *Though not required to do so, the Parents complied with all provisions of 34 CFR §300.148 and the IDEA.*

To the best of their abilities, the Aldermans complied with 34 CFR §300.148 and 20 USC §1412(a)(10)©),[5] and are entitled to reimbursement for the tuition paid to Ivymount. It is clear that DCPS denied N.A. a FAPE.  However, 34 CFR §300.148(a) would relieve DCPS of its obligation to pay for a parentally-chosen private placement only if it, "made FAPE available to the child and the parents elected to place the child in a private school or facility."  In this case, the Hearing Officer found that DCPS denied FAPE to N.A. (Admin. Rec. 23), so subsection (a) does not apply.

Similarly, Subsection (b) does not apply, as the parents did turn to the Due Process procedures as directed as soon as they learned there was a disagreement about FAPE.  It was the DCPS six-month delay that led to this issue, and not any failure of the parents to follow the proper procedures.

Subsection ©) allows the Hearing Officer to order DCPS to reimburse the parents for tuition at Ivymount prior to the April 30, 2007 decision if the "hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate." 34 CFR §300.148©).  This is exactly what the

---

[5]     Because the Hearing Officer relied on the CFR, the CFR cites will be used in this argument.  However, the relevant provisions in the IDEA and the CFR are identical.

Hearing Officer found:  DCPS did not make FAPE available to N.A. (Conclusions of Law I, II),

in a timely manner prior to his enrollment at Ivymount (Conclusion of Law II), and Ivymount is

the appropriate educational setting (Conclusion of Law IV).  Admin. Rec. 23-24.

The exceptions for full reimbursement found in Subsection (d) simply do not apply in this

case.  Pursuant to Subsection (d)(1), a Hearing Officer may reduce or deny reimbursement if,

*after DCPS proposes a placement*:

> (i) [a]t the most recent IEP team meeting that the parents attended
> prior to the removal of the child from the public school, the parents
> did not inform the IEP Team that they were rejecting the placement
> proposed by the public agency to provide FAPE to their child,
> including stating their concerns and their intent to enroll the child in
> a private school at public expense;  or

> (ii) [a]t least ten business days . . . prior to the removal of the child
> from the public school, the parents did not give written notice to the
> public agency of the information described in paragraph (d)(1)(i) of
> this section.

In other words, in order for full funding for a placement that is different from a DCPS-proposed

placement to be unquestionably retroactive, the parents – either at the placement meeting or, if no

such meeting was held, ten business days before the child was removed from a public school to a

private placement – must have timely informed DCPS that they were rejecting the proposed

placement and instead were seeking public funding for a private placement.  The intent of this

notice requirement is clear – to ensure that the local school system has an informed opportunity

to address parental concerns before a child is removed from a public school to a private

placement.

There are a number of obvious reasons why this section does not apply here.  First,

despite the July of 2006 request by the parents, DCPS did not propose a placement for N.A. until

after the beginning of the second semester of the 2006-2007 school year.  Therefore, in August

2006, when it was time to decide whether to continue a now-inappropriate private placement or

send N.A. to the appropriate school, the parents had no "placement proposed by the public

agency" to reject via Subsection (d)(1).

Moreover, N.A. was not attending a *public school* in 2005-2006.  Because of the lack of

appropriate placement prior to the inception of the Ivymount program, DCPS was voluntarily

funding his privately-administered home-based program.  Therefore, the Aldermans were seeking

to move N.A. from one private option to another, and not to "remov[e] the child from the public

school."  As a result, no written notice was required and Subsection (d)(1) never applied.

Regardless of the inapplicability of 34 CFR §300.148(d)(1), the Aldermans did give

written notice to DCPS of their request for a change in placement and intent to enroll N.A. at

Ivymount in July of 2006, thereby satisfying the underlying purpose of the regulation despite its

inapplicability.  (Admin. Rec. 22, 34).  Not only did they give written notice, but they did it early

enough in the summer to leave DCPS plenty of time – and much more than ten business days – to

hold an IEP meeting and consider placement.  Therefore, there is no basis on which to find that

the parents violated 34 CFR §300.148(d)(1).  In addition, once the belated IEP process began,

and then stalled, the Aldermans provided notice again of their request for Ivymount funding.  On

December 13, 2006, the parents wrote, "We look forward to hearing without further delay that

[N.A.] has been placed at Ivymount in the Asperger's program, as it is the only appropriate

program to meet his educational needs."  Admin. Rec. 72.

DCPS never has suggested any lack of notice as to the request for funding at Ivymount.

The school system plainly understood what is equally plain in the parents' written request.  There

is no allegation that DCPS was requesting further evaluations and no finding of unreasonableness with respect to the actions taken by the Aldermans, so Subsections (d)(2) and (3) are equally inapplicable.  As a result, there is absolutely no support for the Hearing Officer's statement that the parents did not comply with 34 CFR §300.148.

It is important to consider the fact that DCPS failed to offer a placement to the Aldermans until after the beginning of the second semester of the 2006-2007 school year. Without a DCPS-proposed program, the parents had nothing to formally reject and therefore no notice was required.  A long line of cases have held that the IDEA is violated if special education and/or related services are offered too late.  For example, in *Gerstmyer v. Howard County Public Schools*, 850 F. Supp 361 (D.Md.  1994), the failure of the school system to have an IEP in place at the beginning of the school year supported a finding for private tuition reimbursement.  Even more on point, in *Kitchelt v. Weast*, 341 F.Supp.2d 553 (D.Md. 2004), the fact that the IEP team did not propose its placement until late September similarly supported tuition reimbursement.  In *Kitchelt*, the Court emphasized that, had the student there started school on his draft or interim IEP, it was clear he would not have received what everybody agreed he needed.  Here, even if N.A. had been able to start in the proposed program, it is beyond argument that he would not have had what he needed and what the Hearing Officer concluded he needed – placement at the Ivymount Asperger's program.  *See also*, *Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576 (D. Md. 2001),  *Alfonso v. District of Columbia*, 45 IDELR 118 (D.D.C.  2006),  *MM v. School Dist. of Greenville County*, 303 F.3d 523 (4th Cir.  2002),  *Foster v. D.C. Bd. of Educ.*, 553 EHLR 520 (D.D.C.  1982).

Finally, the District Court of Maryland recently issued its decision in *Jacobs v. Hairston*, Memorandum Order, Civil Action No. RDB-06-942 (D. Md. April 24, 2007) (a copy of which is attached) – a case directly on point.  In *Jacobs*, the parents sent a letter and notified the school system of their intent to remove their son from his publicly-funded private educational placement, and then sought support from the school system for their son's placement in a new more appropriate private program.  Similar to N.A.'s case, the school system failed to respond to this letter.  The Court found that in situations in which a parent requests a change in placement, "the IDEA requires [the school system] to provide an immediate response to [the parents].  [The school system's] failure to provide such a response constitutes a procedural violation of the IDEA."  *Id*. at 12.  The Court went on to consider whether the violation denied the student a FAPE.

In *Jacobs*, the Hearing Officer failed to hold a hearing on the merits, and thus failed to make factual determinations as to the appropriateness of the student's educational placements.  Accordingly, the Court was unable to determine whether the school system denied the student a FAPE, and remanded the case for further determination on the appropriateness of the programs.  Here, however, no such problem exists.  The Hearing Officer has already concluded that "The autism program at Ludlow-Taylor ES was not appropriate for the student and constitute a Denial of FAPE."  Admin. Rec. 23.  Because of that, and because the parents clearly sought support for N.A.'s placement at the Ivymount Asperger's program, reimbursement is the appropriate remedy.

III.    **Conclusion**

The Aldermans requested that DCPS place N.A. at Ivymount in July 2006 – "prior to removal from home instruction or enrollment at the new placement" as required by Finding of Fact 8 and the CFR.  The only reason N.A. was not placed at Ivymount by the beginning of the school year, as requested by the parents, was the DCPS failure to timely convene an IEP meeting upon learning that the private home-based program was no longer appropriate for N.A..  It took DCPS six months to propose a strikingly inappropriate placement, and during this entire period, the parents were clear and vocal that Ivymount was the only appropriate program from N.A.. (*E.g.*, Admin. Rec. 34, 107-14). As a result, DCPS had more than sufficient notice that the parents had "expected" DCPS to fund N.A. at Ivymount in August 2006, and their unlawful delays cannot be used to relieve them of their obligation to provide a FAPE.

Based on the inconsistent decision of the Hearing Officer, an examination of the record and a review of the applicable law, it is clear that no dispute regarding a material fact exists, and the Aldermans are entitled to reimbursement for the first semester of the 2006-2007 school year, along with costs and fees associated with this action.

Respectfully submitted,

/s/ (filed electronically)
_____

Michael J. Eig          #912733
Patricia Cyr            #490755
Paula Rosenstock        #494580
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Memorandum, with accompanying Motion and proposed Order, were filed electronically on April 14, 2008, and thereby served on counsel for defendants.

_____/s/____(filed electronically)_____

Michael J. Eig

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

N.A., *et al.*,

       Plaintiffs,

       v.                         C.A. No. 07-CV-01355 (RJL)

DISTRICT OF COLUMBIA, *et al.*,

       Defendants.

**ORDER**

Upon consideration of the plaintiffs' Motion for Summary Judgment, along with the related pleadings and any opposition thereto, it is the finding of the Court that the facts are not in dispute, that the plaintiffs are entitled to judgment as a matter of law, and it is by the Court, this _____ day of _____, 2008, hereby

ORDERED, that plaintiffs' Motion for Summary Judgment be and the same is hereby GRANTED; and it is

FURTHER ORDERED, that the administrative decision is reversed in part, and it is

FURTHER ORDERED, that defendants are to reimburse plaintiffs for tuition and expenses associated with N.A.'s attendance at the Ivymount School Model Asperger's starting with the first semester of the 2006-2007 school year.

_____
Richard J. Leon, United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

N.A.,  *et al.*,

       Plaintiffs,

       v.                          C.A. No. 07-CV-01355 (RJL)

DISTRICT OF COLUMBIA, *et al.*,

       Defendants.

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1(h), plaintiffs submit this statement of material facts as to which there is no genuine issue.

1.      N.A. is a twelve-year-old child who has been diagnosed with many significant education disabilities, including Asperger's Syndrome, Attention-Deficit/Hyperactivity Disorder ("ADHD"), a Receptive Language Disorder, a Disorder of Written Output, a Mood Regulation Disorder, Oppositional Defiant Disorder, and difficulties with sensory processing and modulating sensory output.  (Complaint ¶ 7; Admin. Rec. 107.)[1]

1.      DCPS has correctly assigned N.A. a disability code of "Multiple Disabilities." (Complaint ¶ 8; Answer ¶ 8; Admin. Rec. 107.)  With this code, N.A. is eligible to receive special education and related services under an Individualized Education Program ("IEP"). (Complaint ¶ 8; Admin. Rec. 107.)  In fact, N.A.'s multiple disabilities were recognized and diagnosed by first grade, with DCPS placing and funding him at Kingsbury Day School

---

[1]    Citations to the Complaint will be noted as "Complaint ¶ ."  Citations to the Defendant's Answer will be noted as "Answer ¶ ."  Citations to the Administrative Record, which includes the hearing officer's decision, will be noted as Admin. Rec. ___.  The Administrative Record was filed on March 31, 2008.

("Kingsbury") for second and third grades.  (Complaint ¶ 9.)  However, Kingsbury could not manage the disruptive behaviors resulting from N.A.'s disabilities and told his family that he could not come back for the 2004-05 school year.  (Complaint ¶ 9.)

3.      After N.A. left Kingsbury, neither the Aldermans nor DCPS could find an appropriate public or private placement for him.  (Complaint ¶ 10.)  The school system therefore placed and funded N.A. in a home-school program designed and implemented by his mother for the 2004-05 and 2005-06 school years.  (Complaint ¶ 10.)

4.      During the 2005-06 school year, Mrs. Alderman looked for schools that could appropriately educate her son.  (Complaint ¶ 11.)  N.A. was performing at or above grade level academically in his home instruction, but his parents wanted him to move out of home instruction and have more opportunities for social interaction by learning in a school setting with his peers.  (Complaint ¶ 11.)

5.      When she was unable to find an appropriate school setting in the Washington, D.C. metropolitan area, Mrs. Alderman and another parent of a child with Asperger's Syndrome approached started the Ivymount School Model Asperger's Program.  (Complaint ¶ 12.)  Eligible children, including N.A., would be able to enroll in the program at the beginning of the 2006-07 school year.  (Complaint ¶ 12.)

6.      On July 21, 2006, the Aldermans, through counsel, sent a letter to DCPS requesting a Multi-Disciplinary Team ("MDT") meeting to consider and approve placement for N.A. in the new Asperger's Program at the Ivymount School.  (Complaint ¶ 13; Admin. Rec. 22, 34.)

7.      The letter specifically put DCPS on notice that the Aldermans planned to change N.A.'s placement from home-schooling to Ivymount, and specifically requested that DCPS support N.A.'s placement at Ivymount.  (Complaint ¶ 13; Admin. Rec. 34.)

8.      DCPS did not respond to this letter.

9.      In the Fall of 2006, N.A. began attending the new Asperger's Program at Ivymount.  DCPS had not yet convened an MDT meeting nor responded in any other way to the Aldermans' letter of July 21.  (Complaint ¶ 14; Fact 3.)

10.     DCPS finally convened an IEP meeting for N.A. on October 10, 2006. (Complaint ¶ 15; Admin. Rec. 22, 107.)  However, no placement was discussed during this meeting and the Aldermans were asked to return for a follow-up meeting.  (Complaint ¶ 15; Admin. Rec. 22, 107.)

11.     The follow-up IEP meeting was held on November 13, 2006.  (Complaint ¶ 16; Admin. Rec. 22.)  The IEP team, which included Mrs. Alderman and representatives from Ivymount in addition to DCPS personnel, finalized N.A.'s IEP.  (Complaint ¶ 16.)  The team determined that N.A. required placement 100% outside of a general education setting. (Complaint ¶ 16.)  Again, however, no placement decision was reached.  (Complaint ¶ 16; Admin. Rec. 22.)

12.     Angel Hunter, the acting DCPS case manager, informed Mrs. Alderman that N.A.'s package would be sent to a site review committee to determine placement.  (Complaint ¶ 16.)  The Aldermans were not allowed to speak to the committee making the placement decision. (Complaint ¶ 16; Admin. Rec. 22.)  Ms. Hinton told Mrs. Alderman that she would hear back from the committee in a week or two with the placement decision.  (Complaint ¶ 16.)

13.     One month later, on December 13, 2006, the Aldermans still had not heard back from DCPS regarding N.A.'s placement.  (Complaint ¶ 17.)

14.     Counsel for the Aldermans sent a letter to DCPS on this date to inquire about the status of N.A.'s placement and renew the Aldermans' objection to the placement decision being made without their participation.  (Complaint ¶ 17; Admin. Rec. 72.) In this letter, the Aldermans again gave DCPS notice that they were requesting placement at Ivymount.  (Complaint ¶ 17; Admin. Rec. 72.)  DCPS did not respond to this letter.  (Complaint ¶ 17.)

15.     On January 23, 2007, six months after the Aldermans first requested a change in placement, Mrs. Alderman attended another meeting with DCPS and was informed of the site review committee's placement decision.  (Complaint ¶ 18; Admin. Rec. 22, 73, 93, 105.)  The committee had decided to place N.A. in an autism classroom at Ludlow-Taylor Elementary School in Northeast D.C.  (Complaint ¶ 18; Admin. Rec. 22.)

16.     During the meeting, Mrs. Alderman spoke with a psychologist from Ludlow-Taylor and asked questions about the autism class.  (Complaint ¶ 19.)  She determined that it was not an appropriate placement, and again asked the team gathered at the meeting to consider Ivymount.  (Complaint ¶ 19.)  She was informed that the IEP team could not make placement decisions, that neither she nor the IEP team could speak with anyone on the site review committee, and that the IEP team was not authorized to consider private placements even when no appropriate public placement was available.  (Complaint ¶ 19; Admin. Rec. 22, 74-76.)

17.     Mrs. Alderman later visited the autism class at Ludlow-Taylor, and learned that the program ended at sixth grade.  (Complaint ¶ 20; Admin. Rec. 74-76.)  Since N.A. was already in sixth grade, and because DCPS had engaged in such significant delay, this meant that he

4

would only be able to attend the autism class at Ludlow-Taylor for the four and a half months

remaining in the 2006-07 school year, and would then have to go back to DCPS and begin the

placement process again.  (Complaint ¶ 20; Admin. Rec. 74-76.)

       18.     Mrs. Alderman also learned that all of the students in the class performed well

below N.A.'s level.  (Complaint ¶ 20; Admin. Rec. 74-76.)  Whereas N.A. was performing at or

above grade level in academics at Ivymount, as he had during home schooling, the students at

Ludlow-Taylor were performing well below grade level.  (Complaint ¶ 20; Admin. Rec. 22, 74-

76.)

       19.     Two of the students in the class were non-verbal, low-functioning autistic

students, and three of the students were mentally retarded.  (Complaint ¶ 20; Admin. Rec. 22, 74-

76.)  None of the children had Asperger's Syndrome.  (Complaint ¶ 20; Admin. Rec. 74-76.)

       20.     The placement at Ludlow-Taylor was not appropraite for N.A.

       21.     Although N.A.'s transition from home schooling to Ivymount was long and

difficult, he has made great progress at Ivymount and continues to succeed both academically and

socially.  (Complaint ¶ 21; Admin. Rec. 35-57, 88-91.)  He continues to perform at or above

grade level academically while making steady progress on his social and organizational goals.

(Complaint ¶ 21; Admin. Rec. 35-59, 88-91.)

       22.     On January 26, 2007, the Aldermans filed a Due Process hearing request, alleging

that DCPS denied N.A. a Free and Appropriate Education (FAPE) by delaying the IEP process,

refusing to allow the parents to participate in the placement decision, and failing to offer an

appropriate placement.  (Complaint ¶ 22, Admin. Rec. 2-8.)  They further alleged that Ludlow-

Taylor was not an appropriate placement and that the Asperger's Program at Ivymount was a proper placement for N.A.  (Complaint ¶ 22, Admin. Rec. 2-8.)

23.    Under federal and D.C. law, DCPS was obligated to convene a Due Process hearing within thirty-five days of the parents' request, or by March 16, 2007.  (Complaint ¶ 23, Admin. Rec. 10-11.)  A Due Process hearing was not convened until April 17, 2007, before Impartial Hearing Officer H. St. Clair, Esq.  (Complaint ¶ 24; Answer ¶ 24.)

24.    At the hearing, Mrs. Alderman testified to her son's disabilities, his academic history and the progress he had made at Ivymount.  (Complaint ¶ 25, Transcript 14-34.)[2]  She also testified as to the extremely delayed IEP process of the 2006-07 school year.  (Complaint ¶ 25, Tr. at 14-34.)

25.    The Program Director of the Model Asperger's Program at Ivymount School testified about the program and how it serves the needs of disabled yet high-performing children with Asperger's.  (Complaint ¶ 25, Tr. at 35-48.)  The Director explained that N.A. was at grade level academically and that he could continue on in the Asperger's Program at Ivymount through the high school curriculum and would continue to receive educational benefit.  (Complaint ¶ 25, Tr. at 35-48.)

26.    The school psychologist for Ludlow-Taylor testified that, as Mrs. Alderman had observed, all of the students in the autism class at Ludlow-Taylor were academically low-performing and did not have Asperger's.  (Complaint ¶ 26, Tr. at 66-82.)

---

[2]    The transcript of the due process hearing was filed as part of the administrative record. However, it is not paginated as part of the record.  Therefore, the citations to the transcript will refer to the actual transcript page and appear as Tr. at ___.

27.    On April 30, 2007, Hearing Officer St. Clair issued a final administrative decision. (Complaint ¶ 27, Admin. Rec. 17-25.) He concluded that the decision-making process employed by DCPS in this case, and particularly denying the parents the right to participate in the placement of the student, constituted a denial of FAPE. (Complaint ¶ 27, Admin. Rec. 23.) He further found that the autism program at Ludlow-Taylor Elementary School was not an appropriate placement for N.A. and that the placement constituted a denial of FAPE. (Complaint ¶ 27, Admin. Rec. 23.) He also found that N.A. could receive educational benefit at Ivymount and ordered DCPS to place and fund him at Ivymount for the remainder of the 2006-07 school year. (Complaint ¶ 27, Admin. Rec. 24.)

28.    However, the Hearing Officer denied the parents' request for reimbursement for the time N.A. had already spent at Ivymount. (Complaint ¶ 27, Admin. Rec. 23-24.) This time includes nearly the entire 2006-07 school year, before and during which the Aldermans repeatedly tried to get N.A. an appropriate placement through DCPS. (Complaint ¶ 27.) The Hearing Officer's stated reason for not reimbursing the first part of the school year at Ivymount was that the record did not show that the parents informed DCPS that they expected reimbursement for this time, as required by federal law. (Complaint ¶ 27, Admin. Rec. 23-24.)

29.    At no time prior to or during the hearing did DCPS argue that there had been an absence of notice regarding the parents' expectation of reimbursement for the entire 2006-07 school year. (Complaint ¶ 28.)

30.    The Aldermans did in fact give DCPS written notice, in July of 2006, of their intent to place N.A. at Ivymount for the entire 2006-07 school year and request for the support of the school system at that time. (Complaint ¶ 29, Admin. Rec. 34.)

7

31.     They provided written notice a second time on December 13, 2006, when they again wrote DCPS requesting placement for N.A.  (Complaint ¶ 29, Admin. Rec. 72.)  They verbally stated their request for placement at Ivymount at the October, November and January IEP meetings.  (Complaint ¶ 29.)

32.     Because these requests were part of the record before the Hearing Officer, on May 2, 2007, the Aldermans timely filed a motion for reconsideration of Finding of Fact 8 and Conclusion of Law III of the Hearing Officer's April 30, 2007 decision.  (Complaint ¶ 35, Admin. Rec. 119-46.)  Finding of Fact 8 states that the parents did not inform DCPS of their expectation for reimbursement, and Conclusion of Law III denies the reimbursement. (Complaint ¶ 35, Admin. Rec. 22-24.)

33.     After timely filing the motion for reconsideration, the parents repeatedly inquired of the Student Hearing Office as to a ruling on that motion.  (Complaint ¶ 36.)  No opposition was filed by DCPS, but the Hearing Officer  never ruled on the motion.(Complaint ¶ 36.)

Respectfully submitted,

/s/ (filed electronically)

Michael J. Eig          #912733
Patricia Cyr            #490755
Paula Rosenstock        #494580
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Plaintiffs

8

MAY - 2 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRADLEY JACOBS,                    *
*a minor, by his parents and next friends,*
*Charles and Elizabeth Jacobs, et al.,*          *

      Plaintiffs,                    *

v.                                                  *          Civil Action No. RDB-06-942

DR. JOE A. HAIRSTON                    *
*(officially as), Superintendent,*
*Baltimore County Public Schools, et al.,*          *

      Defendants.                    *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

      Charles and Elizabeth Jacobs, in their own right and on behalf of their son, Bradley

Jacobs (collectively, "Plaintiffs"), bring this action against Dr. Joe Hairston in his official

capacity as Superintendent of Baltimore County Public Schools and the Board of Education of

Baltimore County (collectively, "Defendants") alleging violations of the Individuals with

Disabilities Education Act, as amended, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504" or "Rehabilitation Act"), 42 U.S.C. §

1983, and Maryland law. Plaintiffs appeal the January 31, 2006 decision of Administrative Law

Judge David Hofstetter of the Maryland State Office of Administrative Hearings denying their

request for reimbursement of tuition and costs to send Bradley to the Friendship School, a

private school offering individualized education for children with disabilities, during the 2005-

2006 school year. Pending before this Court are the parties' cross-motions for summary

judgment. The parties' submissions have been reviewed and oral arguments were heard at a

hearing held on April 23, 2007, pursuant to Local Rule 105.6. For the following reasons,

EXHIBIT
1 29

Plaintiffs' Motion for Summary Judgment is DENIED, Defendants' Motion for Summary

Judgment is DENIED, and the case will be REMANDED to the Maryland Office of

Administrative Hearings for additional proceedings consistent with this Memorandum Opinion.

<u>BACKGROUND & PROCEDURAL HISTORY</u>

**A.     The Individuals with Disabilities Education Act[1]**

Congress enacted the Individuals with Disabilities Education Act ("IDEA") in 1990 "to

ensure that children with disabilities have available to them a free appropriate public education"

or "FAPE."[2] 20 U.S.C. § 1400(d)(1)(A) (2006).  In order to achieve this objective, states can

receive federal funding for education as long as they make a FAPE available to all of their

disabled children.  *Id.* § 1412(a).  A FAPE must "provide such children with meaningful access

to the educational process" and "be reasonably calculated to confer some educational benefit

. . . ." *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 526 (4th Cir. 2002) (citing *Bd. of*

*Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 192,

207 (1982)).  A disabled child must be educated in the "least restrictive environment" possible,

but he or she should also be given opportunities to participate in classes and activities with non-

---

[1] Although the Complaint alleges violations of the IDEA, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and Maryland law, the background of the case and the parties' submissions focus primarily on alleged violations of the IDEA.

[2] A FAPE includes "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [the IDEA]." 20 U.S.C. § 1401(9) (2006).

2

130

Case 1:07-cv-01355-RJL   Document 18-5   Filed 04/14/2008   Page 3 of 16
Case 1:07-cv-01355-RJL   Document 16-5   Filed 03/31/2008   Page 14 of 29
Case 1:06-cv-00942-RDB   Document 19   Filed 04/25/2007   Page 3 of 16

disabled children where appropriate.  20 U.S.C. § 1412(a)(5)(A) (2006).

In order to ensure that disabled students receive a FAPE, the IDEA requires that states create and update annually an individualized education program ("IEP") for each disabled child, identifying the child's levels of functioning and academic performance, setting specific academic and functional goals to be achieved during the school year, and describing an educational plan that will achieve those goals.  *Id.* § 1414(d).  An IEP is created and reviewed by an "IEP team" consisting of the child's parents, regular and special education teachers, representatives of the applicable school district, and the child if appropriate.  *Id.* § 1414(d)(1)(B).  If an IEP recommends that the child be placed in a non-public school offering special education, the school district must pay for the private education.  *See id.* § 1412(a)(10)(B)(i).  *See also* Md. Code Ann., Educ. § 8-406(c)(1)-(2) (LexisNexis 2004 & Supp. 2005).

The IDEA provides a series of procedural safeguards for both parents and school districts.  20 U.S.C. § 1415 (2006).  For example, if parents are dissatisfied with their child's IEP, ultimate school placement, or progress, they can file a complaint with the state or local educational agency and request an impartial due process hearing.[3]  *Id.* § 1415(f).  The parties must hold a resolution session prior to the hearing to try to resolve the issues.  *Id.* § 1415(f)(B). If no agreement is reached, an impartial hearing officer will preside over a due process hearing and decide "whether the child received a free appropriate public education."  *Id.* § 1415(f)(3)(A), (E).  The hearing officer's decision may be appealed within ninety days to a federal district court.  *Id.* § 1415(f)(3)(g), (i)(2).

---

[3] In Maryland, complaints must be filed with the State Board of Education, while requests for a due process hearing are submitted to the applicable local school district and the Maryland Office of Administrative Hearings.  Md. Code Ann., Educ. § 8-413(d) (LexisNexis 2006).

3

131

Case 1:07-cv-01355-RJL    Document 16-5    Filed 03/31/2008    Page 15 of 29

Case 1:06-cv-00942-RDB    Document 19    Filed 04/25/2007    Page 4 of 16

### B.    Factual Background

Bradley Jacobs ("Bradley") was born on February 5, 1992. He and his parents, Charles and Elizabeth Jacobs ("the Jacobs") reside in Baltimore County, Maryland. Bradley has been diagnosed with numerous learning disabilities and is therefore eligible to receive a free appropriate public education under the IDEA. Beginning with the 2000-2001 school year, the Jacobs enrolled their son in The Lab School of Washington, Baltimore campus ("Baltimore Lab"), a private school offering special education services. Pursuant to a settlement agreement between the Jacobs and the Baltimore County Public Schools ("BCPS"), BCPS funded his placement at Baltimore Lab for academic years 2002-2003, 2003-2004, and 2004-2005.

On January 11, 2005, the Jacobs requested that BCPS continue to pay for Bradley's education at Baltimore Lab for the 2005-2006 academic year. BCPS held a meeting to discuss Bradley's IEP on April 13, 2005. Present were Mrs. Jacobs, a representative of Baltimore Lab, a representative of the public middle school in the area, and other teaching staff. At the meeting, the IEP team recommended—and Bradley's mother agreed—that a variety of observations and assessments needed to be performed in order to update Bradley's IEP. The recommended observations were conducted, and the IEP team met for a second time on June 23, 2005, to review the results. At this meeting, a psychologist from Baltimore Lab was also present. The team decided that an educational assessment was needed, and Mrs. Jacobs again gave her consent. On July 29, 2005, the IEP team met for a third time to review the educational assessment. The team drafted an IEP that set a variety of goals for Bradley in areas of reading, math, writing, speech, and fine motor skills, as well as addressing social, emotional, and behavioral issues. Bradley's mother was present at the meeting and agreed to the IEP's

4

conclusion that Bradley continue to receive private special education.

On August 10, 2005, the Jacobs received notice from BCPS that Baltimore Lab was able to implement Bradley's IEP for the 2005-2006 academic year. At some point during the summer, they questioned whether Baltimore Lab was providing a sufficient education and decided that their son would be better served at the Friendship School ("Friendship"), another private school offering special education. In late August 2005, with no notice to BCPS, the Jacobs secured Bradley's admission to the Friendship School, and he began attending on September 6, 2005.

On September 12, 2005, the Jacobs sent notice to BCPS of their decision to enroll Bradley in Friendship rather than Baltimore Lab, because "he would be more appropriately placed at the Friendship School." (Defs.' Mem. Supp. Summ. J. Ex. 8.) Their letter requested that BCPS fund Bradley's placement at Friendship. BCPS did not respond to the Jacobs' letter.[4] The Jacobs sent a second letter on November 17, 2005, requesting a response to their first letter. They sent a third letter four days later, on November 21, 2005, notifying BCPS of their intention to file a complaint for a due process hearing. They filed for a due process hearing on December 9, 2005. As a prerequisite to the due process hearing, the parties attended a resolution session on December 16, 2005, but were unable to reach an agreement.

The case was assigned to Administrative Law Judge David Hofstetter ("A.L.J. Hofstetter") of the Maryland State Office of Administrative Hearings ("OAH"), and a hearing on

---

[4] At the hearing held on April 23, 2007, counsel for Defendants indicated that someone in BCPS called the Jacobs after the school district received their letter and forwarded it to the appropriate office. However, the subject of the phone call is unknown. Regardless, counsel for Defendants conceded that a written response was necessary.

5

133

the merits was scheduled for January 31, 2006. On January 24, 2006, the Jacobs filed a motion

for summary decision on the ground that Bradley did not receive a FAPE because BCPS failed to

comply with the IDEA's procedural requirements. (*See* Defs.' Mem. Supp. Summ. J. Ex. 28.) In

particular, they argued that BCPS failed to provide them with notice that it would not fund

Bradley's transfer to Friendship after they sent the school district a letter.[5] (*Id.*) BCPS filed a

cross-motion for summary decision on the grounds that it had not violated the IDEA, because its

failure to respond to the Jacobs' letter, even if it could be considered a procedural violation, did

not amount to a denial of a FAPE to Bradley. (*See* Defs.' Mem. Supp. Summ. J. Ex. 29.) On

January 31, 2006, A.L.J. Hofstetter did not hold a hearing on the merits as scheduled, but rather

held a motions hearing on the cross-motions for summary judgment. A due process hearing on

the merits was postponed until March 7, 2006, in the event that the motions were not dispositive.

A.L.J. Hofstetter issued a Decision on February 21, 2006, granting BCPS's motion for

summary decision and denying the Jacobs' motion. *Jacobs v. Baltimore County Public Schools*,

O.A.H. No. MSDE-BCNY-OT-05-60161, at 14 (Md. Office Admin. Hrgs., Feb. 21, 2006)

(A.L.J. Hofstetter) [hereinafter "A.L.J. Decision"]. He first concluded that BCPS violated the

procedural requirements of the IDEA by ignoring the Jacobs' letter requesting reimbursement of

Bradley's enrollment at Friendship. *Id.* at 12. However, he did not find that this procedural

violation resulted in the denial of a FAPE to Bradley. *Id.* at 13. A.L.J. Hofstetter reasoned that

BCPS had already agreed to fund Bradley's placement at Baltimore Lab to implement the child's

---

[5] Under the IDEA, a school district must provide prior written notice to parents of a
disabled child whenever it "(2) refuses to . . . change the . . . educational placement of the child.
. . ." 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503 (2007).

Case 1:07-cv-01355-RJL    Document 16-5    Filed 04/14/2008    Page 7 of 16
Case 1:07-cv-01355-RJL    Document 16-5    Filed 03/31/2008    Page 18 of 29
Case 1:06-cv-00942-RDB    Document 19    Filed 04/25/2007    Page 7 of 16

IEP. *Id.* at 11. He also noted that "[i]t is further undisputed that such a placement is 'appropriate' (even if it is not the Parents' preferred placement)." *Id.* In support of this conclusion, he cited the language of both the Jacobs' September 12, 2005 letter to BCPS stating that Bradley would be "more appropriately placed" at Friendship and their December 9, 2005 request for a due process hearing stating that Friendship would be a "better educational fit." *Id.* He further noted that in the hearing, the Jacobs "essentially conceded that the placement at the Lab School was legally appropriate." *Id.* Relying on case law holding that the IDEA only guarantees an appropriate education, not the *most* appropriate education, A.L.J. Hofstetter held that Bradley was not denied a FAPE and granted BCPS's motion for summary decision. *Id.* at 8, 14.

The Jacobs filed a four-count Complaint with this Court on April 12, 2006, against Dr. Joe A. Hairston, Superintendent of the Baltimore County Public Schools, and the Board of Education of Baltimore County appealing the administrative decision. Count I alleges that BCPS denied Bradley a FAPE in violation of the IDEA, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and Maryland law. Count II claims that the failure of A.L.J. Hofstetter to order the Defendants to place and fund Bradley in an appropriate program violates the IDEA and Maryland Law. Count III alleges that the Defendants violated the IDEA, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and Maryland law by failing to provide the Jacobs with due process. Finally, Count IV alleges that A.L.J. Hofstetter denied the Plaintiffs due process when he failed to "render a proper decision" on substantive grounds. The Plaintiffs seek declaratory, injunctive, and monetary relief, including the costs of Bradley's enrollment in the Friendship School for the 2005-2006 school year. On October 30, 2006, Plaintiffs filed a Motion

7

135

for Summary Judgment (Paper No. 11), and Defendants filed a Motion for Summary Judgment

(Paper No. 12). On April 23, 2007, a hearing was held on the motions.

## STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit Court has articulated an

appropriate standard to be applied in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged
> to conduct a modified de novo review, giving "due weight" to the
> underlying administrative proceedings. In such a situation, findings
> of fact made in administrative proceedings are considered to be *prima
> facie* correct, and if a reviewing court fails to adhere to them, it is
> obliged to explain why. The court is not, however, to "substitute [its]
> own notions of sound educational policy for those of local school
> authorities."

*MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted).

The IDEA itself provides the test that a due process hearing officer, and now this Court, must

apply to determine if a child was denied a FAPE. Generally, "a decision made by a hearing

officer shall be made on substantive grounds based on a determination of whether the child

received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i) (2006). However,

> [i]n matters alleging a procedural violation, a hearing officer may
> find that a child did not receive a free appropriate public education
> only if the procedural inadequacies-- (I) impeded the child's right to
> a free appropriate public education; (II) significantly impeded the
> parents' opportunity to participate in the decisionmaking process
> regarding the provision of a free appropriate public education to the
> parents' child; or (III) caused a deprivation of educational benefits.

*Id.* § 1415(f)(3)(E)(ii). Thus, this Court's analysis differs depending on whether the alleged

violation of the IDEA was substantive or procedural.

This Court must also consider the standard set forth in Rule 56(c) of the Federal Rules of

Civil Procedure that summary judgment is granted only where there is no genuine issue as to any

material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. *Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are material. *Id.* at 248. Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, the nonmoving party must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Where, as here, both parties file motions for summary judgment, the court applies the same standards of review to each motion. *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citing *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985)). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with

the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985).

## DISCUSSION

Both the Plaintiffs and the Defendants have moved for summary judgment, contending that there are no genuine issues of material fact on this appeal from the administrative proceeding. However, at the hearing on April 23, 2007, counsel for the parties acknowledged that there is not a full record in this case with respect to factual findings as to a FAPE for Bradley Jacobs ("Bradley"). This Court finds that there is a genuine issue of material fact as to whether Bradley was denied a FAPE, and that both parties should have had an opportunity during the administrative process to present testimony and other evidence as to the appropriateness of both the Baltimore Lab and Friendship schools. Accordingly, both motions for summary judgment will be denied and this matter will be remanded to the Maryland Office of Administrative Hearings ("OAH") for a due process hearing on the merits.

**A.    Individuals with Disabilities Education Act**

The Plaintiffs' Complaint principally alleges that the Defendants violated the Individuals with Disabilities Education Act by failing to provide their son Bradley with a free appropriate public education. As noted above, the standard that an administrative law judge should apply is provided by the statute itself, and differs depending on whether the Plaintiffs allege a substantive or procedural violation of the IDEA. The Jacobs' motion for summary decision alleged that Bradley was denied a FAPE because BCPS failed to respond to their September 12, 2005 letter requesting reimbursement for Bradley to attend the Friendship School—allegedly a procedural violation under 20 U.S.C. § 1415(b)(3) (2006). Thus, this Court must apply the following

standard:

> In matters alleging a procedural violation, a hearing officer may find
> that a child did not receive a free appropriate public education only
> if the procedural inadequacies-- (I) impeded the child's right to a free
> appropriate public education; (II) significantly impeded the parents'
> opportunity to participate in the decisionmaking process regarding
> the provision of a free appropriate public education to the parents'
> child; or (III) caused a deprivation of educational benefits.

*Id.* § 1415(f)(3)(E)(ii).

First, however, this Court must determine whether there was in fact a procedural

violation. Defendants argued before A.L.J. Hofstetter that the Jacobs' September 12, 2005 letter

requesting that BCPS reimburse the costs of sending Bradley to Friendship did not trigger the

notice requirements of 20 U.S.C. § 1415(b)(3) because the letter itself did not comply with the

requirements for a parent's formal request to change placement. (Defs.' Mem. Supp. Summ. J.

Ex. 29.) Under Maryland law implementing the IDEA, if parents do not provide prior written

notice that they intend to enroll their child in a private school, the school board does not have to

reimburse them. Md. Code Ann., Educ. § 8-413(i)(1)[6] (LexisNexis 2004 & Supp. 2005). The

notice must formally reject the placement proposed by the school board and include the reasons

for the rejection. *Id.* While these requirements specifically apply to parents moving their child

from a public school to a private school, the IDEA and accompanying Maryland laws still

require that parents provide adequate notice for unilateral transfers between private schools.

The Jacobs' letter simply said the parents had decided to move Bradley to Friendship and

---

[6] Section 8-413 of the Education Article of the Maryland Code was amended, effective
July 1, 2006. S. 107, 2006 Leg., 421st Sess. (Md. 2006). The amendments eliminated the notice
requirements, among other things. However, this Court must apply the version of the statute that
was in effect at the time of the events leading to this lawsuit.

11

139

Case 1:07-cv-01355-RJL     Document 18-5     Filed 04/14/2008     Page 12 of 16

Case 1:07-cv-01355-RJL     Document 16-5     Filed 03/31/2008     Page 23 of 29
Case 1:06-cv-00942-RDB     Document 19     Filed 04/25/2007     Page 12 of 16

sought reimbursement for the new school. The parents did not ask to reopen the IEP process,

provide reasons why the existing IEP was inadequate, or state that the Lab School was an

inappropriate placement; it merely said Bradley would be "*more* appropriately placed" at

Friendship. (Defs.' Mem. Supp. Summ. J. Ex. 8 (emphasis added).) Nonetheless, even though

their letter lacked specificity, the IDEA required BCPS to provide an immediate response to Mr.

and Mrs. Jacobs. BCPS's failure to provide such a response constitutes a procedural violation of

the IDEA. Accordingly, the next inquiry under Section 1415(f)(3)(E)(ii) is whether that

violation "(I) impeded the child's right to a free appropriate public education; (II) significantly

impeded the parents' opportunity to participate in the decisionmaking process regarding the

provision of a free appropriate public education to the parents' child; or (III) caused a

deprivation of educational benefits."

### 1.     Impeding the Right to a FAPE

As to the first prong, in order to find that the procedural violation impeded Bradley's

right to a FAPE, there must be a factual determination as to whether Baltimore Lab would have

offered Bradley a FAPE in the 2005-2006 school year. If Baltimore Lab were not an appropriate

placement, then there must be a determination with respect to whether Friendship could offer a

FAPE.[7] As this case is an appeal from an administrative decision, this Court must ordinarily

---

[7] The Plaintiffs concede that Friendship has not been certified by the state of Maryland as a state-approved special education school. (Pls.' Mem. Supp. Summ. J. 25.) Under the IDEA, in order for a school to offer a FAPE, the school must "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B) (2006). However, because the record lacks any evidence as to BCPS's decisionmaking process when it selected Baltimore Lab to implement Bradley's IEP during the 2005-2006 school year, it is unclear at this time whether that factor would preclude Friendship from even being considered as a potential placement. This issue should be explored on remand.

give deference to any factual findings made by the administrative law judge, because "findings

of fact made in administrative proceedings are considered to be *prima facie* correct. . . ." *MM v.*

*Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted).

However, there was no factual determination made in this matter as there was never a due

process hearing on the merits.

In his decision, A.L.J. Hofstetter concluded as a matter of law that Bradley was not

denied a FAPE because the Baltimore Lab school offered an appropriate education. A.L.J.

Decision at 13. Specifically, he noted that "[i]t is . . . undisputed that such a placement is

'appropriate' (even if it is not the Parents' preferred placement)." *Id.* at 11. The fact that

Baltimore Lab had been deemed appropriate for the prior school years is not necessarily

conclusive that it and not the Friendship school was appropriate for the academic year in

question without presentation of evidence and testimony and a factual finding by the

administrative law judge. Indeed, the record in this case indicates that BCPS offered to

introduce evidence that Friendship was an inappropriate placement, in recognition of the fact that

legal arguments would not necessarily suffice to support a factual determination. (Hearing Tr.

27:8-10, Jan. 31, 2006.)

In reviewing the administrative record in this case, it is the view of this Court that there is

insufficient evidence concerning the two schools to make a factual finding as to a free

appropriate public education for Bradley Jacobs. Quite simply, this matter should not have been

resolved on summary decision motions but should have been resolved after a due process

hearing on the merits. Thus, the admitted procedural violation of BCPS may have impeded

Bradley Jacobs's right to a free appropriate public education.

13

Case 1:07-cv-01355-RJL    Document 18-5    Filed 04/14/2008    Page 14 of 16

Case 1:07-cv-01355-RJL    Document 16-5    Filed 03/31/2008    Page 25 of 29
Case 1:06-cv-00942-RDB    Document 19    Filed 04/25/2007    Page 14 of 16

2.    **Significantly Impeding the Parents' Involvement**

As to the second prong of this standard, this Court finds that BCPS's procedural violation did not "significantly" impede the Jacobs' involvement in the decisionmaking process. In January of 2005, the Jacobs requested that Bradley continue to attend Baltimore Lab for the 2005-2006 school year, and Mrs. Jacobs participated in a thorough IEP process in the spring and summer of 2005. At no time did the Jacobs question the appropriateness of Baltimore Lab. Thus, the Plaintiffs cannot argue that they were denied access to the original IEP process. They also waited until September 12, 2005—after Bradley was enrolled and taking classes at Friendship—before notifying BCPS of their decision to move him to that school. At the motions hearing held on April 23, 2007, counsel for the Plaintiffs even conceded that the Jacobs could have notified the school board earlier than September 12, 2005. Thus, although BCPS should have provided some kind of written response to the Jacobs' letter, its failure to do so did not deny the parents involvement in the decisionmaking process.

3.    **Depriving Education Benefits**

As to the third prong, the Plaintiffs do not contend that Bradley was denied educational benefits as a result of BCPS's procedural violation. On the contrary, they argue that Bradley made significant progress at Friendship. (Pls.' Mem. Supp. Summ. J. 24-25; Jacobs Decl. ¶ 9.) Thus, there is no basis to support a finding that BCPS's failure to respond in writing to the Jacobs' September 12, 2005 letter caused a deprivation of educational benefits.

Accordingly, this case shall be REMANDED to the Maryland Office of Administrative Hearings to make a factual determination as to whether Baltimore Lab or the Friendship School was an appropriate placement to implement Bradley's IEP during the 2005-2006 school year.

14

142

Case 1:07-cv-01355-RJL    Document 18-5    Filed 04/14/2008    Page 15 of 16

Case 1:07-cv-01355-RJL    Document 16-5    Filed 03/31/2008    Page 26 of 29
Case 1:06-cv-00942-RDB    Document 19    Filed 04/25/2007    Page 15 of 16

**B.      The Rehabilitation Act of 1973**

Plaintiffs allege that the Defendants denied their son Bradley a free appropriate public

education in violation of Section 504 of the Rehabilitation Act of 1973. Section 504 provides:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 7(20) [29 U.S.C. § 705(20)], shall, solely
> by reason of her or his disability, be excluded from the participation
> in, be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance or
> under any program or activity conducted by any Executive agency or
> by the United States Postal Service.

29 U.S.C. § 794 (2006). It is undisputed that Section 504 applies to BCPS, and that the school

system cannot deny disabled students access to a public education based on their disabilities.

Defendants argue, however, that Plaintiffs' Section 504 claims are identical to their IDEA claims

and therefore cannot survive summary judgment. (Defs.' Mem. Supp. Summ. J. 16-17.) This

Court has previously held that where a plaintiff's "IDEA and § 504 claims are identical, and

their IDEA claim failed, their § 504 claim must fail as well." *Alexis v. Bd. of Educ. for*

*Baltimore County Pub. Sch.*, 286 F. Supp. 2d 551, 560 (D. Md. 2003) (citations omitted);

*Steinberg v. Weast*, 132 F. Supp. 2d 343, 349 (D. Md. 2001); *Jones v. Washington County Bd. of*

*Educ.*, 15 F. Supp. 2d 783, 787 (D. Md. 1998). In light of the fact that the case will be remanded

to OAH for a factual finding on the appropriateness of Baltimore Lab, this Court will reserve

judgment on Plaintiffs' Section 504 claims until a disposition has been made on their IDEA

claims.

**C.      42 U.S.C. § 1983**

Plaintiffs also allege that Defendants' actions violated 42 U.S.C. § 1983. To prevail on a

section 1983 claim, the Plaintiffs must show (1) that they were "deprived of a right secured by

the Constitution or laws of the United States, and (2) that the deprivation was committed by a

person acting under color of state law." *Alexis*, 286 F. Supp. 2d at 560 (citing *West v. Atkins*,

487 U.S. 42, 48 (1988)). Defendants allege that "Plaintiffs' Section 1983 claims should . . . be

dismissed since Section 1983 is merely a vehicle Plaintiffs have selected for asserting violations

of federal statutes. . . . Section 1983 does not provide a separate claim for relief." (Defs.' Mem.

Supp. Summ. J. 17.) Defendants are correct that, if "the Plaintiffs have not shown that they were

deprived of a right secured by the Constitution or by federal law, they cannot defeat summary

judgment." *Alexis*, 286 F. Supp. 2d 551, 560 (D. Md. 2003); *Hodge v. Jones*, 31 F.3d 157, 167

(4th Cir. 1994) (quoting *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988)) ("If there is no

violation of a federal right, there is no basis for a Section 1983 action. . . ."). In light of this

Court's ruling remanding the case to OAH for an evidentiary hearing, Plaintiffs' Section 1983

claims need not be addressed at this time.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED, and

Defendants' Motion for Summary Judgment is DENIED, and the case will be REMANDED to

the Maryland Office of Administrative Hearings for additional proceedings consistent with this

Memorandum Opinion. A separate Order follows.


/s/ _____
Richard D. Bennett
United States District Judge

Date: April 25, 2007

16